```
 1                IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE EASTERN DISTRICT OF TEXAS

 3                         MARSHALL DIVISION

 4   MOBILE TELECOMMUNICATIONS       )(

 5   TECHNOLOGIES, LLC               )(     CIVIL DOCKET NO.

 6                                   )(     2:13-CV-946-JRG

 7   VS.                             )(     MARSHALL, TEXAS

 8                                   )(

 9   ZTE (USA), INC.                 )(     JULY 5, 2016

10                                   )(     1:40 P.M.

11   _____

12                IN THE UNITED STATES DISTRICT COURT

13                 FOR THE EASTERN DISTRICT OF TEXAS

14                         MARSHALL DIVISION

15   MOBILE TELECOMMUNICATIONS       )(

16   TECHNOLOGIES, LLC               )(     CIVIL DOCKET NO.

17                                   )(     2:13-CV-948-JRG-RSP

18   VS.                             )(     MARSHALL, TEXAS

19                                   )(

20   HTC AMERICA, INC.               )(     JULY 5, 2016

21                                   )(     1:40 P.M.

22                         PRE-TRIAL HEARING

23         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

24                 UNITED STATES DISTRICT JUDGE

25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:   (See Attorney Attendance Sheet docketed in
                           minutes of this hearing.)
 3

 4   FOR THE DEFENDANT:   (See Attorney Attendance Sheet docketed in
                           minutes of this hearing.)
 5

 6   COURT REPORTER:      Shelly Holmes, CSR-TCRR
                          Official Reporter
 7                        United States District Court
                          Eastern District of Texas
 8                        Marshall Division
                          100 E. Houston Street
 9                        Marshall, Texas  75670
                          (903) 923-7464
10

11   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3   July 5, 2016

4                                                    Page

5          Appearances                                1

6          Hearing                                    3

7          Court Reporter's Certificate             136

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for a pre-trial

 4    hearing in the matter of Mobile Telecommunications

 5    Technologies, LLC versus HTC America, Inc.  This is Member Case

 6    No. 2:13-CV-948.

 7              Let me call for announcements.  What says the

 8    Plaintiff, MTel?

 9              MR. DACUS:  Good afternoon, Your Honor.  Deron Dacus

10    here with Ian Cohen, Dustin Taylor, and Ray Mort on behalf of

11    the Plaintiff, MTel, Your Honor, and we're ready to proceed.

12              THE COURT:  All right.  What says the Defendant HTC?

13              MR. GILLAM:  Good afternoon, Your Honor.  Gil Gillam

14    on behalf of HTC America.  With me, Jerry Selinger, Susan

15    Powley, and Trampas Kurth, and we're ready to proceed, Your

16    Honor.

17              THE COURT:  All right.  Let's start, counsel, with the

18    motions in limine.  The Court is aware that there are certain

19    agreed motions in limine.  Those are granted by the Court.  We

20    won't spend any time going through them.

21              Let's go next to Defendant's motions in limine, the

22    opposed motions in limine, and we'll start with Defendant's

23    Motion in Limine No. 1.  Any evidence of litigation settlements

24    between MTel and third parties.

25              Let me hear from the movant, HTC, from the podium.
```

1          MR. GILLAM:  Your Honor, if I could, we have a couple

2   of cases that may be applicable during the course of the -- of

3   the -- of the hearing this afternoon.  We already provided them

4   to counsel, but I have copies for the Court and clerk.  May I

5   approach?

6          THE COURT:  All right.  You may approach.

7          MR. GILLAM:  Thank you.  I'm not sure exactly when

8   they're going to come up in the context of things, Your Honor,

9   but that way, everybody...

10          THE COURT:  All right.  When they come up, I'll have

11   them.

12          Go ahead, counsel.

13          MR. SELINGER:  Good -- good afternoon, Your Honor.

14   May it please the Court.

15          The -- Motion in Limine No. 1 seeks to exclude the --

16   the financial terms of -- of the settlement agreements from the

17   settlement agreements.  There -- there are a couple of

18   circumstances under which the -- the non-financial terms may be

19   relevant.  And that includes if -- if the Court does not grant

20   the motion pertaining to indirect infringement that HTC has

21   pending, then -- then the fact that end users of carrier --

22   carriers are free to use would -- would be relevant.

23          THE COURT:  Let me ask you this, Mr. Selinger.

24          MR. SELINGER:  Yes, Your Honor.

25          THE COURT:  Given that there may be cases where it

1   applies and there may be cases where it doesn't, why should I

2   grant some kind of blanket across the board order in limine

3   here rather than take up each license as whether or not it's

4   comparable or not, whether or not it came out of a settlement

5   or not, either when we get to the exhibits or on some ad hoc

6   basis?  Why is there some kind of global application warranted

7   here?

8          MR. SELINGER:  And, Your Honor, the short answer is

9   neither side is relying on the financial terms.  But I'm

10  perfectly willing to -- to have this treated license-by-license

11  if and when those issues arise.

12         THE COURT:  Well, given that you've indicated in your

13  initial statement that sometimes it's applicable and sometimes

14  it's not, it seems like to me that would be the most reasonable

15  approach to take, rather than some kind of all in or all out

16  across-the-board basis.

17         MR. SELINGER:  That -- that's acceptable, Your Honor.

18         THE COURT:  Well, unless there's something further,

19  I'm going to carry the Defendant's Motion in Limine 1, and it

20  will rise and fall on an individual basis with the licenses as

21  they're raised and their merits are argued and decided by the

22  Court as we go forward.

23         All right.  Let's move then to Motion in Limine No. 2.

24  Any reference to unrelated litigation involving HTC America or

25  its affiliates.

1              MR. SELINGER:  The -- Your Honor, the reason for --

2    for this is because there's no reason that unrelated litigation

3    should come in and calling that to the jury's attention

4    would -- would be unreasonably prejudicial, even -- even in the

5    context of the wrong kind of question without an answer.

6              THE COURT:  Well, it seems like to me the rub, if

7    there is a rub here, is what is unrelated and what's not

8    unrelated.  Are there disputes about various other cases out

9    there that some think are related and some think are unrelated,

10   or is that -- is that just me looking for problems here?

11             MR. SELINGER:  There -- there is no such dispute, Your

12   Honor.

13             THE COURT:  Okay.  Good.  Good.  This is obviously not

14   agreed to.

15             What's -- what's Plaintiff's response to Defendant's

16   request here?

17             MR. DACUS:  Thank you, Your Honor.  Deron Dacus on

18   behalf of the Plaintiff.

19             This is largely agreed to, Your Honor, with one

20   exception, and the exception is that the Defendant's damages

21   expert reviewed HTCA licenses, and he -- he expressly

22   references those in his report, and he has a separate schedule

23   for them.  Some of those licenses evolve out of settlement or

24   litigation, and technically the MIL, as currently written,

25   would preclude us from even asking or talking to him about

```
 1   those.
 2          And so that I'm clear with the Court, I mean, we have
 3   no intentions, of course, unless HTCA opened the door, of
 4   talking about any other litigation beyond those license -- HTCA
 5   licenses that their expert looked at and reviewed in this case.
 6          THE COURT:  Okay.  Well, on a high-level basis, I'll
 7   grant this motion in limine, but it's with the understanding
 8   that if there are specific licenses that are derived from prior
 9   litigation that are either within the expert's report and the
10   report survives Daubert or they're offered as contested
11   exhibits and they are admitted or pre-admitted by the Court as
12   having passed the evidentiary test, then they're not going to
13   be blocked by the granting of this MIL.
14          MR. DACUS:  Thank you, Your Honor.
15          THE COURT:  Okay.  Then let's go to Defendant's Motion
16   in Limine 3.  Evidence or argument related to prior claim
17   construction, except for the claim construction itself.
18          Mr. Selinger, what's the Defendant's position on this?
19          MR. SELINGER:  And, Your Honor, this is a motion in
20   limine that finds -- it's expressed as well in some of other
21   motions pending before the Court.
22          The -- the Magistrate Judge in his order, Docket No.
23   149 and 52, ordered the parties not to make reference to any
24   claim construction proceeding, except to inform the jury of the
25   definitions actually adopted by the Court.
```

1          And the -- this -- this arises out of MTel's

2    infringement and validity experts repeating at great length

3    what I would call claim construction dicta from -- from cases

4    that HTC America was not involved in, that are not the actual

5    claim construction ruling itself, and put it in -- and MTel has

6    said, well, we're not going to attribute those to a prior Court

7    analysis or ruling.

8          And let me emphasize, these are not the actual

9    rulings.  But that puts me in -- in an -- what I think is an

10   impossible position.  I either have to allow MTel's expert to

11   express opinions on -- on a view that is -- is dicta from

12   another case, or if I examine on that, then the -- I open the

13   door for the expert to say, well, didn't you realize that

14   Magistrate Judge Payne in Apple said exactly that?

15         And I just don't think it's -- it's the -- the

16   underlying analysis is not relevant.  And having -- having

17   that in this case, I submit, would be -- be highly prejudicial,

18   and there's -- there's no way -- and even the prospect of

19   opening the door with a question, I think, is unfair and

20   prejudicial.

21         THE COURT:  This is inextricably tied, I assume, to

22   Dr. Kesan's report?

23         MR. SELINGER:  To -- yeah, to him --

24         THE COURT:  And the motion to strike related thereto?

25         MR. SELINGER:  -- to him and -- and Dr. Prucnal.  They

1  both -- they -- they both expand at length on claim

2  construction dicta from -- from other cases, Your Honor.

3         THE COURT:  All right.  Let me hear Plaintiff's

4  response.

5         MR. TAYLOR:  Good afternoon, Your Honor.  Dustin

6  Taylor for the Plaintiff.

7         Your Honor, Plaintiff opposes this motion in limine

8  because it would prevent Plaintiff not from attributing

9  statements to the Court, which Plaintiff agrees is in violation

10  of the Court's order, but merely for making those statements

11  with independent support.

12         Your Honor may be familiar with this case from

13  previous cases that Judge Payne has presided over, and one of

14  those instances involves the issue of the term

15  "retransmission."  In the claim construction order in this

16  case, the Court noted the dicta from prior cases and held that

17  it was construing the term in light of those cases.

18         MTel's experts presented additional support beyond the

19  Court's statements for why those positions were true, namely

20  that retransmission wasn't limited to a prior transmission from

21  the same source to the same destination, and second, that the

22  term -- that the scope of the claims for the '946 patent, the

23  independent claims, rather, were not limited to messages with

24  errors.

25         MTel opposes this motion in limine because it would

1    preclude MTel from making those statements on its own

2    initiative without attributing any of those statements to the

3    Court.

4            THE COURT:  Well, let me say this, counsel.  We're not

5    going to relitigate claim construction before the jury, and

6    we're not going to have the trial break down into squabbling

7    between the sides that one or the other are going behind the

8    Court's claim construction rulings.

9            The order included in the claim construction opinion

10   that your opposing counsel referenced is in every one of Judge

11   Payne's opinions, and it's in every one of my opinions.  And

12   that's to make it completely clear that the parties are not to

13   go behind the actual constructions adopted by the Court.

14           Now, even though that means you don't argue the merit

15   or lack of merit in the analysis that goes into the claim

16   construction opinion, it means that you're not oblivious to it.

17   So if a particular term is given the -- its plain and ordinary

18   meaning by the Court but in the analysis of the term in the

19   claim construction order, the Court expressly disclaims or

20   rejects a particular argument that was made at claim

21   construction, just because that argument is not in the adopted

22   construction of plain and ordinary meaning doesn't mean you get

23   to make the same argument again at the trial.  You -- you do

24   not get to contradict the -- not only the actual constructions

25   but the reasoning in the opinion, even though it's the -- it's

1    those adopted constructions that are going to be in the

2    jurors' notebooks, it's what they're going to be confronted

3    with.

4         And, you know, if -- if you put up an expert who has

5    an opinion that contradicts the clear direction and conclusion

6    of the claim construction order, even if you try to say, well,

7    Dr. X, our expert, is basing that on some independent basis,

8    that's not proper.

9         You're not going to attack the claim construction

10   order, either with an expert on some independent basis or any

11   other basis.  You're going to talk about the claim construction

12   terms as adopted and construed by the Court before the jury.

13   You're going to do that with the guidance of not contradicting

14   the analysis and underlying conclusions otherwise set forth in

15   the claim construction opinion.  And we're not going to

16   relitigate claim construction in the lawsuit -- in the trial

17   before the -- before the jury.

18        My conclusion here is that the best use of the Court's

19   resources is to grant this motion in limine, because in the

20   vast majority of circumstances, I think that's applicable.

21        If there reaches a point in the trial where you

22   believe that something that is properly admissible and -- and

23   presentable in front of the jury is somehow colored by the

24   claim construction order and you have some fear that you may be

25   violating this order in limine, then you certainly have

 1   prerogative to approach the bench, explain that this is a

 2   tangential connection, and you just want to make sure that

 3   you're not running afoul of the Court's limine ruling,

 4   otherwise, you see that it has a clear basis to be presented to

 5   the jury, then in that likelihood, you're going to get approval

 6   from me at the bench, and you're going to get to go ahead and

 7   present that evidence to the jury.

 8          But the Court's gatekeeping function is better

 9   employed in this instance by a grant, rather than a deny.

10          MR. TAYLOR:  I understand, Your Honor.  May I seek one

11   point of clarification?

12          THE COURT:  You may.

13          MR. TAYLOR:  In your reasoning, you made the statement

14   that the position would contradict the order.  These statements

15   at issue at this motion in limine are actually statements that

16   MTel's -- MTel's experts would make that are consistent with

17   the Court's claim construction order.

18          HTC, with this motion in limine, is seeking to prevent

19   MTel and its experts from being able to affirmatively state

20   these reasonings, such as that the mobile unit is not limited

21   to errors because those were not in the Court's explicit

22   construction of that term.

23          THE COURT:  As long as the evidence presented during

24   the trial is consistent with the Court's adopted constructions

25   and is consistent with the reasonings set forth in the claim

```
 1    construction order, you will not have any problems from the
 2    bench.
 3              MR. TAYLOR:  Understood, Your Honor.  Thank you.
 4              THE COURT:  Okay.  All right.  Defendant's Motion in
 5    Limine 3 is granted.
 6              Let's go to Motion in Limine 4.
 7              MR. SELINGER:  Thank you, Your Honor.
 8              THE COURT:  Let me hear from Defendant on this,
 9    please?
10              MR. SELINGER:  No. -- No. 4, I think the dispute that
11    the parties have is the last phrase or supplemented in this
12    case or deposition testimony pertaining to such reports.
13              And I think MTel would agree to a motion in limine
14    that stopped with properly submitted.
15              HTC America submits that the law also allows opinions
16    that the opposing party has itself asked about in an expert
17    deposition.  And it's -- I cite, Your Honor, Tyco Healthcare
18    Group, and it's -- it's actually -- it's on Page 10 of our
19    objections to H -- to MTel's opposed motions in limine.  But
20    it's the Tyco Healthcare Group versus Applied Medical
21    Research --
22              THE COURT:  Is what we're really arguing about here,
23    Mr. Selinger, an expert who gives an opinion in a written
24    report and then is subsequently deposed and goes beyond that
25    opinion and gives either additional opinions or other
```

1    information that goes beyond the scope of the report?  Is that

2    what you're concerned about trying to prevent coming in here?

3              MR. SELINGER:  No.  Actually, Your Honor, what -- what

4    I'm trying to prevent or actually what MTel is trying to

5    prevent is the or supplemented in this case deposition

6    testimony.  HT -- and just to be very clear, MTel asked experts

7    questions not -- not where an expert blurted out and said, oh,

8    by the way, I forgot to say this or that, but where -- where

9    the response to the lawyer's question was additional

10   information that was not in that specific form contained in --

11   in an expert report.

12             THE COURT:  So are you saying that that additional

13   information should come in because the other side opened the

14   door by asking the question?  Or are you saying that additional

15   information should not come in because it goes beyond the scope

16   of the expert's report?  What -- what are you telling me?

17             MR. SELINGER:  I'm -- I'm telling the Court that that

18   additional information should come in.  And -- and that is

19   the -- that is the one -- the should versus should not out of a

20   deposition is the one area of dispute that the parties have, I

21   believe, on this motion in limine.

22             THE COURT:  Is this one of these limines where each of

23   you submitted something roughly the same, and it was, well, I'm

24   not going to agree to theirs because they wouldn't agree to

25   mine?  There are a few of those floating around in here.

1          MR. SELINGER:  There -- there may be, Your Honor.  But

2    I don't -- I don't believe -- I don't believe this is one of

3    those.  I think the --

4          THE COURT:  Okay.

5          MR. SELINGER:  -- the difference is that or deposition

6    testimony pertaining to such reports.  I think the two sides

7    are in agreement with the language up to that.

8          HTC America submits that the motion in limine should

9    not exclude deposition testimony elicited by the other side.

10   And it -- and it goes both ways if that happened -- if I -- if

11   I did that.  So that's -- that's our dispute.

12         THE COURT:  All right.  Let me have a response from

13   Plaintiff.

14         MR. DACUS:  Your Honor, I can understand the Court's

15   confusion because the posture of this limine is a little

16   confusing.

17         This is, of course, HTCA's proposed limine, and when

18   they proposed it to us, of course, we agree with that first

19   part.  As we understand the Court's rules, an expert can only

20   testify insofar as he disclosed his opinions in his reports.

21   And as counsel said, it's the -- the last part of their

22   proposed limine that says "or deposition testimony pertaining

23   to such reports" that causes us concern.

24         And to put a fine point on the reason here, Your

25   Honor, there is at least one occasion, and perhaps multiple

```
 1   occasions, where HTCA's experts did not expressly opine on
 2   certain topics.
 3        I'll give you one example.  Dr. Beckmann, their
 4   invalidity and non-infringement expert, with respect to
 5   invalidity of the '946 and Claim 1 under Section 103, our
 6   contention is there's nothing in his report about that.  Yet he
 7   did testify on that issue at deposition.
 8        And so the reason we object to this "or" clause is
 9   because HTCA's position is even if it's not in the report, if
10   he happened to testify about it at deposition, then he gets to
11   testify about it on the stand.  I'll candidly tell the Court
12   that's not my understanding of the Court's rules, and that's
13   what gives rise to our objection or opposition to this motion
14   in limine.
15        THE COURT:  Well, then somebody explain to me if
16   that's the case, why this is Defendant's motion in limine, and
17   Defendant proposes that "or deposition testimony" be covered by
18   the limine and thereby excluded?  Are they asking to keep out
19   what they're now telling me they want to get in?
20        MR. DACUS:  Well, if you read the limine, Your Honor,
21   or at least as I read it, that "or deposition testimony" is
22   actually an exception from the limine.  So what they're saying
23   is you only get to testify -- the expert only gets to testify
24   on the topics that are included in his report or in his
25   deposition.
```

1              THE COURT:  Well, it says not -- okay.  It would

2    limine out theories or opinions not included in the expert's

3    reports that were timely submitted or supplemented.  I assume

4    from that that means supplemental expert reports, or deposition

5    testimony.  So all three of those things, original reports,

6    supplemental reports, and deposition testimony, look like they

7    stand on an equal plane, equal footing to me.

8              And if those are to be limined out, this is

9    Defendant's requested motion in limine, and yet they're telling

10   me and you're telling me if the expert was deposed and went

11   into it, even though it's not in the report, Defendant thinks

12   it ought to come in during the trial.

13             MR. DACUS:  Defendant thinks it should.  Plaintiff

14   does not, Your Honor.

15             THE COURT:  Right, but this is their motion in limine.

16             MR. DACUS:  Your Honor, I -- I attempted to start this

17   by saying this appears to be very oddly postured and --

18             THE COURT:  All right.  Well, let's -- let's do this.

19             MR. DACUS:  I think --

20             THE COURT:  Regardless of how it's postured, let me

21   just make it clear to everybody that experts' testimony is

22   going to be defined and confined to their reports, whether

23   they're original reports or supplemental reports.  If those

24   reports withstand any challenge under Daubert or any motion to

25   strike and we get through at the pre-trial and we're headed

1    toward the trial of the case, whatever surviving opinions are

2    in those reports are what's going to confine and define that

3    expert's testimony.

4         Now, I don't know how to make it any clearer than

5    that.  We -- those of you -- I know Mr. Gillam and I know

6    Mr. Dacus are well aware from having practiced before me on

7    multiple occasions, I don't like objections with the jury in

8    the box that Witness X is going beyond the scope of his report

9    because I then have to send the jury out, I have to get the

10   report, I have to look at the language that one side says he's

11   gone beyond and the other side says he hasn't, and I have to

12   make a decision, and it's highly disruptive.  It breaks the

13   concentration of the jury.  It breaks the flow of the trial.

14   It wastes time.

15        And it's something that I tell all litigants going to

16   trial before me if you're sure you're right, make your

17   objection.  But if you're making it and you're wrong or I get

18   even a hint that it's something less than completely sincere,

19   I'm liable to penalize somebody for wasting my time and

20   disrupting the trial and delaying the process for the jury.

21        So I don't know how to make it any clearer than that

22   that on both sides of this case, the expert witnesses are going

23   to testify to what's in their reports, whether it's an original

24   report or a supplemental report.  But the fact that an expert

25   might have been asked in a deposition about something else

```
 1   that's not in their reports doesn't serve as an exception to

 2   that rule and doesn't open a back door to getting that in

 3   before the jury.

 4         So to that extent, I will grant the order in limine

 5   excluding theories and opinions not included in the reports or

 6   any supplements thereto, which in my view, says that what is in

 7   the report and any proper supplements is the universe of what

 8   those experts should be testifying about.

 9         Is everybody clear on the Court's posture?

10         MR. DACUS:  Yes, Your Honor.

11         THE COURT:  Is that clear to you, Mr. Selinger?

12         MR. SELINGER:  Yes, Your Honor.

13         THE COURT:  Okay.  Let's go to Defendant's Motion in

14   Limine 5.

15         MR. SELINGER:  May I proceed, Your Honor?

16         THE COURT:  You may.

17         MR. SELINGER:  Again, this is -- this is one where the

18   two sides are -- are close.  We have language about any subject

19   matter, which I think is a little broader than what MTel was

20   willing to agree to and then any other applicable claim of

21   privilege.  Just to make sure that if something is privileged a

22   question won't -- won't be asked that would require an

23   assertion of privilege.  And that's -- that's really the

24   dispute.

25         MTel, I think, says any subject matter is unclear.  I
```

1    think our point is, it's not -- it's not necessarily the

2    specific question, but it's subject matter that would

3    trigger -- would necessarily trigger a -- a privilege

4    objection.

5              THE COURT:  So are you saying that if an inquiry's

6    been previously made in discovery or otherwise and if the

7    response has been to assert a privilege, be it attorney-client

8    or work product or whatever, that that would be covered by

9    this, or are you talking about situations where nothing's been

10   raised yet, but it would draw a privilege objection if it were

11   raised for the first time before the jury, or are you talking

12   about both?

13             MR. SELINGER:  I was actually thinking about the

14   former situation, Your Honor.  But now that the Court has

15   raised it --

16             THE COURT:  Of course, how do I know, as opposing

17   counsel, you're going to assert a privilege if I ask it for the

18   first time in front of the jury?

19             MR. SELINGER:  And I don't know that -- that I can

20   answer that, which was why I was thinking of the former

21   situation.

22             THE COURT:  All right.  What's MTel's position on

23   this?

24             MR. COHEN:  Good afternoon, Your Honor.  Ian Cohen for

25   the Plaintiff.

1        THE COURT:  Good afternoon.

2        MR. COHEN:  We are generally in agreement with

3   Defendant, Your Honor, and it's only as to the certain specific

4   terms, as Mr. Selinger explained.

5        MTel has no intention -- if MTel lodged an objection,

6   for example, in response to an interrogatory, if something was

7   privileged, MTel is not at trial going to try to get that in

8   somehow.  We just want to make sure that we know what the

9   universe is of -- of that subject matter that has been excluded

10  based on the objection.

11       And MTel's concern is that the language regarding any

12  subject matter could be read quite broadly.  And, two, that the

13  final clause or -- and/or any other applicable claim or

14  privilege doesn't tell MTel what the universe is of -- of that

15  excluded subject matter.

16       THE COURT:  Well, is there -- is there confusion in

17  Plaintiff's collective mind as to what Defendant might have

18  asserted a privilege objection to, so that you're not sure what

19  they've asserted a privilege in regard to?

20       MR. COHEN:  No, I think it's the other direction, Your

21  Honor.  If MTel asserted a privilege, we know why we asserted

22  that privilege, and we know what the topics we thought were

23  privileged.  We just want to make sure that only that specific

24  evidence to which MTel objected does not come in and not

25  something that is -- might be tangentially related to it, to

1   which MTel did not object.

2        THE COURT:  Well, you're complaining about the

3   broadness of the language "any subject matter."

4        I mean, it seems like to me you know what you've

5   asserted a privilege in regard to.  You've been told what the

6   other side asserts a privilege in regard to.  Unless there's a

7   lack of clarity as to where both sides stand on privilege

8   issues, then there shouldn't be any problem with an order in

9   limine that prohibits both sides from going into what the other

10  side has claimed a privilege in regard to without approaching

11  and getting leave of the Court first.

12       MR. COHEN:  Okay.

13       THE COURT:  So that's -- that's what the ruling of the

14  Court is going to be.  If -- if you have any doubt that you're

15  about to go into a matter that you believe might have been

16  asserted to be privileged by the other side, then you should

17  approach and clarify that with the Court and opposing counsel

18  at the bench and get the Court's leave before you go into it.

19       MR. COHEN:  Yes.  Thank you, Your Honor.

20       THE COURT:  So despite the interpretation, I'm going

21  to grant Defendant's Limine No. 5.

22       All right.  That brings us to limine No. 6 from the

23  Defendants.  Cost incurred in prosecuting or defending this

24  lawsuit or financing this lawsuit from either party.

25       MR. GILLAM:  May I proceed, Your Honor?

1          THE COURT:  Yes, Mr. Gillam.

2          MR. GILLAM:  Your Honor, I believe we -- we basically

3   have an agreement on No. 6.  The --

4          THE COURT:  This is one of those you didn't like mine

5   so I'm not going to like yours?

6          MR. GILLAM:  Pretty much, Your Honor.

7          THE COURT:  Yeah.

8          MR. GILLAM:  I think the only issue is, and Mr. Dacus

9   and I actually discussed this earlier today, and I think we'll

10  actually reach an agreement on this.

11         As far as the cost or the financing and all of that

12  business, nobody's going to get into that.  I think the

13  question is whether or not either side would cross-examine

14  another's expert on how much they have spent in preparation of

15  their expert report -- in other words, they might -- I might

16  want to cross-examine their expert about how much he's charged

17  MTel for doing a certain amount of work.  Well, that's actually

18  part of the prosecution cost.

19         But we've sort of reached an agreement that if -- if

20  I'm going to go into that, I'm going to let him know.  If he's

21  going to go into it, he's going to let me know.  So I don't

22  think we have a basic problem with this.  I don't think we have

23  a disagreement.  But that's the one area which is a little bit

24  unclear which we're trying to work out.

25         THE COURT:  Okay.  Well, I'm going to preclude the

1   parties, by way of granting this limine, from going into the

2   cost incurred in the prosecution or defense of this lawsuit or

3   financing this lawsuit from either party.

4          That being said, it's proper to cross-examine the

5   opposition's expert on their remuneration in this case.  It's

6   proper to cross-examine the opposition's expert on their total

7   remuneration from that party over the last six months, year,

8   some period of time.  In other words, if you can show the jury

9   that Dr. X is a captive expert of Plaintiff or Defendant, I

10  think that's a fair attack on their credibility.  So the limine

11  would not exclude that.

12         Now, if you -- if both sides want to have an

13  agreement, you'll flag the other before you go into it, you can

14  do that outside of my supervision.

15         MR. GILLAM:  Thank you, Your Honor.  And we actually

16  have been discussing this.  We have requested documentation

17  from certain of their experts about remuneration from their

18  client, and they want it from us, as well.  So I believe we're

19  going to be able to exchange that information.

20         THE COURT:  Nobody has concerns about other areas of

21  inquiry except cross-examining expert witnesses about their

22  remuneration, correct?

23         MR. GILLAM:  Not that I'm aware of Your Honor.

24         MR. DACUS:  That's correct, Your Honor.

25         THE COURT:  Okay.  Well, then I think you know where

1    the guidelines are.

2           MR. GILLAM:  Thank you.

3           THE COURT:  But for the record, No. 6 -- Defendant's 6

4    will be granted.  Notwithstanding that grant, inquiries as to

5    opposing expert's remuneration in this case or from the

6    opposing party over a period of time is not excluded.

7           MR. GILLAM:  Thank you, Your Honor.

8           THE COURT:  All right.  Let's go to Limine No. 7 from

9    the Defendants.

10          MR. GILLAM:  This is kind of a cross-motion in limine.

11   I think we all -- we both sort of have the same thing, if I

12   understand it.

13          The real issue here with respect to this, and I think,

14   again, this applies to one of their motions in limine, as well,

15   is the inclusion of -- of actually language in their motion in

16   limine which we did not have in ours.  And that is whether or

17   not we're able to talk about -- we're not going to talk about

18   net worth, personal worth, any of that business of any person,

19   any party, anything like that.

20          The question that we would probably like to inquire

21   about, and it goes to the area of investment is that our

22   position in this case and -- and has -- has been all along that

23   this is an investment case for this particular Plaintiff.  I

24   mean, they have taken an investment, and they're trying to turn

25   it into damages against our particular client.

 1          And so to the extent we would talk about that business

 2   and it's considered an investment, you know, we think we're

 3   entitled to go into that, but not talk about investments that

 4   he has in stocks or bonds or any of that other kind of

 5   business, and nothing about net worth, and that would go both

 6   ways.

 7          We don't really have a problem with their motion in

 8   limine, and I think they don't have a problem with ours.  It's

 9   just we want to be totally clear that we would like permission

10   to talk about what their actual business is.

11          That being said, we also understand the Court's

12   rulings from other cases.  You're not going to call them a

13   troll.  You're not going to call them, you know, bad names or

14   any of this other kind of business, which we, of course, will

15   not do.  But that's what this dispute seems to rise around with

16   respect to this particular motion.

17          THE COURT:  So I gather this is really focused on

18   Plaintiff's corporate representative?

19          MR. GILLAM:  Yes, sir.

20          THE COURT:  All right.  Well, what's Plaintiff's

21   position on this?

22          MR. DACUS:  From listening to the explanation, Your

23   Honor, I think we're in agreement.  As -- as Mr. Gillam, said,

24   we have a -- the same limine proposed, and I'll draw the

25   Court's attention to the very last phrase here, that does allow

 1   the Defendant to talk to our corporate witness about ownership

 2   in MTel and its related companies, which is the, quote,

 3   unquote, investment that Mr. Gillam was referencing.

 4        So my reading of this limine is it does -- it does not

 5   preclude the Defendant from doing what they said they would

 6   like to do, at least in that -- related to this particular

 7   limine.

 8        THE COURT:  All right.  Well, I'll grant Defendant's

 9   Motion in Limine 7.  I'll make it -- I'll either grant the

10   Plaintiff's correspond -- corresponding limine or make this

11   grant mutual to both sides.  But it's clear, counsel, that any

12   witness's personal ownership in either party is subject to

13   proper inquiry because it goes to their credibility and

14   believability and the amount of weight the jury should give to

15   their testimony.

16        What their investments, financial assets, or other

17   type inquiries are with regard to anything other than MTel or

18   HTC is off limits and is irrelevant and is improper.

19        MR. GILLAM:  Understood.

20        THE COURT:  All right?

21        Okay.  Those are Defendant's motions in limine.

22        Let's go next to Plaintiff's motions in limine.  And I

23   understand that No. 7 has been withdrawn; is that correct?

24        MR. DACUS:  That's correct, Your Honor.

25        THE COURT:  All right.  Then let's start with

```
 1    Plaintiff's Motion in Limine No. 1, Mr. Dacus or Mr. Cohen,

 2    whoever is going to offer it.

 3              MR. COHEN:  Thank you, Your Honor.

 4              The purpose behind this motion in limine, I think, is

 5    fairly straightforward.  To the extent that MTel dropped a

 6    claim, or HTCA drops a claim or defense, we think that delving

 7    into the reasons behind that decision to drop one of those

 8    claims can only -- one, irrelevant, and, two, can only confuse

 9    the jury.

10              But we're not saying that -- that, for example, claims

11    that were not asserted have -- or that HTCA could have to

12    pretend as if those don't exist and are not in the patent.

13    What we are asking is that HTCA couldn't say, isn't it true you

14    dropped this and doesn't that mean, therefore, that that is not

15    infringed and by extension the other claims are, therefore, not

16    infringed, something along those lines, Your Honor.

17              THE COURT:  All right.  I understand your position.

18              What's Defendant's response?

19              MR. SELINGER:  May I proceed, Your Honor?

20              THE COURT:  You may.

21              MR. SELINGER:  I'm not sure that we really have a

22    fight, based on the explanation I've heard.  MTel at one point

23    asserted the third patent called the '506 patent.  It's gone.

24    We're not going to say anything about that.

25              The -- the two, in addition to this state of mind
```

```
 1   language in there, which it -- it was conditioned on, the two
 2   issues I -- I was concerned about, one was MTel has in its jury
 3   charge -- it had it in its prior jury charge, reference to a
 4   dependent claim that it had sued HTC America and no longer
 5   does, and I was concerned that the way -- the way the language
 6   was phrased, I wouldn't -- I wouldn't be able to comment on
 7   that.
 8        The -- the -- and the other is I was concerned that
 9   although MTel has represented that it's not pursuing
10   infringement of now Claim 4 of the '428 patent, HTC America
11   still has a declaratory judgment claim for invalidity pending.
12   And I didn't want to find I was somehow precluded from that.
13   But in terms of -- of what I heard counsel explain, trying to
14   get into underlying rationale, that's -- that's not something
15   that I had any idea about.
16        THE COURT:  All right.  Well, I'm going to grant
17   Plaintiff's Motion in Limine No. 1.
18        Let me make it real clear to everybody.  If it's a
19   live issue in this case when the jury takes its seat in the
20   box, then it's proper to talk about.  If it's a former claim or
21   defense that's no longer live and has been dropped in any
22   fashion, it's not proper to go into it.
23        Now, that doesn't mean if Plaintiff asserted
24   infringement of Claim 5, just to pull a number out of the air
25   for example purposes only, in one of the patents-in-suit and
```

has then dropped that claim of infringement, doesn't mean

nobody can mention Claim 5 in the lawsuit.  But they can't say

Plaintiff previously sued us for this, and then they dropped

it, and thereby give the inference or implication that it was a

bogus claim to begin with or there was a good defense to it or

otherwise.

So if it's a live claim or defense, even if it's a

counterclaim, it's certainly proper to go in to the jury.

We've got -- we're going to have our hands full trying all the

live claims in this issue.  We don't have time to talk about

what used to be at issue that's no longer at issue in the case.

So I'm going to grant Plaintiff's Limine No. 1.

Let's go to Limine No. 2.

MR. DACUS:  Your Honor, Plaintiff's Limine No. 2 goes

to the fact that it appears to us that the Defendant intends to

talk about the USPTO practices and procedures, including the --

the percentages that patents are invalidated, quality of the

USPTO, and specifically in this case, MTel's expert, Jay Kesan,

has an article that relates to some of those issues.

In addition, there's been some indication that perhaps

we're going to talk about whether or not the United States

Patent and Trademark Office examination process is less than

that of the European Patent Office -- Office process.  We

believe those issues are irrelevant.  They're confusing to the

jury.

1          Certainly the Defendant can put forward evidence as to

2     why the patents are valid or invalid, but further testimony

3     related to the procedures and processes and I guess the

4     successful nature of those at the USPTO, we believe, should be

5     precluded.

6          THE COURT:  All right.  What's Defendant's position?

7          MR. SELINGER:  Your Honor, if -- if MTel's argument

8     was only that the patent complied with the Graham factors, we

9     wouldn't be having this fight.

10          The problem rises because MTel's expert, Kesan, in his

11     rebuttal report, provides his view of the quality of the work

12     done by two examiners over five years of the application's

13     pendency.  And it's -- it's his rebuttal validity report at

14     Paragraphs 150 and 151 where -- where Dr. Kesan says the prior

15     art that we relied on is not listed on the face of -- of the

16     '946 patent.  I agree with the examiners that the one --

17     that -- that patent is not relevant, and it does not

18     anticipate.

19          So he's -- he's linked him -- he's linked his opinions

20     to work that was done by the examiners, but then he doesn't

21     want us to say anything about the fact that such work can

22     sometimes be less than perfect.  And that's just not fair.

23          THE COURT:  Well, we're going to start out with the

24     presumption of validity, which the Court is subject to from the

25     statute, and issued United States patents are presumed to be

1  valid.  We're not going to disparage the PTO, and we're not

2  going to bolster the PTO.  Factually as to how a patent is

3  prosecuted and issued is fair game.  What happens.  Not whether

4  it's good or bad or whether it's reliable or not reliable, but

5  what happens factually is fair game.

6           I don't expect to hear any testimony about

7  re-examinations or IPRs.  IPRs, CBM review, those things that

8  stem from the Smith Leahy America Invents Act are, by statutory

9  statement, parallel proceedings.  They don't intersect with

10 this Court's proceeding, and this Court's proceedings don't

11 directly impact the P -- the PTAB's proceedings.  So we're not

12 going to go into what survived IPR review and what didn't

13 survive IPR review.

14          And to the extent any witness wants to go beyond those

15 guideposts, then I'm going to grant the limine, and -- and to

16 the extent you're going to talk about anything that is

17 editorial or opinion-related as to reliability, goodness,

18 badness, anything you want to talk about the PTO that is not a

19 purely factual recital of what they do and how they do it or if

20 you're going to get into anything that falls within the purview

21 of the PTAB or any of the various types of re-examination that

22 are allowed under the AIA, then you're going to have to

23 approach the bench and get leave before you go into it.

24          MR. SELINGER:  That's fine, Your Honor.

25          THE COURT:  This is one of the areas, counsel, that is

replete with risk to confuse the jury.  And there's no need to

get into a lot of technical explanation about procedural hoops

and hurdles at the PTO that don't weigh directly on the merits

of this case.

And I view those as a high area of risk for jury

confusion and really no relevance to the issues that this jury

is going to be asked to decide.  They're going to be told that

these patents-in-suit are presumed to be valid, that

presumption can be overcome.  That's what this trial is about.

They have to be overcome with clear and convincing evidence.

And I'm going to instruct them in my preliminary instructions

about the rudimentary process of how patents are issued.

They're going to see the -- the patent video from the

Federal Judicial Center.  So that is how we're going to do

this.

But even if an expert witness has opined separately

about the reliability or the trustworthiness of the

decision-making process at the PTO, that's not something I

expect to hear in this trial without an express explanation to

the Court in advance and leave being granted.

MR. SELINGER:  Thank you, Your Honor.

THE COURT:  Okay.  That will effectively be a grant of

Plaintiff's Motion in Limine 2.

And brings us to 3, regarding the fact that experts'

opinions may have been excluded from any other lawsuit

1   unrelated to this one.

2           MR. DACUS:  That's correct, Your Honor.  This -- this

3   is a limine that I'm sure the Court has -- has seen many times.

4   It's also a limine that Judge Payne has looked at specifically

5   with respect to these MTel cases.  I'm certain the Court's

6   aware that this is, I think, the fifth pre-trial on these same

7   patents.  And Judge Payne has granted this limine each time,

8   and it would just preclude either party from referencing or

9   talking about any Daubert or exclusionary-type orders in prior

10  cases for the experts.

11          And I'll tell you specifically in this case, as in a

12  lot of cases, this comes up in the damages context because

13  it's been an evolving issue.  And specifically MTel's expert,

14  Mr. Bratic, I think the -- the Defendants would like to say

15  that he's been excluded in a case previously or his opinions

16  were excluded in a case previously.  And we don't think

17  that's -- that's a proper thing to do.

18          THE COURT:  All right.  What's the response from

19  Defendant?

20          MR. GILLAM:  Unfortunately, Your Honor, taking a look

21  at that, that's probably exactly what we would like to do, but

22  I think we probably agree to this motion.

23          THE COURT:  All right.  I'm going to grant Plaintiff's

24  Motion in Limine No. 3.  I'm not going to let the lawyers ask

25  the experts if their opinions have been excluded in any prior

```
 1   lawsuit.  I'm not going to let the experts ask the lawyers if
 2   they've ever lost a jury trial either.  The knife is going to
 3   cut both ways.
 4            MR. GILLAM:  Then my day is just made, Your Honor.
 5   Thank you very much.  Thank you.
 6            THE COURT:  Okay.  Plaintiff's Motion -- Motion in
 7   Limine 3 is granted.
 8            Let's go to 4.  We've talked about claim construction
 9   already.  I know this retransmission is a big issue, and we're
10   going to get into that on the summary judgment motions, but
11   what's Plaintiff's request here?
12            MR. TAYLOR:  You're exactly right, Your Honor.  Your
13   Honor just dealt with this issue a few minutes ago with regard
14   to HTC's motion in limine, and Your Honor will see the issues
15   again throughout the day.
16            I would like to, instead, take this moment to focus on
17   the second aspect of Plaintiff's motion in limine, which is
18   with regard to specifying the portion of the displayed message
19   for which the user desires a retransmission.
20            Now, the Court did not construe this term which
21   provides the term its plain and ordinary meaning.  And HTC
22   would argue that the term requires the user to be able to
23   specify any portion of the displayed message, and MTel argues
24   that the claim requirement is met so long as the user is able
25   to specify a singular portion.
```

1          Your Honor will see additional evidence and argument

2    regarding this issue specifically as we get into the

3    Plaintiff's motion to strike.  There -- but Defendant would

4    argue that prosecution history estoppel applies here, and MTel

5    believes that issue -- or arguing prosecution history estoppel

6    to the jury is prohibited.

7          THE COURT:  We're not going to argue prosecution

8    history estoppel to the jury, I can tell you that.

9          MR. TAYLOR:  I'm happy to hear that, Your Honor.

10          THE COURT:  And as I said earlier, we're not going to

11    relitigate the claim construction process.  However, with

12    regard to the specifics, it seems like -- that you've raised,

13    it seems like to me that that's best left to either rise or

14    fall with the motion to strike and the other matters that the

15    Court has before it on a pre-trial basis.

16          MR. TAYLOR:  Understood, Your Honor.

17          THE COURT:  Defendant have anything to add to this

18    discussion?

19          MR. SELINGER:  No, Your Honor.

20          THE COURT:  All right.  Well, the Court is going to

21    order that neither party shall present evidence or argument or

22    statements contrary to the claim construction rulings of the

23    Court.

24          With regard to specifically the dispute regarding what

25    is or isn't retransmission, the Court's not going to grant an

 1    express limine ruling, but will allow its rulings on other

 2    pre-trial matters to resolve this issue on the specific terms

 3    as presented.

 4            Let's go to Plaintiff's Motion in Limine No. 5.

 5            MR. MORT:  Your Honor, Ray Mort for MTel.

 6            Opposing counsel and I had a brief discussion this

 7    afternoon.  I think we're largely in agreement.

 8            There's two issues here.  We presented this really as

 9    a -- a prevention of the practicing the prior art defense to

10    infringement.  However, looking at the scope of our motion in

11    limine, it would inadvertently cover, I think, legitimate

12    evidence that the Defendant may raise regarding the after

13    acquired or what -- what time in technology as it relates to a

14    means-plus-function claim.  We didn't mean to exclude that.  We

15    have provisionally agreed, and I believe that their position is

16    that their expert has not provided an opinion that they don't

17    infringe because their invention -- or not their invention,

18    their -- their products practice some prior art system.

19            So I think it's our agreement that they won't present

20    that defense, and this MIL is largely unneeded for that.

21            THE COURT:  Okay.  Defendants want to comment on this?

22            MR. SELINGER:  Just -- just very briefly, Your Honor.

23            We're -- and the reason that -- that I posed this

24    wasn't because we want to put on a practicing the prior art

25    case, but because --

1          THE COURT:  Hope not.

2          MR. SELINGER:  I know better, Your Honor.

3          But because there -- there are -- there are other

4 aspects, and I think counsel agrees, where we're in a

5 relationship with -- with prior technology are relevant.  And

6 so I think we've -- we've agreed that I'm -- I'm not going to

7 put on that kind of a defense.  And the -- the motion in limine

8 really isn't needed.

9          My -- my concern was it was -- it was gray enough and

10 broad enough that it would require trips to the bench that --

11 that I thought would be unnecessary.  And, frankly, if I ask

12 the wrong question, I have no doubt that opposing counsel will

13 object, and the Court would, if appropriate, give a curative

14 instruction at the very least.

15          THE COURT:  All right.  Well, I'm going to grant

16 Plaintiff's Motion in Limine 5 to the extent it means that

17 neither party shall compare an accused device or

18 instrumentality to prior art, but the only comparison

19 appropriate before the jury are the claims themselves to the

20 prior art references.

21          MR. SELINGER:  May I -- Your Honor, that -- that, I

22 believe, may be exactly what counsel and I had agreed we could

23 do based on -- under -- under the Doctrine of Equivalents

24 analysis, the 112(6), the -- the scope -- under the DuPay case,

25 the -- the scope of the Doctrine of Equivalents is limited by

 1    what is in the prior art.

 2            And then a second component, which counsel alluded to,

 3    is -- is that for statutory equivalence under 112(6), not --

 4    not Doctrine of Equivalents, the -- the accused equivalent

 5    structure must have existed at the time that the patent issued.

 6    And -- and I had understood from counsel that we were -- we

 7    were not going to preclude those from coming in.

 8            THE COURT:  Well, then how -- how would you suggest

 9    the Court word its order here, or are you suggesting that I

10    simply deny this limine?  I certainly think the Court needs to

11    make it clear that the only proper comparison is the claims

12    themselves with the prior art, at least for invalidity

13    purposes.

14            MR. SELINGER:  Absolutely.  No -- no dispute on

15    invalidity, Your Honor.

16            THE COURT:  Okay.

17            MR. SELINGER:  It's the other component that -- that

18    gets into the gray area.

19            THE COURT:  Well, then what I'll do is order that no

20    party shall offer evidence or argument regarding the issue of

21    invalidity that purports to compare anything other than the

22    claims themselves to the prior art references.

23            MR. SELINGER:  Thank you.

24            THE COURT:  Okay.  That brings us to Plaintiff's

25    Motion in Limine 6.  And I think we've covered this

 1    substantially, have we not?  Or is there something new here?

 2         MR. DACUS:  I don't think we've covered No. 6, Your

 3    Honor, unless I'm -- I'm missing something.

 4         THE COURT:  Okay.  All right.

 5         MR. DACUS:  In fact, I was going to apologize to the

 6    Court up front because this one takes a little bit of

 7    background and context for the Court, I think, because the

 8    facts are pretty specific to this case.  And I will say up

 9    front to the Court, this is an issue that Judge Payne has --

10    this limine he's grappled with in all four of the previous

11    pre-trials that we've had and has ruled favorably to MTel on

12    this issue.

13         But to -- to set the -- the scene for the Court, these

14    patents at -- at issue, Your Honor, had prior owners, and there

15    were a couple of business or purchase transactions of these

16    patents.  Obviously, there was a price paid for the patents,

17    and so this limine goes to excluding those purchase amounts

18    that were paid for these patents-in-suit.

19         And to further break that down and the reason it

20    requires further explanation is within that -- it was not only

21    a purchase of the patents, but it was an entire purchase of the

22    entire business.  Within that business purchase, there was an

23    allocation done post-purchase of a value to the patents.

24         The only testimony related to that in these cases has

25    been that the allocation related for tax purposes and -- and

 1   other purposes other than a true valuation or appraisal of the

 2   value of the patents.

 3         So Judge Payne has previously, in all the cases,

 4   agreed to the limine and granted the limine, excluding that

 5   allocated value of the patents.  And we continue to assert that

 6   that should be the Court's ruling here.  That should be

 7   excluded.

 8         What Judge Payne has done in other cases, however, is

 9   he has allowed in the total purchase price of that business.

10   What's different in this case, though, is HTC's expert chose

11   not to rely in any way on that overall purchase price.  In

12   fact, he affirmatively said that that's a piece of information

13   that's not relevant to his calculation of the reasonable

14   royalty here.

15         So we believe in this case not only should the

16   allocated amount of the purchase price to the patents be

17   excluded, but also the overall purchase price -- and if that's

18   me, I apologize, Your Honor.

19         THE COURT:  I'm not sure where it's coming from to be

20   honest with you.

21         Go ahead, Mr. Dacus.

22         MR. DACUS:  Thank you, Your Honor.

23         So that -- that's -- I think that's the sum and

24   substance of the issue, Your Honor, is we believe that both the

25   overall purchase price of these -- of the businesses and then

1   the allocated amount of that purchase price to the patents are

2   irrelevant to the issue of a reasonable royalty that is before

3   the jury in this case.  And that -- in fact, that lack of

4   relevance is confirmed by the Defendant's damages expert who

5   looked at those same documents and concluded that they were not

6   relevant.

7            THE COURT:  I assume the Defendant's expert on damages

8   does contend that this valuation, post-acquisition has some

9   relevance?

10           MR. DACUS:  He did not, Your Honor.  As a matter of

11  fact, he -- he doesn't even reference it.  In fact, I intended

12  to say that.  There's absolutely no reference in his report to

13  this, quote, unquote, allocation to the patents.  So I'm not

14  even sure that's --

15           THE COURT:  All right.

16           MR. DACUS:  -- really an issue here.

17           THE COURT:  Well, let me hear from the Defendants, and

18  I'll find out why we have a disagreement.

19           MR. SELINGER:  May I proceed, Your Honor?

20           THE COURT:  You may.

21           MR. SELINGER:  If we --

22           THE COURT:  We can tag team this if we need to.

23           MR. SELINGER:  Thank you, Your Honor.

24           THE COURT:  Okay.

25           MR. SELINGER:  I've -- I've got a component I'd like

1  to speak to, and the -- the fact of -- of the sale price and

2  the valuation, I believe, have two potential areas of

3  relevance.  One is -- one is the damage issue, which -- which

4  the Court has alluded to and to which Mr. Gillam will speak.

5          The -- the other is evidence relating to the issue

6  of -- of the licenses and knowledge of licenses.  We've --

7  we've got -- we've got the -- the Verizon issue and the --

8  the -- if the Court grants the pending summary judgment on --

9  on the Verizon license, then -- then that issue drops out, but

10  if there's a fact issue for the jury, then the Plaintiff has --

11  has claimed it -- it was a bona fide purchaser, but those --

12  the kind of numbers we're talking about for the patent

13  portfolio and in the context of the overall purchase price, I

14  believe is a relevant fact for the jury to consider in terms of

15  why -- why the patents would have been priced that way or

16  valued that way, and how that relates to either the Verizon

17  Wireless license, the Verizon license, or the issue of -- of a

18  claim by the University of Mississippi.

19          So I think there's -- there's relevance separate and

20  apart from damages if the Court --

21          THE COURT:  Well, if Mr. Dacus is correct and your

22  damages expert doesn't rely on the total purchase price of

23  these businesses or assets and says that's not a good guide and

24  if your damages expert doesn't talk about the actual

25  post-closing of the transaction's valuation of the patent

1  portfolio, what's he going to testify to that would run afoul

2  of this limine?  Because he's certainly not going to testify

3  outside the boundaries of his report.  So where -- where is

4  the -- where is the intersection of the problem here?

5       MR. SELINGER:  Well, the intersection of the problem,

6  I believe, has to did with the actual evidence, and the --

7  the -- it's the problems -- we say post-closing, we're actually

8  talking about prior transactions, Your Honor.  And those -- the

9  documents themselves are -- are relevant evidence for the jury

10 to consider in the context of -- of whether that might -- that

11 valuation might have been based in part on -- valuation not by

12 our damages expert, but by the -- the seller, by -- by the fact

13 that Verizon had a -- a perpetual non-exclusive license or by

14 the fact that Ole -- Ole Miss, University of Mississippi had --

15 had rights as a co-owner.  There -- there's some reason why the

16 number was -- was that low.

17      THE COURT:  Well, I -- I understand there's a pending

18 motion for summary judgment with regard to standing and an

19 assertion that University of Mississippi has an interest and

20 are not joined in the lawsuit.  But I don't see that that's

21 appropriate to be dealt with in the motion in limine context at

22 all.  That motion is either going to be granted or denied on

23 its own merit.

24      But what I'm wondering about is where -- where do you

25 anticipate testimony to be offered?  Beyond the summary

 1  judgment stage, assuming we get to a trial, where do you

 2  anticipate testimony to be offered that this would otherwise

 3  bar and gives rise to your opposition?  That's what I'm not

 4  following you on, Mr. Selinger.

 5          MR. SELINGER:  If -- if -- two -- there are two ways,

 6  Your Honor.  One -- one is if the Court concludes that -- the

 7  Court finds that there's a genuine issue of material fact as to

 8  whether Verizon is -- is a licensee.

 9          And in that case, the fact that the patents were

10  valued as -- as low as they were in -- in connection with the

11  prior transaction, I believe, is relevant evidence that the --

12  that the purchaser understood the nature of the transaction.

13  That -- it would be evidence that -- and -- and, again, if the

14  Court concludes that the issue of standing presents issues of

15  fact to be tried, again, the same -- same issue.

16          The fact that the University of Mississippi had -- had

17  ownership rights, would well be a factor explaining the very

18  low value of the patents prior to the business acquisition by

19  Velocita, MTel's sister.

20          THE COURT:  All right.

21          MR. SELINGER:  And --

22          THE COURT:  Go ahead.

23          MR. SELINGER:  I'm sorry.  I was going to -- I didn't

24  want to forget Mr. Gillam, Your Honor.

25          THE COURT:  No.  You have something to add on this

 1   point, Mr. Gillam?

 2            MR. GILLAM:   I do, Your Honor, just with respect to

 3   the damages portion of it.   And I would apologize to the Court

 4   for not having the whole report here with me today.

 5            But certainly the other transactions that we're

 6   talking about, and I'm -- and I'm familiar with what Mr. Dacus

 7   said about the -- the carve-out with respect to asset

 8   allocation that Judge Payne did.   And we're willing to live

 9   with that.

10            But -- but our expert, Mr. Thomas, actually did talk

11   about in his criticism of Mr. Bratic, his exclusion of these

12   other SkyTel -- it's called SkyTel -- but these other

13   transactions.   And we'll specifically refer the Court to

14   Section 189 of his report.   And I apologize, I only have a

15   small portion of this.   But he -- he talks about as further

16   evidence of the flawed and unreliable nature of Mr. Bratic's

17   methodology and calculations is that Mr. Bratic's opinion

18   values the '946 patent at more than double the value of

19   historical transactions for substantially all of SkyTel's

20   assets, including the '946 patent.   For example, Mr. Bratic

21   inappropriately ignores the previous transactions that

22   substantially all of SkyTel's assets, including the '946

23   patent, by simply stating -- and then he goes on to quote some

24   of Mr. Bratic's report itself.

25            So it's a part of his report, number one.   And, number

1  two, certainly these other transactions involving these patents

2  are the subject of proper cross-examination.

3       So if the Court needs other information from us, I

4  apologize for not having it in hand.  I'll be happy to provide

5  it to the Court, but it is a part of his report.  It is

6  certainly a proper subject of cross-examination of Mr. Bratic.

7  As far as the specific carve-out, we can live with that.  But

8  the historical nature and the historical transactions involved

9  in these patents, as they've been passed from company to

10  company to company at various low prices, quite honestly, is

11  certainly something that's in the report, and it's certainly

12  the subject of cross-examination.

13       THE COURT:  I assume that portion of the report is

14  subject to at least a partial motion to strike?  Or is this

15  solely teed up on a MIL basis?

16       MR. DACUS:  That portion of the report is not subject

17  to a motion to strike, Your Honor.

18       THE COURT:  All right.  Well, Mr. Gillam, you say that

19  we can live with the traditional carve-out.  I assume by that

20  you're meaning that an order that would preclude the offering

21  of testimony as to the post-sale valuation that's been carved

22  out earlier?

23       MR. GILLAM:  Where they -- quite frankly, Your Honor,

24  and I can't remember what the number is.  Mr. Dacus may

25  remember this, but it was some allocation as to the value of

1   the patent, of what -- what was it?

2        THE COURT:  The patents-in-suit or the portfolio of

3   all the patents?

4        MR. DACUS:  May I address that, Your Honor?

5        THE COURT:  Yes, please.

6        MR. DACUS:  It's a small number.

7        MR. GILLAM:  Right.  And it's a small number.  I mean,

8   I can't remember what it is, but...

9        MR. DACUS:  I think it's $963,000.00.

10       MR. GILLAM:  Right.  And that's the portfolio, and

11   that's the portion that Judge Payne excluded before.  And while

12   we would love to talk about that, we understand that and can

13   live with that, but these other transactions involving these

14   patents, we believe, are fair game.

15       THE COURT:  Mr. Dacus, what's your response to, as

16   Mr. Gillam calls it, these other transactions?

17       MR. DACUS:  The other transactions, Your Honor, are

18   the sale of an entire business that just happened to include

19   these patents.  And because it's of an entire business, we

20   don't think it's relevant, and we don't think the -- the jury

21   should be confused by looking at the overall transaction.

22   And --

23       THE COURT:  So these other sales don't include an

24   allocation of value only to the patent portfolio?

25       MR. DACUS:  They do, Your Honor.  And I -- let me try

```
 1   to do a better job explaining because I've done a poor job.

 2          The sale of the entire business, just as an example,

 3   was $25 million.  And within that purchase price of $25 million

 4   for tax purposes, as the Court likely knows, for subsequent

 5   accounting reasons, they did an allocation to all the assets.

 6   And one of those allocations was to the patent portfolio, which

 7   included the patents-in-suit.

 8          So that allocation, there's no evidence in this case

 9   or any MTel case that that relates in any way to the value of

10   the -- of the patents themselves.  It's simply a tax purchases

11   allocation for --

12          THE COURT:  In this situation, we're -- that's the

13   $963,000.00 you talked about?

14          MR. DACUS:  Correct, Your Honor.

15          THE COURT:  Okay.

16          MR. DACUS:  And so my understanding is the Defendant

17   doesn't object to that part of the limine.  But the overall

18   purchase of the business itself really has no relevance.  I

19   think there's a smattering of cases on this actually, and

20   we've discussed them with Judge Payne in the past, where

21   Courts have excluded those purchase prices because of the fact

22   that they included all of the assets of the business, rather

23   than just the patents-in-suit, and it was confusing to the

24   jury.

25          And that's -- that's really what we would ask the
```

```
 1   Court to do here.  And it's -- although it's contrary to what
 2   Judge Payne has done in the past, I think it's warranted here
 3   because the Defense expert expressly says that those purchase
 4   prices are not informative of what a reasonable royalty would
 5   be.  No doubt he was critical of Mr. Bratic, but he expressly
 6   says:  I don't think these are relevant.  I don't think this is
 7   informative as to a reasonable royalty.  And putting that
 8   amount in the jury box just adds to what will surely be already
 9   confusion.
10           MR. GILLAM:  If I could respond to that, Your Honor?
11           THE COURT:  Yes, please, Mr. Gillam.
12           MR. GILLAM:  Your Honor, this matter is before this
13   Court and not Judge Payne, but -- but consistently with respect
14   to this particular issue, we -- the parties -- whether it be
15   Samsung in another case or Apple in another case, have been
16   able to go into this very area simply because whether it's
17   the -- the value of the -- when you talk about the value of
18   the business as a whole, you are necessarily including the
19   value of those patents.  And when you have an expert who has
20   opined like Mr. Bratic has done here with the numbers he has
21   opined here, we are able -- we should be able to cross-examine
22   him here.
23           Now, whether or not those are -- are benchmarks by any
24   expert with respect to a reasonable royalty, I don't think
25   that's ever been true in any case where an expert has given
```

```
 1    testimony.  But certainly, the sale of these assets, when you
 2    go through the history of what has happened here, which they'll
 3    go through, as well, they'll talk about how these -- these --
 4    these -- this -- these patents and the businesses have been
 5    sold from point-to-point-to-point.  That should be a matter of
 6    fair game with respect to the value or the -- the price that
 7    these things are sold for.
 8              In connection with that, of course, is the -- are the
 9    patents included within the same.  So we think we should be
10    able to go into that.
11              THE COURT:  The price that these things are sold for,
12    as you say, you're talking about the entire business?
13              MR. GILLAM:  The entire business, yes, sir, which
14    would necessarily include the patents themselves.
15              THE COURT:  How many of these lily pads will the frog
16    jump between?  How many sales?  Will it be one?  Will it be
17    two, three, four, five?
18              MR. GILLAM:  Four or five.
19              THE COURT:  How many of these transactions are we
20    talking about?
21              MR. GILLAM:  Four.
22              MR. DACUS:  I believe there to be only two, Your
23    Honor.
24              THE COURT:  Something more than one.
25              MR. GILLAM:  Something more than one.  I think I -- I
```

1    don't have the timeline in front of me, Your Honor, but it

2    was -- I think -- I thought they'd been sold more than -- well,

3    they're -- they're sold -- there's -- there's more than one

4    transaction within the company that -- that currently owns the

5    patents themselves, but I think from -- from the origination

6    point, it may be two, may be three.

7            THE COURT:  And this $963,000.00 number, that was

8    arrived at after we'll say Sale 1 took place for tax allocation

9    purposes?

10           MR. GILLAM:  It's actually in the end.  It's toward

11   the end, I think, it's the -- is it the --

12           THE COURT:  Go ahead.

13           MR. DACUS:  Your Honor --

14           THE COURT:  Go ahead.

15           MR. DACUS:  -- I do believe it's part of what I would

16   call the first sale transaction.  It's part of the -- the sale

17   transaction from MCI Worldcom into the Verizon entity.

18           THE COURT:  Well, I certainly didn't handle

19   transactions of the scope and size that these probably were,

20   but I handled enough business transactions in practice to

21   understand that value allocation is often driven by anything

22   but the true underlying value.  The buyer wants values

23   heightened on those assets he can rapidly depreciate.  The

24   seller wants values lowered on assets, but they may have to pay

25   short-term capital -- I mean, regular gains on, as opposed to

1   long-term capital gains where they want the value allocated.

2          I can certainly see that this $963,000.00 number is a

3   great distance removed from being probative.  I'll exclude

4   that.  I'll exclude by limine order reference to whether it's

5   at the first transaction or down the road in this series of

6   transactions, a specific allocation of the patent portfolio at

7   $963,000.00, or some similar number.  I'll exclude any specific

8   valuation of the patent portfolio in any of these buy/sell

9   transactions.

10          As to the total sales price, assuming these are asset

11  sales, as opposed to an actual merger and acquisition, but as

12  to the total price, I'm not going to exclude that.  I think

13  that that's an area ripe for cross-examination by the

14  Defendant, and I think if as Mr. Dacus says, the Defendant's

15  expert expressly rejected that as a relevant value point, he

16  should have no problem pointing that out to the jury as a part

17  of the trial.

18          So I'm going to grant the limine as to an express

19  valuation of the patent portfolio in which the patents-in-suit

20  were placed during any of these buy/sell transfers or

21  transactions leading up to the present, but I'm going to limit

22  the limine to that scope.

23          MR. GILLAM:  Understood, Your Honor.

24          THE COURT:  Is that clear with everybody?

25          MR. DACUS:  Yes, Your Honor.

```
 1          THE COURT:  Okay.  Let's go to Plaintiff's motion --
 2   well, 7 has been withdrawn.  So let's go to 8.
 3          This looks like to me what I call a comply with the
 4   rules limine.  Improper opinion testimony by a lay witness is
 5   excluded by the Rules of Civil Procedure.  Why should I grant a
 6   limine that says do what the rules say?
 7          MR. DACUS:  Perhaps you shouldn't, Your Honor.  And --
 8   and to be candid with the Court, I think this is an issue
 9   that's going to be recurring issue when the Court looks at depo
10   designations.  It's been a recurring issue in past cases, and
11   every indication is it's -- it's going to be an issue here as
12   to whether or not inventor testimony steps on claim
13   construction.
14          What we -- the reason for the limine, though, is --
15   and the reason I think it's proper is we don't want -- to the
16   extent there are inventor witnesses, and there very may -- very
17   may well be, we don't want questions related to claim
18   construction even though -- even though those questions were
19   posed to that particular witness during his deposition.
20          So the purpose of the -- the limine is to preclude
21   that type of dialog where we have to jump up and object, and it
22   looks like we're attempting to hide something when it truth
23   it's not the proper subject for inventor testimony.
24          THE COURT:  Well, I think the Court's prior limine
25   rulings that prohibit the parties from going behind the claim
```

```
 1   construction order will apply to inventor witnesses just like
 2   any other witness.  So to that extent, it may already be
 3   covered.
 4        And to the extent we're going to have inventor
 5   testimony by way of deposition, it seems like to me the more
 6   precise way to do this is on a designation or counter
 7   designation basis where I can look at specifically what's asked
 8   for, as opposed to a blanket limine ruling that would exclude
 9   it across the board.
10        MR. DACUS:  Understood, Your Honor.  That sounds
11   reasonable to us.
12        THE COURT:  Well, given -- given that exchange, I'm
13   going to deny Plaintiff's Motion in Limine 8.  That doesn't
14   mean that the rules have suddenly changed about attempting to
15   go behind the claim construction order of the Court.  It just
16   means that you're subject to the general limine ruling that
17   I've already given, and if there are specific deposition
18   designations that would be offered, the Court reserves the
19   right to look at those on an as presented basis as to whether
20   the Court's persuaded that they do attempt to counter --
21   contravene the claim construction ruling in any way.
22        MR. DACUS:  Understood, Your Honor.
23        THE COURT:  All right.  Let's go to Plaintiff's Motion
24   in Limine No. 9.
25        MR. DACUS:  Your Honor, this is a motion that the
```

 1    Court's seen often, I'm sure.  And it's in a -- it's a limine

 2    that would preclude certain derogatory or pejorative comments

 3    toward the Plaintiff, including things such as patent troll,

 4    troll, toll collector, pirate, stick-up, shakedown, saying that

 5    MTel is in the business of filing lawsuits.

 6              THE COURT:  Well, notwithstanding all those

 7    disparaging terms, and they clearly are, why should the Court

 8    limine out any factual reference to the fact that MTel doesn't

 9    produce a product?

10              MR. DACUS:  Thank you for asking that, Your Honor.  I

11    meant to address that.  The --

12              THE COURT:  Seems to me your limine request may go

13    further than the Court's gone previously.

14              MR. DACUS:  Understood, Your Honor.  And I need to

15    address that.

16              From MTel's position, the only thing that's relevant

17    or even potentially relevant is whether or not MTel practices

18    these patents, and that -- that certainly is a relevant

19    inquiry.  But beyond that, to say that MTel does nothing or

20    MTel makes no products, in addition to not being quite

21    factually true, it really has no relevance in front of the

22    jury.

23              So I do agree with the Court that it's a proper

24    inquiry to ask whether or not MTel makes or practices any

25    product that includes the patents-in-suit, but to go beyond

 1    that, I think, would be improper because it's not relevant.

 2        THE COURT:  Why would it not be relevant to the issue

 3    of damages?  I mean, if you're practicing the patents-in-suit

 4    that you allege Defendant's infringing, that can impact your

 5    business, whereas if you're not in that business at all, it may

 6    be of no impact.

 7        MR. DACUS:  I agree, Your Honor, and I think they can

 8    ask whether or not we practice the patents-in-suit.  And

 9    that -- that potentially does impact damages, and it's part of

10    one of the Georgia-Pacific factors.

11        But to go further and say on top of that, MTel does

12    nothing, they don't make any product whatsoever, and all they

13    do is bring lawsuits, that's the part that I think has no

14    relevance.

15        THE COURT:  What's -- what's Defendant's posture on

16    this?

17        MR. SELINGER:  With the Court's permission, we may tag

18    team again.

19        THE COURT:  Go ahead, Mr. Selinger.

20        MR. SELINGER:  The -- the issue -- and, Your Honor --

21    Your Honor, I think is right.  The core issue, which is does

22    MTel make a product that embodies the invention?  And the

23    answer clearly is, no.  But -- but the proper inquiry, I think,

24    doesn't stop there.

25        There -- there could be -- there could be tagalong

```
1    sales of -- and damages even if what -- what MTel was not

2    making was the patented invention.  And I -- and I think for --

3    for Georgia-Pacific, it is -- it is -- it is appropriate for

4    the jury to understand that -- that MTel does not make

5    anything.

6         I don't know, and I'll let Mr. Gillam speak to the --

7    it's just a shake-down artist.  I don't -- I can assure the

8    Court I've never used that phrase, but I pass the podium, and I

9    will do so.

10        THE COURT:  Mr. Gillam.

11        MR. GILLAM:  Your Honor, the Court has had this come

12   up before the Court on -- on numerous occasions.  The question

13   is how far does the disparaging of a party go?  There is --

14   there's a complete difference in my mind between calling

15   someone a troll or a pirate or a stick-up artist or anything

16   like that and talking about the true business of the company

17   itself.  And that's what this company does.

18        It purchased -- in this particular case, purchased

19   these patents or through a portfolio, and then it goes out and

20   is part of a program of going after various companies, trying

21   to license -- license this -- license its -- license -- getting

22   them to take a license.

23        We don't have to get into information about how many

24   companies they've sued or anything like that.  But this is a

25   program where they've sued numerous, numerous companies over
```

1    these patents.  And we think we should be able to talk about

2    the fact that that's what the business is.  And so it's a --

3    it's a matter of degree as to how far we can go into talking

4    about what it actually does.

5         We're not going to call them a shake-down artist or

6    anything like that.  But to be able to -- to specifically talk

7    to the head of this company about what his business is and what

8    he does, we think we should be able to -- entitled to go into

9    that.  But that's -- that's what's really happened here.  It's

10   not a -- it's nothing more than that.

11        THE COURT:  Do you have anything to add, Mr. Dacus?

12        MR. DACUS:  Very briefly, Your Honor.

13        The fact is what counsel says is it's a fact that what

14   these people do is not produce, but they protect their patent

15   by bringing lawsuits.  Even though that's a fact, the question

16   is, is it relevant to anything?  And the truth is there's no

17   Georgia-Pacific factor or any other element of a claim to which

18   that is relevant.  It is relevant to say we do not practice the

19   patent.  We agree with that.

20        But it's not relevant to say, at least in the

21   Defendant's opinion, that the only thing you do is bring

22   lawsuits.  That's just not relevant to any of the

23   Georgia-Pacific factors, and we think the Court should preclude

24   them from doing that.

25        THE COURT:  All right.  Here's -- here's what the

1    Court's going to rule here, counsel.

2           I'm going to exclude and grant the limine with regard

3    to all of the specific derogatory terms that are listed in

4    here.

5           Further, I'm going to preclude, by way of this limine

6    order in a general sense any disparaging remarks with regard to

7    the Plaintiff.

8           And so you will know where I am going to draw the line

9    in that catchall of any other disparaging remarks, I think it's

10   appropriate from a factual standpoint to describe the

11   Plaintiff's business model, what they do.  Do they make other

12   products and they just don't make a product embodying this

13   patent?  Do they make no products at all?  I think a fair

14   factual overview of what the Plaintiff does is appropriate.

15          However, and I want the Defendant to be very careful

16   of this, that -- that can easily be handled in a disparaging

17   way.  The kind of statement about all they do is file lawsuits,

18   I would consider a disparaging remark, and I would grant an

19   objection that Defendants violated the limine order of the

20   Court.

21          If you're going to go beyond a factual recitation and

22   add any comments that are -- would be of an editorial nature,

23   a subjective valuation nature, then I think you are into the

24   realm of disparaging remarks, and you violate the Court's

25   order.

1          I'm not inclined to limit the only inquiry from the

2    Defendant as to whether or not the Plaintiff practices the

3    patent.  I think it's -- I think the jury's entitled to know

4    who MTel is and what they do.  And I don't think there's

5    anything that a Plaintiff who purchases a patent and then

6    enforces that patent has to be ashamed of, any more than a

7    person that purchases a piece of property and enforces their

8    right to keep others off that property has to be ashamed of it.

9    And you don't have to cultivate property to have the right to

10   prohibit trespassers from being on your property.

11         So I think a fair explanation, from a factual

12   standpoint about what the Plaintiff does, an inquiry of their

13   representatives in that vein is proper.  But to the extent

14   those inquiries or statements or arguments cross the line and

15   include language of an editorial nature or attaching some kind

16   of value or lack of value or impropriety implied or otherwise

17   as to what the Plaintiff's factual business model is, is going

18   to be a disparaging remark and is going to draw an adverse

19   ruling from the Court and an appropriate action related

20   thereto.

21         Is everybody clear on where the Court is?

22         MR. DACUS:  Yes, Your Honor.

23         MR. GILLAM:  Yes, Your Honor.  Could I ask one

24   question?

25             THE COURT:  Yes, sir.

```
 1            MR. GILLAM:  I believe I absolutely understood what

 2   the Court's order is.  With respect to that, Your Honor, one

 3   thing I can see coming up, for example, is the fact that MTel

 4   in this case had -- I think what is a factual inquiry is that

 5   MTel -- MTel had the patents and then sued my client without

 6   any notice whatsoever.

 7            So that the first notice that these folks got of any

 8   patent infringement allegation was when they got a lawsuit.

 9   And we think that would be a factual inquiry.  I'm just trying

10   to think of how these things may come up.

11            THE COURT:  I would view that as a factual inquiry.

12            MR. GILLAM:  All right.

13            MR. SELINGER:  May I -- may I confer with counsel for

14   a second, Your Honor?

15            THE COURT:  You may.

16            And, counsel, I would just say, as has been my

17   practice since I've been on the bench, I'm going to be

18   available to you every morning before we start trial.  And if

19   overnight you've thought of something you want to ask that you

20   think is close to the line on some of these rulings, you might

21   want to check with me before you ask it and get an opinion from

22   the Court as to whether you should or shouldn't go there.

23            And you're going to have that option and prerogative

24   available to you.  And if you don't take it and you jump out

25   there and I disagree that it's not within the lines, it's
```

1   beyond the lines, then you're not only going to have made a

2   mistake, you're going to have given up an opportunity to

3   prevent making a mistake.

4           What else, Mr. Gillam?

5           MR. GILLAM:  I suspect the Court will hear from us,

6   Your Honor.

7           THE COURT:  That's what I'm here for.

8           MR. GILLAM:  Thank you.

9           THE COURT:  All right.  Let's go to Plaintiff's Motion

10   in Limine No. 11.

11           MR. DACUS:  By my count, Your Honor, we may have

12   skipped No. 10.

13           THE COURT:  Did we skip 10?

14           MR. DACUS:  Yes, Your Honor.

15           THE COURT:  Let's go back then.

16           MR. DACUS:  And I'll be brief here, Your Honor.

17   This -- this is a limine to preclude any argument or testimony

18   to the fact that Plaintiff's counsel, Reed & Scardino,

19   previously represented a company by the name of Eon

20   Corporation.

21           And to give the Court a brief background here and how

22   this might come up and how it's come up in -- in other matters,

23   MTel came to its first introduction to Reed & Scardino by way

24   of the fact that Reed & Scardino represented Eon Corporation in

25   a lawsuit against MTel or MTel's predecessor, actually.

 1          In addition to that, in that Eon lawsuit, Dr. Kesan,

 2   who is the infringement -- the invalidity expert in this case,

 3   also served as the invalidity expert in the Eon case on behalf

 4   of Reed & Scardino, and myself also.

 5          So this limine is just to preclude that type of

 6   argument or testimony either to MTel witnesses or ultimately to

 7   Dr. Kesan to say that -- to imply in any way that, you know,

 8   something nefarious about the Reed & Scardino firm or myself or

 9   related to the fact that Dr. Kesan has worked for Reed &

10   Scardino in the past.

11          Subsumed within this, of course, is whether or not

12   it's a legitimate matter of inquiry to ask an expert whether or

13   not they've worked for any of the lawyers.  We think it's not.

14   We think that should be mutual.  Whether or not they worked for

15   a party is a different issue, but whether or not the experts

16   have worked for the law firms, we -- we think should be

17   excluded.  We'd ask the Court to grant the limine.

18          THE COURT:  All right.  Defendant's response?

19          MR. SELINGER:  Yes -- yes, Your Honor.

20          This really is about Dr. Kesan.  And he -- I wrote

21   down a phrase, and I may have -- I apologize, Your Honor, if I

22   took it out of context, but the captive expert.  Dr. --

23   Dr. Kesan has -- has been an expert for -- in cases involving

24   Reed & Scardino, I think, 20 times.  And -- and it's a relevant

25   fact.  I mean, he's -- he's been the validity expert in a

1    series of -- of MTel cases.  He's been a validity expert in a

2    series of -- of Eon cases, and there -- it's not a pejorative,

3    but -- but to -- if I wrote the phrase down right, I think the

4    jury's entitled to know that he's a captive expert.

5           THE COURT:  All right.  I'm going to deny Plaintiff's

6    Motion in Limine 10 with this clarification.  One of the most

7    critical -- in my view, one of the most critical functions the

8    jury provides is the assessment of the credibility and

9    believability of the witnesses, including the experts.  And

10   that's why I think it is a relevant area of inquiry as to how

11   much the experts are compensated.  Are they compensated

12   excessively?  How much of testifying in Court or being retained

13   by law firms with regard to ongoing litigation is a part of

14   their annual income.  If you have somebody that's a professor

15   at a university who 5 to 10 percent of their time is doing this

16   kind of expert witness work, I think that's relevant for the

17   jury to know.

18          If you have a Ph.D. who has his own consulting firm

19   and 99 percent of his time is spent retained by law firms in

20   litigation matters, whether he actually ends up on the witness

21   stand or not, I think that's a relevant fact for the jury to

22   know.

23          If there's a witness who can reasonably be shown or a

24   reasonable attempt be made to show that they're a captive of

25   either a party or a law firm for whom they're retained, I think

1   that's a relevant fact to be shown or attempted to be shown.

2        I think -- I think counsel should be rather

3   circumspect.  However, I have seen overly aggressive attempts

4   to paint an expert as someone's captive or unbelievable or not

5   credible blow up because they've gone too far, and they hurt

6   themselves a whole lot more than they help themselves.

7        That's a matter of trial judgement for trial lawyers

8   to make.  I'm not going to tie your hands.  There are not going

9   to be any personal attacks on the experts, but factual

10  inquiries as to their compensation and repetitiveness for which

11  they've worked for either party or either counsel in the case,

12  I think, is a fair -- fair area of inquiry.  It goes to the

13  credibility and believability of the witness, and in so many of

14  these cases, they come down to who the jury believes is the

15  most credible expert, whether it's infringement, validity, or

16  damages.  I'm not going to tie your hands on how you try that

17  law -- that part of the lawsuit.  So I'm going to deny

18  Plaintiff's Motion in Limine 10.

19        THE COURT:  Let's now go to Plaintiff's Motion in

20  Limine 11.

21        MR. MORT:  Your Honor, Ray Mort, again, for MTel.

22        Pending right now is a motion for summary judgment

23  regarding standing.  That's an issue that's exclusively for the

24  Court to decide, not for a jury.  And for that reason, we don't

25  believe that there should be any testimony regarding those

1    issues in front of the jury.

2         THE COURT:  All right.  Defendant?

3         MR. SELINGER:  I certainly agree with counsel that

4    there's pending a motion for -- for summary judgment that MTel

5    lacks standing.

6         Part of MTel's opposition there is that there are

7    genuine issues of material fact, and -- and I submit that under

8    the DDR case we cited, those -- those fact issues can be tried

9    to the jury even -- even if at the end of the day the issue of

10   standing is a legal one for the Court.

11        And so it -- it may be that we're arguing about

12   nothing depending on what -- what the Court does with the

13   summary judgment motion, but to the extent the Court finds

14   genuine issues of material fact, then the jury ought to be

15   entitled to hear them.

16        THE COURT:  Well, there clearly is a motion for

17   summary judgment related to the standing issue.  I think to a

18   large extent, this limine rises or falls with that.

19        To the extent -- and this is conditional and

20   speculative on what's going to happen when we get to the MSJs,

21   but certainly if the Court denies the motion for summary

22   judgment, to the extent there are -- if there's -- if there's a

23   live issue as to standing that requires certain factual

24   findings to be made, then I think the parties are going to get

25   to submit their evidence to the fact finder and let the fact

1  finder make those determinations.

2       You know, against the prospect that the motion for

3  summary judgment is denied, this limine seems excessively broad

4  to me.  You know, I understand Defense counsel's tempting

5  morsel that if Court will just grant your summary judgment

6  motion, none of this will come up.  I hear it all the time when

7  you tell juries if you'll just find no infringement, you don't

8  have to answer any of the rest of these questions, but

9  nonetheless, as tempting as that might be, if the motion for

10  summary judgment is denied, it will be because there are

11  factual determinations that need to be made.  And those may or

12  may not be submitted to the jury.  The jury may not ultimately

13  answer the question as to whether there is or isn't standing,

14  but they may have to make factual findings from which the Court

15  can then answer the standing issue.

16       I think this attempts to preempt all that by the

17  broadness of the request, and, therefore, I'm going to deny

18  Plaintiff's Motion in Limine 11.

19       I will say if the motion for summary judgment is

20  denied and if there are identified factual determinations to be

21  made by the jury as the fact finder, then I expect and I

22  anticipate that counsel for both sides will limit their

23  inquiries to witnesses and their offering of evidence to those

24  identified factual issues.  And we're not going to go off on

25  some irrelevant tangent related to Plaintiff and the University

```
 1    of Mississippi that don't directly focus on those factual

 2    matters to be determined.

 3              Okay.  That brings us to Plaintiff's Motion in Limine

 4    12.

 5              MR. DACUS:  Limine 12, Your Honor, seeks to preclude

 6    HTC from eliciting testimony related to the fact or the purpose

 7    showing that MTel did not sue some other party, be it a carrier

 8    or likewise.  There's simply no relevance to that -- presenting

 9    that factual issue in -- in front of the -- in front of the

10    jury that we're aware of.  We'd ask the Court to grant it.

11              THE COURT:  Now, how does this -- how does this relate

12    to the allegation of license in this case, Mr. Dacus?  You're

13    not trying to preclude somebody from arguing somebody had or

14    didn't have a license?

15              MR. DACUS:  No, Your Honor, to the contrary.  This --

16    this limine, although it's a little tricky, you've got to read

17    it really closely, is aimed at preventing them from saying MTel

18    did not sue someone, as opposed -- the license issue would be

19    evidence of MTel did sue someone.

20              So this -- this is an attempt, for example, to prevent

21    the Defendant from saying, well, part of this claim,

22    Mr. Witness, actually involves the carrier, and you didn't

23    bother to sue the carrier, did you, or something to that effect

24    because there's no relevance to the jury --

25              THE COURT:  Okay.
```

 1            MR. DACUS:  -- in that regard.

 2            THE COURT:  All right.  What's Defendant's response?

 3            MR. SELINGER:  There's -- if I may, Your Honor.  There

 4   are actually two -- two components to this.

 5            First is MTel has not sued Verizon.  It's the one

 6   carrier that hasn't been sued.  And MTel wants to argue that

 7   HTC America had no design-around option but then seek HTC

 8   America from pointing out that Verizon has not been sued.

 9   And -- and there's a case in this district, the Tyco Healthcare

10   Group versus Applied Medical Research which we cite on Page --

11   in our -- in our opposition to No. 17, where the -- where the

12   Court said the fact that Plaintiffs have not filed any lawsuits

13   against Ethicon for infringement of the patents-in-suit can be

14   brought up in relation to the existence of acceptable

15   non-infringing alternatives.

16            There's a -- and there's a second component, and that

17   is MTel never sued Motorola.  Motorola was originally in the

18   paging -- pager business.  It supplied MTel's predecessor, it

19   supplied SkyTel pagers, and then it moved into the smartphone

20   business.  And we rely on Motorola prior art.

21            So the fact that Motorola hasn't been sued is also

22   relevant.  Other -- other than Verizon and Motorola, I don't --

23   I don't have any intention to talk to other third parties.  And

24   I know in -- in the -- or about other third parties.

25            I know in one of the prior cases, MTel didn't want

```
 1   someone to talk about Qualcomm or the chip makers in effect.
 2   That -- that wasn't on my laundry list, but I do think I
 3   have -- especially if the Court concludes that there are
 4   factual issues that preclude summary judgment for Verizon, we
 5   should be able to let the jury know.  And -- and it's -- that
 6   MTel has not sued Verizon despite suing AT&T, T-Mobile, and
 7   Sprint.
 8            Thank you.
 9            THE COURT:  All right.  Do you have something to add,
10   Mr. Gillam?
11            MR. GILLAM:  Your Honor, yes.  I actually was talking
12   to Mr. Dacus, or at least bringing this up.  There -- there is
13   one other issue that I don't know how this plays into that.
14            MTel made the decision not to sue the parent in this
15   company, that's HTC.  And so I don't know how that might come
16   up.  I think in some of the other trials, you know, there was
17   some discussion about -- I can't remember what it was actually,
18   because you had a similar situation in Samsung.  You had the --
19   the American branch sued but not the parent, and to the extent
20   there is any discussion about that, I don't want to run afoul
21   of a motion in limine if we get into some discussion about HTC.
22   And I don't know whether they would bring it up or we would
23   bring it up, but I just do raise that issue simply because I
24   can see it perhaps being a problem.
25            THE COURT:  Well, I think the safest course for the
```

```
1   Court to follow here is to grant the motion and then position
2   the Court as the gate keeper.  And if there's a -- given the
3   context of the trial and the evidence, if there's a valid
4   reason why Defendant should need to talk about the fact that
5   Plaintiff didn't sue Verizon or Motorola, you can certainly
6   approach and offer your reasons, and at that juncture, the
7   Court will have a much better idea as to the merit or lack
8   thereof and can give you guidance.  But to just leave the door
9   wide open at this point, I think is a mistake.
10          With regard to HTC America and its parent corporation,
11  HTC, I think you -- I think both sides need to meet and confer
12  on that.  To the extent there can be an understanding about
13  crossover between these entities without having to approach and
14  get leave, I'll certainly entertain whatever agreement you all
15  might come to.  To the extent you can't, we'll take it up as it
16  comes up.
17          MR. GILLAM:  Okay.  Thank you.
18          THE COURT:  All right.  That brings us to No. 13.  I
19  can't imagine why we'd want to talk about prosecution history
20  in front of the jury.
21          MR. TAYLOR:  I agree, Your Honor.
22          THE COURT:  What's the Defendant's response?
23          MR. SELINGER:  Your Honor, I jotted down something --
24  something else that I heard earlier.  And --
25          THE COURT:  Did you jot it down accurately?
```

1          MR. SELINGER:  I hope so.

2          The -- first of all, everyone understands that the

3  issue of prosecution history estoppel is an issue for the

4  Court.  And -- and no one's -- I have no plan to argue

5  prosecution history estoppel to the jury.

6          Having said that, what I jotted down earlier is -- is

7  that it provides factual context, factual history of -- of what

8  became the '946 patent as -- as it was prosecuted.  And I did

9  write down factually as it is prosecuted.

10          And so it just seems to me it -- it is context for

11  what became the -- the '946 patent, and -- and it evolved -- it

12  evolved from a parent.  It was a continuation-in-part.  And --

13  and I think that's -- that's relevant context for the jury.

14          Recognizing that more than a little dose of

15  prosecution history estoppel is likely to both put the -- put

16  the jury to sleep and --

17          THE COURT:  Well, let me see if I can address your

18  concern a little bit, Mr. Selinger.

19          The history of the prosecution of the patents-in-suit,

20  I don't think would fall within this limine.  The fact that an

21  act took place during that prosecution that you believe would

22  estop the Plaintiff from taking a position or would have a

23  legal binding impact on something in this trial, I think would

24  violate this type of limine.

25          I'm not saying that granting this would preclude you

```
 1    from discussing the factual process of how these
 2    patents-in-suit were issued and how they were prosecuted.  I
 3    think the line gets drawn where you say and because they did
 4    this, that you can't find this, or you have to come to this
 5    conclusion.  And I think that's an appropriate point at which
 6    to draw the line.  And if you're going to go that far, you're
 7    at least going to have to convince me there's a valid reason
 8    for it before you go that far.
 9              MR. SELINGER:  That's a fair line, Your Honor.
10              THE COURT:  All right.  I'm going to grant Plaintiff's
11    Motion in Limine No. 13.
12              Okay.  Let's talk about 14.  This seems to me to be
13    very much akin to what we just went through.  Plaintiff, tell
14    me what you're specifically trying to protect against here.
15              MR. TAYLOR:  Your -- Your Honor, for Plaintiff's
16    Motion in Limine 14, we are seeking to preclude evidence
17    regarding the '428 patent, including the Court's ruling finding
18    indefinite Claim 4.
19              HTC contends that this information is relevant because
20    of its counterclaims.  However, as MTel raised in the pre-trial
21    order and the jury instructions, MTel believes that there's not
22    a justifiable controversy to be submitted because Judge Payne's
23    claim construction found Claim 4 and therefore -- thereby the
24    Dependent Claim 6 and 7 to be indefinite.
25              We believe that any introduction of this -- of the
```

 1    '428 patent would merely confuse the jury.  And, furthermore,

 2    Your Honor, we believe that the actual purpose behind HTC's

 3    intention to talk about the '428 patent and as evidenced by

 4    their opposition to MTel's motion in limine is regarding the

 5    identity and the expert's opinions regarding the identity of

 6    one skilled in the art.

 7            THE COURT:  All right.  What's Defendant's response?

 8            MR. SELINGER:  Twofold, Your Honor.  First -- actually

 9    threefold.

10            First, it is correct that -- that Judge Payne, again,

11    found Claim 4 and its dependencies indefinite.

12            THE COURT:  So you won on that?

13            MR. SELINGER:  I won -- well, except MTel -- MTel

14    has -- has pending object -- has a pending objection on that.

15    And -- and MTel has -- MTel has withdrawn its claims of -- its

16    assertions of infringement of Claim 4, as evidenced in -- in

17    the motion in limine and also in the -- in the joint pre-trial

18    order, but we're -- and --

19            THE COURT:  Let me ask this.

20            MR. SELINGER:  Yes.

21            THE COURT:  Those objections will have been -- they

22    will have run their course time wise and there should be a

23    ruling by the Court on those before we get to trial in this

24    case, should there not?

25            MR. SELINGER:  There -- there should be.  And -- and,

1    Your Honor, that leads to what -- what Plaintiffs said -- I

2    forget his precise words, but -- but I wasn't trying to be

3    subtle in here.  And the -- the dispute is this.  Early on in

4    this case and going back to prior cases when -- when both '946

5    and '428 patents were in the case, the two sides -- each expert

6    came up with a single level of ordinary skill in the art.

7    And -- and I moved to strike portions of Dr. Prucnal because he

8    didn't consider one -- one of the inventors of the '428.

9          So the dispute is this.  One of the inventors of the

10   '428 has a degree in computer science.  And when -- when

11   Dr. Prucnal came up with his common standard, he -- he said

12   computer science isn't sufficient because you've got to learn

13   too many other things.  And this is -- this is another pending

14   fight we have.

15         Dr. Beckmann said:  Well, no, when you consider this a

16   person of ordinary skill in the art could either have an

17   electrical engineering degree and -- and experience or a

18   computer science degree and -- and appropriate experience.

19         Then Dr. Kesan in his rebuttal invalidity report says:

20   Ah-ha, Dr. Beckmann is wrong because his level of skill in the

21   art is too low because computer science graduates just wouldn't

22   know enough.

23         So if the '428 isn't in this case, then all I have is

24   a list of inventors for the '946, but that wasn't the context

25   in which the two sides' experts came up with their opinions

1    about the level of ordinary skill in the art.

2           And so this is a back door run on the -- some of the

3    other issues we have pending in motions to strike and Daubert

4    motions on what -- what was and wasn't appropriate for -- for

5    the experts to consider.

6           THE COURT:  All right.  Well, I think I understand

7    what you said.  Let me ask it this way.  Are there any live

8    claims or counterclaims regarding Claim 4 of the '428 in the

9    lawsuit at present?

10          MR. SELINGER:  Yes.  There -- there -- HTC America has

11   live declaratory judgment counterclaims for patent invalidity

12   of the '428.

13          THE COURT:  And those are not otherwise disposed of by

14   the Magistrate -- Magistrate Judge's indefiniteness finding as

15   a part of the claim construction?  Those are still live issues?

16          MR. SELINGER:  If -- if there's a final judgment that

17   comes out of that, then -- then I would -- I would think that

18   would resolve it, but the concern I have, Your Honor, is --

19          THE COURT:  If -- hypothetically, if I should overrule

20   Plaintiff's objections to the report and recommendation of the

21   Magistrate Judge in this regard prior to the beginning of the

22   trial, would as of the beginning of the trial, those still be

23   live issues for consideration by the jury?

24          MR. SELINGER:  They might be.  And -- and let me --

25   and I apologize for the -- the ambiguous answer.

1         And Your Honor may be familiar with -- with the prior

2    sequence of events of Samsung.  Samsung went to trial against

3    MTel.  It prevailed.  The jury found the -- the claims were not

4    infringed, final judgment.

5         MTel then sued Samsung again.  And I'm -- my concern

6    is that MTel could turn around and not -- notwithstanding the

7    ruling, because this is the second time the Magistrate Judge

8    has found Claim 4 indefinite, and it didn't stop MTel from

9    suing my client on that.

10        So, I mean, MTel could -- there -- there are ways

11   that MTel could unilaterally remove any risk for me.  I mean,

12   it's -- it's well known, and there might have been some --

13   some discussions about it.  And that -- that would moot the --

14   the declaratory -- or could moot the declaratory judgment

15   claims.

16        That still leaves open the issue of whether

17   Dr. Beckmann was -- was right in considering the -- the

18   expert -- the level of skill of one of the inventors and

19   whether Dr. Prucnal and Mr. Kesan -- Dr. Kesan were wrong in

20   ignoring him.

21        THE COURT:  I just don't see how if Plaintiff's

22   objections to the Magistrate's R&R, having found during claim

23   construction this claim to be indefinite, if those objections

24   are disposed of by me before we go to trial, how you could have

25   anything more final in advance of trial than you're ever going

1    to get on any issue.  I mean, no, it won't have been to the

2    Court of Appeals, but nothing ever is when it goes to trial.  I

3    don't know how you could be in a more sure position than you

4    would be in that posture than you could be on anything else.

5    If -- if I'm missing something here, I'm -- I'm open to hearing

6    about it.

7            MR. SELINGER:  And -- and my concern, Judge, and --

8    and I may be imprecise on it, is we got sued on -- on the '428

9    patent and continued to be sued, even though the Magistrate

10   Judge enter -- entered a ruling that -- that Claim 4 was

11   indefinite and the patent was invalid.  And -- and so you are

12   absolutely correct, it -- it should in theory end any dispute.

13   My concern is it hasn't been the case in the past.

14           But putting that to the side, even -- even if that's

15   right, I think my -- my expert needs to be able to talk --

16   depending on what the Court does on the motions to strike,

17   we -- we need to be able to talk about the fact that the '428

18   patent was in the lawsuit, that one -- one of the inventors on

19   that patent had a computer science degree, and so it was -- it

20   was appropriate to consider his -- his education, and -- and it

21   can be done in a non-pejorative way.

22           THE COURT:  Well, I'm not going to pre-judge the

23   motion to strike, and it will stand on its own when we get to

24   that.  But notwithstanding that, I just don't see that there's

25   any -- assuming, again, that the District Court overrules the

```
 1   Plaintiff's objections to the report and recommendation of the
 2   Magistrate Judge finding Claim 4 of the '428 patent to be
 3   invalid as indefinite, I don't see that we have a live case or
 4   controversy on Claim 4 of the '428.
 5           And so I'm going to grant Plaintiff's Motion in Limine
 6   No. 14 to the extent that I overrule the objections of the
 7   Plaintiff.
 8           Now, if I were to grant those objections, it becomes
 9   still a live issue, and this limine order would certainly be
10   set aside.  And it would be a live issue for trial.  But
11   assuming that those objections to the Magistrate's report and
12   recommendation are denied, then I think you're in as final a
13   position as you can be on that issue going to trial.
14           MR. SELINGER:  Thank you.
15           THE COURT:  And, again, this ruling won't limit or
16   predetermine what the Court does or doesn't do on your pending
17   motion to strike.
18           All right.  Before we get to the next motion in
19   limine, which is Plaintiff's No 15, let's take a short recess.
20   Court stands in recess.
21           COURT SECURITY OFFICER:  All rise.
22           (Recess.)
23           COURT SECURITY OFFICER:  All rise.
24           THE COURT:  Be seated, please.
25           All right.  Let's next take up Plaintiff's opposed
```

 1    Motion in Limine No. 15.

 2            MR. DACUS:  Thank you, Your Honor.

 3            This is an issue, Your Honor, that I think we touched

 4    on when the Court talked to us earlier about whether or not an

 5    expert's opinion must be contained in the report and whether or

 6    not it's valid if he only talked about in deposition.  And so

 7    this is a limine with some specifics related to that issue.

 8    And the specifics are that the Defendants have an expert, David

 9    Taylor, who's a lawyer who --

10            THE COURT:  Teaches at SMU.

11            MR. DACUS:  Teaches at SMU, yes, sir, and they expect

12    him to testify related to some of these licensing issues.

13            THE COURT:  He's an Aggie, Mr. Dacus.  I thought you'd

14    like that.

15            MR. DACUS:  I do like Mr. Taylor, Your Honor?  I

16    just -- the part I don't like is when he expects to testify to

17    things that he did not put in his report but he did say or

18    testify to in deposition.  And the specific here is part of

19    that licensing dispute relates to this Cellco Partnership

20    agreement.

21            THE COURT:  Right.  Why shouldn't this rise or fall

22    with the motion to strike?

23            MR. DACUS:  Because I think, Your Honor, candidly, I

24    thought about that.  The Court could deny the motion to strike.

25    And if the Court does that and Mr. Taylor takes the stand, he

1    should not be allowed to testify about the Cellco Partnership

2    agreement because there's nothing in his -- there's no

3    substance in his report.  The entirety of what's in his report

4    related to this Cellco Partnership agreement is a reference to

5    the fact that it is a document that he reviewed in his docs

6    reviewed list.  But there's no analysis, and it's clear to us

7    that he intends to testify about that at trial.

8              THE COURT:  Why would he not be subject to the Court's

9    already announced rule that experts are confined to the

10   substance of their reports?

11             MR. DACUS:  No, I think he is, Your Honor, and it --

12   it --

13             THE COURT:  I mean, I just don't see what granting

14   this limine does for you.

15             MR. DACUS:  The only thing it does is it refines that

16   point and issue prior to trial so that we don't have to jump up

17   if he starts talking about the Cellco Partnership agreement.

18             THE COURT:  Well, if he starts talking about it in

19   contravention of a limine ruling, you're still going to be

20   jumping up anyway.

21             MR. DACUS:  Understood, Your Honor.

22             THE COURT:  Well, subject to the outcome of the motion

23   to strike and subject to the Court's already announced general

24   practice that all experts are limited to the substance of their

25   reports and any proper supplemental reports that they filed, I

1    don't see any benefit to this additional layer.  I think it's

2    clearly covered.  And based on that, I'm going to deny

3    Plaintiff's Motion in Limine 15.

4           MR. DACUS:  Thank you, Your Honor.

5           THE COURT:  Unless the Defendants feel emboldened, I

6    will hold him to the same standard as everybody else.

7           Okay.  Let's go to Plaintiff's Motion No. 16.

8           MR. DACUS:  Plaintiff's Motion 16, Your Honor, seeks

9    to preclude Defendant HTC from referencing the verdict or the

10   jury findings in the Samsung case that was previously tried in

11   front of Judge Payne.  The broad issue here is that those jury

12   findings are not relevant to the proceedings here, not relevant

13   to infringement, validity, or the damages.

14          To the extent the Court found some tangential

15   relevance, I think the prejudice certainly outweighs the

16   relevance, and the Court should not allow that verdict to be

17   discussed.

18          I'll -- I'll go ahead and preempt what was contained

19   in the Defendant's response, and that is something to the

20   effect that that verdict is or was a final judgment.  We

21   dispute that.  I don't know if the Court would even go that far

22   in the analysis.  But the facts are such that we filed a JMOL,

23   the Court overruled our JMOL.  We filed a motion to reconsider.

24   The Court never ruled on that motion to reconsider, and

25   pending -- while that motion was pending, the case was

```
 1   resolved.  And certainly there was -- there as never a final

 2   judgment in the case.  I don't know that the Court should go

 3   that far in the analysis.  The Court should just preclude the

 4   jury verdict from the Samsung case.

 5           Thank you, Your Honor.

 6           THE COURT:  All right.  What's the Defendant's

 7   response?

 8           MR. SELINGER:  Let -- if I may, Your Honor, let me

 9   begin with final -- with the fact of the final judgment

10   quickly.

11           THE COURT:  Well, final or not final, why is it

12   relevant?

13           MR. SELINGER:  Well, it's -- it's relevant -- MTel's

14   damages expert has opined and MTel's technical expert have

15   opined that there are no non-infringing alternatives.  And the

16   most obvious non-infringing alternative and the one we want to

17   be able to show in view of their positions is that the

18   high-level functionality, which was public record in Samsung,

19   doesn't infringe.

20           This was -- this is a -- Plaintiff -- Plaintiff wants

21   to say you -- you have no design-around to not let us talk

22   about the most obvious one.  That's seal -- shield and sword,

23   if you will.

24           THE COURT:  All right.  Well, I'm persuaded that

25   allowing either party to go into the substance of other
```

1   litigation involving other parties is fraught with risk and

2   creates a high level of confusion to the jury.

3          I'm going to grant Plaintiff's Motion in Limine No.

4   16.  To the extent we get to a situation during the trial,

5   Mr. Selinger, where you think there's a logical and reasonable

6   basis to seek some targeted and limited exception to that, then

7   you can certainly approach at that time.

8          MR. SELINGER:  Thank you, Your Honor.

9          THE COURT:  All right.  Plaintiff's 17 is granted.

10          Let's go to Plaintiff's Motion in Limine 18.

11          MR. MORT:  Your Honor, Ray Mort again for MTel.

12          This is somewhat similar to -- I think within the

13   scope of the Court's previous order that says we need to

14   listen to yours and Judge Payne's order regarding claim

15   construction.

16          During claim construction, HTC argued there were two

17   reasons why the claim was limited to messages with errors.

18   One, the definition of mobile unit, which the Court rejected,

19   and they have not objected to his report and recommendation.

20          The other is with regard to the structure -- the input

21   switch which is part of the structure for the means for

22   transmitting.  They also argued in claim construction that the

23   corresponding structure was an input switch which would allow a

24   user to request retransmission of a message with errors.

25          Judge Payne rejected that limitation and said it was

```
 1    simply to input switch.  And so we have seen -- in the expert
 2    reports and so forth, we see two avenues in which they are
 3    attempting to get around that, and we just want to make sure
 4    that we're clear with the Court that what's going on and that
 5    shouldn't be allowed.
 6             THE COURT:  Why do you need this in light of the fact
 7    the Court's made it as clear as I can possibly make it that
 8    we're not going to relitigate claim construction?
 9             MR. MORT:  And I think it's -- it's more of a notice.
10    I don't think we do explicitly need this, as -- as long as it's
11    understood that -- yeah, I don't think we do.
12             THE COURT:  All right.  Defendant have some response?
13             MR. SELINGER:  I do, Your Honor.  Counsel -- counsel
14    is correct that HTC America asked the Court to adopt the
15    construction of the term "mobile unit" that Judge Lynn had in
16    the Northern District of Texas.  The Court declined to do so,
17    and I've not filed an objection.
18             Counsel, however, is incorrect in -- in this issue of
19    a switch that allows the user to be corrupted by -- by errors.
20    This is really a -- an issue that is -- that is -- that arises
21    in connection with the motion to strike and also motion for
22    partial summary judgment of non-infringement, Your Honor.
23             But the one -- the one thing I wanted to point out is
24    I had asked the Magistrate Judge who had construed the -- the
25    means for transmitting limitation to include, quote, input
```

1    switches 1516, end quote, to -- to be clear that construction

2    as -- as the specification was, that one of those input

3    switches was a switch that allowed the user to request

4    retransmission of a message corrupted by errors and to

5    specifically add that.  And what -- what the Magistrate Judge

6    said during the hearing, if I may --

7              THE COURT:  Well, let me just ask you this, counsel.

8              MR. SELINGER:  Yes.

9              THE COURT:  Opposing counsel said in light of the

10   Court's position on going behind claim construction, he really

11   doesn't need this motion in limine, so why are we still

12   talking?

13             MR. SELINGER:  Only -- only because he managed to get

14   in a few other things.  But with that, I'll be quiet, Your

15   Honor.  Thank you.

16             THE COURT:  All right.  I'm going to deny Plaintiff's

17   Motion in Limine 18.  These issues, as to the -- to the extent

18   they relate to the pending motion for summary judgment and

19   other pre-trial matters not present before the Court, they'll

20   be dealt with there.

21             But given the Court's clear admonition to the parties

22   and counsel that they are not to attempt directly or indirectly

23   to go behind or circumvent the claim construction opinion in

24   this case, I think it's effectively already covered.

25             So we'll go to Plaintiff's Motion in Limine No. 19.

 1          MR. DACUS:  Your Honor, I believe Plaintiff's Motion

 2   in Limine No. 19 is covered by the Court's ruling on HTC's

 3   Motion in Limine No. 6.  Those cover the same ground.

 4          And, likewise, for MTel's Motion in Limine No. 20, I

 5   believe that was ruled upon by the Court related to HTC's

 6   Motion in Limine No. 7, which granted it.

 7          THE COURT:  Defendants agree with that?

 8          MR. SELINGER:  We do, Your Honor.

 9          THE COURT:  All right.  Well, same rulings on these

10   substantive matters as previously announced will apply to

11   Plaintiff's Motions No. 19 and 20.  And they'll be mutual as to

12   both parties in the lawsuit.

13          Okay.  That gets us through the disputed motions in

14   limine.

15          Let's next go to the pending motions for summary

16   judgment.  Let's start with Defendant's motion for summary

17   judgment based on standing.  This is Document 168.

18          And let me hear from the moving Defendant on this.

19          MR. SELINGER:  May I proceed, Your Honor?

20          THE COURT:  Yes, you may.

21          MR. SELINGER:  The -- first, I think the parties agree

22   that MTel has the burden of proof to show standing.  I submit

23   that MTel failed to create any evidentiary disputes.

24          There -- there are two contracts on which HTC America

25   relies, 1992-'93 and '90 -- through '94 contracts.  Those --

1   those were authenticated in HTC America's brief at Pages 4 and

2   6, and then evidence identified their notes 11 and 12.  And our

3   Undisputed Facts 14 and 17.

4         Now, MTel's response seems to demand conclusive proof

5   of authentication.  But that is not the rule.  And the first

6   case in -- in the book we've served on -- handed Your Honor and

7   also the other side is United States v. Watkins, and the Court

8   was specific there.  It's a Circuit decision that said:  We do

9   not require conclusive proof of authenticate -- of

10  authenticity.  Federal Rule 901 merely requires some evidence

11  which is sufficient to support a finding that the evidence in

12  question is what its proponent claims it to be.

13        However, with that said, HTC America's evidence,

14  which is Undisputed Fact 14 and 15 and MTel's responses to

15  those undisputed facts under Local Rule CV-56, authenticates

16  the con -- the two contracts in a way that removes all

17  reasonable doubt.

18        The -- the evidence with the 1992 contract included

19  testimony from Dr. Petrovic that he had signed it in two

20  places, one on the second page of -- of the agreement.  That's

21  Exhibit 18 to -- to my declaration.  And then on the page

22  immediately following the special terms and conditions.  That's

23  his testimony, which is Exhibit 9 at Page -- Transcript Page

24  56.  He also confirmed the -- the signature of Dr. Stacy Holmes

25  on the second page, and Dr. Petrovic confirmed that he had

created most of the proposal at Pages 57 and 58.

One of MTel's co-inventors, Mr. Garahi signed a letter on August 10, 1992, which by its express terms, accepted the -- the 1992/93 proposal.  That's Exhibit 12 to my declaration. The letter is -- is Garahi Exhibit 5, and its testimony is at Transcript Pages 568 to 570.

Now, what -- what MTel did in response to Undisputed facts 14 and 15 -- and if I may briefly display them to the Court?

THE COURT:  You may.

MR. SELINGER:  So 14 describes the -- the document, the -- the agreement or the proposal, and its terms and conditions.  And then 15 sets forth -- Undisputed Fact 15 then finishes with Dr. Garahi's acceptance -- or Mr. Garahi's acceptance.

Then if I may turn to MTel's response, and it's --

THE COURT:  Mr. Selinger --

MR. SELINGER:  Yes, sir.

THE COURT:  -- I don't want to cut you off, but even if I were persuaded that based on the contractual assertions that the University of Mississippi had -- had some equitable interest in the intellectual property at issue, the Plaintiffs allege that even in that contingency, it's a bona fide purchaser for value without notice.  And with that kind of an allegation, how is there not a material question of fact, even

1   if it's limited to the BFP status of the Plaintiff, how is --

2   how do we get -- how do you get the Court in a situation where

3   there is no material question of fact where it's appropriate

4   for the Court to grant this motion?

5           MR. SELINGER:  Thank -- thank you for asking, Your

6   Honor.

7           THE COURT:  That, to me, is where the bottom line is.

8           MR. SELINGER:  Okay.  So I start from the premise

9   that -- that the BFP status is an affirmative defense, and --

10  and that Rhone -- Rhone-Poulenc case that we cited, 284 F.3d at

11  1328.  There shouldn't be much -- much dispute about that.

12          So MTel has the burden of -- of showing it's -- it's a

13  BFP.  We -- and this -- this is one of these Celotex summary

14  judgment motions where when -- when the non-movement --

15  non-movant has the burden, the -- the moving party just has to

16  put in some evidence, and then the non-movant has to -- to do

17  something more than just say that's not true.

18          The evidence we put in was the assignment from SkyTel

19  to Bell Industries, and in the assignment from Bell Industries

20  to -- to Velocita, which put Velocita, which was the MTel

21  entity or its parent -- it's sister on actual inquiry notice

22  that its assignment of patents came with baggage.  And in

23  particular, the -- the language of those assignments,

24  they're -- and they're in evidence, is the patents were subject

25  to, quote, any rights and licenses granted to third parties on

1    or before the effective date hereof.  Not just licenses but

2    rights and licenses.

3           So we've put that into evidence.  MTel never

4    responded.  MTel didn't -- and the fact is, MTel -- MTel's --

5    Velocita's former CEO said:  We didn't do due diligence.  They

6    don't have -- MTel doesn't have any evidence to offer to

7    overcome that inquire -- that -- that actual or inquiry notice.

8    And that's why it's not a material -- a genuine issue of

9    material fact.  It was -- once -- it was its burden initially,

10   BFP status.  We put in some evidence to show it was on

11   inquiry -- at least inquiry notice if not actual notice, and

12   MTel's response, which is, no, it's your job -- and that's --

13   that's why I believe --

14          THE COURT:  So you're -- you're effectively telling me

15   the Plaintiffs abandoned their affirmative defense?

16          MR. SELINGER:  Yes.

17          THE COURT:  Okay.  Go ahead and present what remaining

18   argument you may have.

19          MR. SELINGER:  Your Honor, just -- just to -- so let

20   me just go back -- I won't go through the contracts unless the

21   Court wants more on those.  I believe that -- that MTel's

22   response and Undisputed Facts 3 and 4 doesn't controvert.  And

23   I'm looking for my paper, which I've managed to -- to misplace.

24   It admits both agreements -- here we go.  If I may, Your Honor?

25          So looking at Response to Material Fact 3, it doesn't

1    deny that there was an acceptance.  It -- MTel's position is --

2    is that it did not accept the modified language.  But I submit

3    to -- to Your Honor, looking at Exhibit 5, the document doesn't

4    say what MTel argues it does.  The document is very clear, and

5    says:  We accept your terms and conditions.  And then -- let me

6    take that off.

7         And, likewise, in response to the 1993/1994 assertions

8    of -- of contract, again, MTel didn't say no.  What -- what

9    MTel -- MTel said in No. 5 -- Argument 5, if I may, is -- and

10   I -- I apologize for the highlighting -- for the highlighting.

11   That was for me.  It was accepted, but only on March 10 --

12   March 30, 1994.

13        Once -- once we get past the -- it was accepted, it's

14   not -- it's not correct because the -- the letter of acceptance

15   says, we accept your terms and conditions, which included the

16   term beginning the previous August.

17        So -- so that's -- that's why there's no genuine issue

18   of material fact on -- on the record and in the Court's local

19   rules under CV-56.

20        The contracts were not hearsay at one point.  MTel

21   made that objection.  Kepner-Tregoe says:  Contracts are not

22   hearsay.  The con -- and then -- then, again, those two

23   contracts were assignments from Dr. Petrovic to the University

24   of Mississippi.  And.  And what FilmTec says:  Assignment of --

25   of an expected interest is -- is -- we're going to make

```
 1    something -- or you -- you shall own it.  And as in FilmTec,
 2    the assignment was automatic, required no further action on --
 3    on the assignee because of the way that document was worded,
 4    unlike all of the others on which MTel relies which said and
 5    you will -- and you assign it when -- whenever.
 6              THE COURT:  Let me ask you this.
 7              MR. SELINGER:  Yes.
 8              THE COURT:  Is there still not an issue of fact with
 9    regard to whether or not this particular invention was
10    conceived and reduced to practice during the summer month
11    interval when had it occurred at that point, the university
12    would not have had an interest in the resulting intellectual
13    property?
14              MR. SELINGER:  I don't believe so, Your Honor.
15              THE COURT:  Okay.
16              MR. SELINGER:  And let me -- let me explain why.
17    The -- and -- and it just has to do with the absence of any
18    evidence.  Dr. Petrovic is -- is not going to appear for trial
19    live.  He's been designated for -- and -- and --
20              THE COURT:  But on a motion for summary judgment, it's
21    your burden to establish that there's no factual dispute as
22    regards to what you've alleged.  I mean, you would have to
23    establish no material question of fact as to whether or not the
24    university had an interest.
25              Now, if you did, then I agree with you that the
```

1    assertion defensively by Plaintiff that their BFP results in

2    them bearing that burden, but until you establish beyond any

3    material -- question of fact that the University of Mississippi

4    had an interest, i.e., that this was conceived and reduced to

5    practice during that part of the calendar year when

6    contractually they would have ripened into and interest, as

7    opposed to had it been conceived and reduced to practice during

8    the summer months when they wouldn't have, that's your burden.

9    And an absence of evidence there doesn't get you, as I see it,

10   to where you need to be.

11            MR. SELINGER:  If I may respond, Your Honor?

12            THE COURT:  Please.

13            MR. SELINGER:  Again, we're dealing with the second

14   prong of Celotex, the second test in Celotex.  Standing is

15   MTel's burden.

16            What -- what we have -- what we -- what I believe we

17   have done is shown that there were two contracts that a

18   continuation-in -- in-part was filed, and there's no -- we've

19   shown that there's no evidence that it was done at least during

20   the school year.

21            Now, at that point, I submit, MTel says:  Well, wait a

22   minute, maybe it was done during these periods -- during this

23   period of time when life was different.  But that's lawyer

24   argument.  And -- and I submit where -- where it's MTel's

25   burden to show standing, MTel couldn't just say you forgot

1  about this period of time.  It had a burden to come forward

2  with -- with affirmative evidence, and it didn't do that.

3        THE COURT:  But this is your motion.

4        MR. SELINGER:  It is.

5        THE COURT:  So you have the burden on your motion,

6  which would be you have the burden to establish that there is

7  no material question of fact that the University of Mississippi

8  had an interest, i.e., that it was conceived and was reduced to

9  practice during the period -- the calendar year when they would

10  obtain an interest.

11        Now, why is -- why is that not your burden to prove --

12  why are you telling me that because Plaintiff -- because

13  Plaintiff hasn't disproved it, that they should -- they should

14  fail on this motion?

15        MR. SELINGER:  Because I've come through -- because

16  we've offered evidence of -- of the contracts and the fact that

17  there is not any evidence of work that was done during that

18  summer period.  My -- my problem is -- is I'm trying to prove a

19  negative.  And I'm not -- and under Celotex, I think --

20        THE COURT:  But, I mean, if you follow the -- if you

21  follow the paper trail, the contracts between the various

22  entities and individuals here don't reflect on their face that

23  the university had an interest; is that correct?

24        MR. SELINGER:  Not exactly.  It's -- it's -- it's my

25  belief that the language of the agreement -- the two -- two

```
 1   contracts, were assignments to the University of Mississippi

 2   from Dr. Petrovic.

 3           Now, they weren't specific to any particular

 4   invention.  But with that language, as in FilmTec, once -- once

 5   the application was filed in -- in September of 1993, that was

 6   an automatic assignment to the university, and that was during

 7   the period of the second contract.

 8           Now -- and let -- let me just mention one other thing,

 9   Your Honor, because -- because I may -- I may have overlooked

10   some evidence that -- that I do have.

11           The -- the parent app -- the parent patent, which we

12   call the '403 patent, was -- was an outgrowth of work that was

13   done -- MTel financed to -- to move from a one-directional

14   paging system to a two-directional paging system.  And -- and

15   as part of that work, MTel -- the -- the '403 patent disclosed

16   sending automatic messages back in the event that a message was

17   not correctly received by a pager.  And -- and that -- that

18   appears -- and I've got the pages.  I won't -- I won't burden

19   the Court now.

20           The '946 patent, the -- the continuation-in-part

21   patent, said:  Well, you know, maybe that creates a problem

22   that -- because you're -- you're -- you're requiring and

23   calling for needless retransmissions when -- when a message

24   is -- is on -- contains errors, but it could be understood.

25           So the '946 patent, which was filed on September 21 of
```

1  1993, said:  We're going to -- we're going to provide this

2  alternative approach, instead of automatic correction before

3  the user actually sees it, of giving the user the option to

4  push a request retransmission button.

5          The first -- the only evidence anyone has of that is

6  the actual filing of the '946 patent on September 21, 1993.

7  There -- there is no evidence that MTel has produced -- it

8  hasn't denied -- it doesn't have an invention disclosure record

9  relating to -- to this change from automatic to user optional,

10  and the first piece of paper we see reflecting that work is --

11  is the application that was filed in -- in -- during the second

12  term of -- during the term of the second contract.

13          So I believe there is affirmative evidence that --

14  and -- and there's no evidence other than that in this case.

15  And, again, it's a Cel -- it's a Celotex situation where my

16  burden -- where -- where MTel has -- I'm trying to prove a

17  negative, and -- and so Celotex is -- is a little more flexible

18  in -- in the burden of proof -- Celotex and its progeny when

19  one is trying to -- to prove the absence of evidence supporting

20  some -- the non-movant's claim.

21          THE COURT:  What else, counsel?

22          MR. SELINGER:  That's it, Your Honor.

23          THE COURT:  Let me hear a response from Plaintiff.

24          MR. MORT:  Your Honor, Ray Mort again for MTel.

25          I think there's at least six independent reasons that

1    their motion fails.

2           Just as a very brief background, these documents came

3    from a subpoena to -- to the University of Mississippi.  These

4    were collected from people's files from 20 something years ago,

5    and I think the entirety, except for a privileged document, has

6    been produced to the Court.  And there was much more

7    correspondence between the parties, and much of what we have in

8    the files are drafts.  I mean, there's some other proposals and

9    so forth that have some partial signatures.  And I think the

10   authentication issue is more than that Mr. Petrovic signed the

11   proposal.

12          One of the real questions is, yes, there appears to be

13   some proposals that were accepted, but the -- the dates between

14   the supposed acceptance is four months for the first one and 10

15   for the second one.  And there was clear pattern in the

16   documents we provided that MTel constantly rejected the clauses

17   that said that the University of Mississippi would retain any

18   ownership rights.

19          It was always MTel's position that they're paying for

20   this, they're going to keep all the patent rights.  You can see

21   it in the '91 agreement, and in '94, there's a couple of --

22   correspondence where they're saying -- actual letter from the

23   University of Mississippi says:  Here's the slip sheets for

24   this proposal which corrected the standard ownership policy

25   clause that University of Mississippi tries to enforce, and it

1    says:  It's the same as the one we did last year in '93 which

2    demonstrates that the proposals that they identify are the ones

3    that we accepted were modified and changed.  So it's a lot of

4    fact issues in terms of what were the actual terms of any

5    accepted proposal.

6         But beyond that, I think some of the insurmountable

7    evidence is -- this is the agreement that they say was in

8    effect.  So let's look at a couple of things.

9         If employees of MTel come up with the invention, it's

10   owned by MTel.  If the employees of the University of

11   Mississippi come up with it, it's owned by the University of

12   Mississippi.  This is not, by the way, an assignment by

13   Mr. Petrovic or Dr. Petrovic to either MTel or University of

14   Mississippi.

15        The only term -- times that this clause even comes

16   into play is if it's jointly developed -- if the invention --

17   so one of the predicates for this clause to even occur, HTC has

18   to prove that it was an employee of University of Mississippi

19   and an employee of MTel that jointly came up with a new matter

20   for the '946.  They can't even prove that Dr. Petrovic

21   contributed to the new matter of the '946.

22        At the deposition, he said:  I don't recall that part

23   of it.  I didn't work on the retransmission technology.  He

24   worked on error correction stuff.  That was disclosed in the

25   original '403.  It is a dependent claim, so he's a proper

1    inventor of the '946.  But he didn't contribute to the new

2    matter.  So he is not a contributor to the new matter.

3          Also --

4          THE COURT:  As I understand Mr. Selinger's argument,

5    he's told me at least twice that, quote, this is a Celotex

6    matter, and, therefore, he simply has to raise an issue of

7    standing, and then the entire burden shifts to you, because as

8    the patentee, you have to establish standing to bring the

9    action.  So what he's basically said is I raise the issue --

10         MR. MORT:  Uh-huh.

11         THE COURT:  -- and MTel hasn't met their burden.  Now,

12   why is that not right?

13         MR. MORT:  Well, it's not right for a couple of

14   reasons.

15         One is through Dr. -- Mr. Carper's declaration, he

16   clearly shows a line of title, going back to Dr. Petrovic and

17   the other inventors named on the '946 patent, all the way

18   through to MTel.  We have established the prima facie standing

19   that we are the legal titled owner of the '946 patent.  Then

20   it's up to him then to come in there and say, oh, no, there's

21   someone else that has a right that intervenes or has a partial

22   right.  We don't have to go out there and prove the entire

23   world doesn't have a right to the '946 patent.  We can trace

24   our rights to the original inventors.

25         THE COURT:  I don't -- I assume then that nobody's

 1   taking the position on either side of this issue that the

 2   University of Mississippi had an express legal interest that

 3   what they might have had under the arguments presented by

 4   Defendant is an equitable interest, an undocumented interest

 5   that they might have had depending on how this actually came

 6   about, was conceived, and reduced to practice.  Do you

 7   understand -- do you -- do you differ with that?

 8           MR. MORT:  I believe -- our position is they don't

 9   have legal interest.  At best, they have an equitable interest.

10   I do think that HTC takes a contrary position to that.  I think

11   that they construe -- as noted earlier, I think they think that

12   this is an assignment by Dr. Petrovic to the University of

13   Mississippi, therefore, provides them legal title.

14           THE COURT:  You would agree that you couldn't be a

15   bona fide purchaser for value and without notice if there was a

16   record interest vested in a third party like the University of

17   Mississippi?

18           MR. MORT:  If it was recorded at the Patent Office.

19           THE COURT:  You could only cut off an equitable

20   interest as a BFP?

21           MR. MORT:  No, I don't agree.  I believe you can

22   cut -- cut off a legal interest if it's not recorded.  It's --

23   it's just like mortgages.  If someone sits there and actually

24   in Mississippi where a lot of this is -- where it was, they

25   have cases on this, and we've -- we've fought with this in

1    another matter -- where a legal interest can get cut off.  Just

2    like if you go out and buy a house, if they don't record that

3    in the county and that seller goes out and fraudulently sells

4    it to someone else, that new person is the owner -- legal owner

5    if they go record it, and it's the same with the -- the patent

6    statute.

7            THE COURT:  Okay.  So whether the interest is legal or

8    equitable, if it's not -- if it's not recorded where there's

9    constructive notice given, then you can still have a BFP?

10            MR. MORT:  Absolutely.

11            THE COURT:  All right.

12            MR. MORT:  I think, again, though, the -- the biggest

13    thing is they can't even demonstrate that Dr. Petrovic even

14    contributed to it.  He was deposed.  He never -- he says:  I

15    didn't work on that stuff.

16            The other aspect I would say is this clause, not only

17    does it have to be made jointly, it's only to the scope of this

18    agreement.  So the retransmission technology of the '946 wasn't

19    subject to these proposals.  Dr. Petrovic was working on signal

20    strength measurements of these base towers and the interference

21    that would come around through buildings and towers and so

22    forth, and he was working on error correction stuff.

23            So even if he was a contributor to the retransmission

24    technology and even if it was an employee that they could

25    identify of MTel that was one of the other inventors and -- it

 1    still would apply.

 2            That's another thing that they have -- they have to

 3    prove all the predicates for this clause to apply, that it was

 4    an enforceable contract, that it -- that the conception and

 5    reduction to practice was within that period of time, that it

 6    was made jointly by employees of both entities, and that it was

 7    within the scope of the agreement.  They haven't even put --

 8    they didn't even respond to our position in our response

 9    regarding the scope of the agreement.  They just can't get

10    there.

11            THE COURT:  What else, counsel?

12            MR. MORT:  I think that is enough.

13            THE COURT:  All right.  If there's not further

14    argument, let's move on to the next motion for summary

15    judgment, which is Defendant's MSJ regarding license and

16    marking.  That's Document 176.

17            With regard to the MSJ regarding standing, the Court

18    will take that under advisement, and I'll get you some guidance

19    by way of a written ruling as soon as possible.  But let's go

20    on to the license and marking MSJ as presented by Defendant.

21            MR. SELINGER:  If I can have one minute, Your Honor,

22    we're getting the -- we're change -- we're changing notebooks.

23            THE COURT:  That's fine.

24            MR. SELINGER:  Thank you, Your Honor.  May I proceed?

25            THE COURT:  You may.

1          MR. SELINGER:  Cellco or Verizon Wireless depend --

2     the names are the same -- was an affiliate of -- of SkyTel and

3     so was Verizon Communications as -- as of the time the

4     SkyTel/Bell Industries intellectual property agreement was

5     executed.

6          This follows from -- from contract construction by the

7     Court of -- of the definition of affiliate and its -- its

8     incorporated term "control" in the intellectual property

9     agreement, and that agreement incorporates the term as defined

10    in the asset purchase agreement.

11         There -- there really are no genuine issues of

12    material fact here.  MTel did not dispute any of HTC America's

13    Undisputed Facts 17 through 25, and MTel brief at Page 2

14    skipped over those.

15         And the -- the asset -- the two agreements are in

16    evidence.  There's no dispute that the intellectual property

17    agreement itself includes a -- a grab back license under all --

18    all of the patent portfolio, which include the one or two

19    patents that are here in dispute?  And the grab back clause --

20    if I may briefly, Your Honor, is -- it's Selinger Exhibit N,

21    and it's Section 2.2 of the agreement.  And -- and I don't

22    think this -- this term is in dispute.

23         Now, the intellectual property agreement incorporates

24    by reference the definition of affiliate in -- in the asset

25    purchase agreement, and that's Undisputed Fact 20.  The -- the

1    asset purchase agreement is, by its terms, governed by New York

2    law.  And the asset purchase agreement is Selinger Exhibit M,

3    as in Michael, Page 61.

4           So this -- this leads to the first issue for the

5    Court, and it's the -- the scope of the term "affiliates" and

6    the contract.

7           Now, there's -- there's a definition of affiliates

8    that is -- if I may briefly.  It's -- sorry about that.

9           And that definition of affiliate is in the contract.

10   It -- just a couple of -- of -- I apologize for the quality.

11   There.

12          It's -- the relationship between the entities is

13   direct or indirect through one -- one or more intermediaries.

14   Control means possessing directly or directly.  It's the power

15   to direct or cause the direction of the management and policies

16   of the controlled party.  And -- and then it goes on, and it

17   indicates that the power to direct or cause direction of

18   management of policies can be established in any one of three

19   ways or any one of multiple ways.

20          First, ownership of voting securities.  Second -- and

21   it's the -- the last line in there -- by contract.  And the

22   third, or otherwise.

23          Now, the meaning -- the meaning of affiliate and

24   control are questions of law for the Court.  Under New York

25   law, the -- the contract definition is identical to the

1    definition of affiliate used in SEC regulations.  The -- the

2    cases that HTC America cites in the Southern District of New

3    York applied New York law to identical -- in the case of the

4    AAR Allen case -- and nearly identical definitions in the case

5    of -- the Telenor case of -- of affiliate and control.

6          Now, the AAR Allen case instructs that while affiliate

7    and control are broad in the context of the SEC case --

8    capacious was the word that the case used, and I had to look it

9    up -- but it's even more broadly construed in the context of --

10   of contract law.  And -- and the AAR Allen case was -- was a

11   decision on summary judgment.

12         The -- the Telenor and Core cases are in our brief.  I

13   won't -- I won't go into them anymore.  Telenor did -- except

14   Telenor interpreted the definition as listing alternative

15   sources of power to direct.

16         Turning to the -- the next issue, which is Cellco

17   Verizon Wireless was an affiliate of Verizon

18   Communications, and we have more undisputed facts.  The -- the

19   Cellco Partnership agreement is Selinger Exhibit O, not in

20   dispute.  At the time the intellectual property agreement was

21   executed, it's undisputed that -- it's Undisputed Facts 23

22   through 25 -- that Verizon communications, through

23   intermediaries, owned a 55 percent interest in Cellco.  At the

24   time the intellectual property agreement was executed and ever

25   since, it's not disputed that Verizon Communications, through

1  intermediaries, controlled the majority of the seats on

2  Cellco's board of representatives.  That's Undisputed Facts 28

3  and 29.

4        THE COURT:  Four out of seven, correct?

5        MR. SELINGER:  Four out of seven, Your Honor.  And

6  then it -- then it in -- increased over time, but -- but it

7  was -- I might have been -- they had nine at one point, but it

8  was -- Vodaphone always minority numbers, but -- but they're --

9  the -- it was always a majority.  It was either four out of

10  seven or five out of nine.

11        THE COURT:  Is there some indication that Vodaphone

12  had some prerogatives in the form of veto even though it's in a

13  minority position?

14        MR. SELINGER:  It -- yes, Your Honor.  And -- and, in

15  fact, Vodaphone had some very specific veto rights, but

16  those -- I'll submit to the Court that those were not veto

17  rights concerning the -- the management and -- and policy of --

18  of the company.  In fact, MTel -- MTel's case is actually --

19        THE COURT:  Well, if they don't affect the management

20  or policy of the company, what do they affect?

21        MR. SELINGER:  Well, they don't --

22        THE COURT:  I mean, management and policy are pretty

23  broad terms.

24        MR. SELINGER:  Well, they don't -- they don't affect

25  the power to direct or cause the direction of the management

1    and policies of the company.  They -- they -- they allow veto

2    what I -- and in corporate parlance, I think, there's some

3    specific organic acts, but not the -- the overall direction and

4    management and policies of the company.

5            And if I -- if I may have one second?

6            THE COURT:  Sure.

7            MR. SELINGER:  Because there's -- while Ms. Powley is

8    looking, the part -- the two sides seem to agree that -- that

9    control can be shared.  The -- the -- and that's -- now, the

10   other evidence -- while she's looking -- we -- we do rely on

11   decisions of the Federal Communications Commission that

12   specifically found that Verizon Communications controlled

13   Cellco.  And -- and we have one of them in -- in the brief,

14   specific factual findings.  Those -- those --

15           THE COURT:  From a precedential standpoint, how is the

16   factual finding of an administrative agency binding on this

17   Court?

18           MR. SELINGER:  It's -- Your Honor, I -- I don't submit

19   that it's binding.  I submit that it's evidence.

20           THE COURT:  All right.

21           MR. SELINGER:  Now, what -- what I was looking for was

22   there's a Vodaphone decision from Indiana Tax Court on -- on

23   which MTel relies, and -- and I'm looking at Footnote 8.  And

24   what -- what the Tax Court there said:  More importantly,

25   however, the fact that Vodaphone holds veto rights deemed not

 1  to indicate participation in the management of a business does

 2  not indicate the fact that it participates.  And -- and there's

 3  no question, Vodaphone had the right to participate.

 4       But they -- they were -- but the veto rights weren't

 5  themselves by MTel's case considered to indicate

 6  participate in -- participating in the management of the

 7  business.  So while, yes, those are there, under -- under

 8  MTel's view, the only time one would comply with that

 9  definition of affiliates and control was -- was if there was

10  absolute and total control.

11       That's not how the SEC has construed that term.  It's

12  not how the New York cases have construed that term.  And --

13  and the fact that Vodaphone has some minor opportunities to

14  participate, whether -- whether by board -- by minority

15  board -- board of representative seats or by the ability to

16  appoint one individual or the fact that it can -- it -- it has

17  the ability to veto specifically defined activities does not --

18  does -- does not either eliminate or raise a disputed question

19  of fact about whether Verizon Communications indirectly had the

20  power to cause or direct the causing of the management

21  policies.

22       THE COURT:  Could not the underlying agreement have

23  said if the parties had chosen it to say that if there was

24  complete or shared control by using the term "control" without

25  expressly defining it as something less than complete control,

1  does the language used in the agreement -- even though others

2  may have found that partial control is a form of control,

3  unless the definition of control in the operative document

4  defines it as something less than complete control, can it be

5  for purposes of construing that document and its application

6  control, if it's partial or less than complete or subject to

7  various vetoes by its minority participant?

8          MR. SELINGER:  Yes, it can.

9          THE COURT:  Okay.

10          MR. SELINGER:  And I think -- I think if -- based --

11  based on the history of that definition, the fact that it's

12  found in -- parrots the SEC language, and it's been

13  construed in other context before then, I submit that if -- if

14  the parties meant for control to be sole and exclusive, that

15  they would have used sole and exclusive, not the other way

16  around.

17          THE COURT:  That's the other side of that coin.

18          MR. SELINGER:  It is, Your Honor.

19          THE COURT:  Okay.  What else, counsel?

20          MR. SELINGER:  And let -- let me then go on.

21          The -- the next part of that, of course, is -- is the

22  issue of compliance with the marking statute.  It's -- it's

23  been briefed.  MTel has the burden to mark if Cellco was a

24  licensee.  We've sold millions of phones to Cellco.  Cellco

25  resold those phones.  There's no evidence that any of them had

1    the number.

2           Cellco argued -- or MTel argues about off the shelf or

3    have made.  That ignores the fact that the -- Cellco grants

4    includes the right to have imported which doesn't come with any

5    of that baggage.  We think that the -- the Northern California

6    Court in the Asetek case got it right when -- when the Court

7    said -- when the party there -- the Plaintiff there tried to

8    argue that the infringer was selling the heart of the

9    invention.  And that's not what the patent says -- and that's

10   not the -- patent said there.  That's not what the patent says

11   here.

12          MTel says:  Well, we're -- you're -- you're not

13   modifying the email.  Well, that's -- the claim doesn't say a

14   patent -- it's not a patent on emails.  It's a patent on a

15   mobile phone.

16          And the -- as far as -- as the -- does the Court --

17   does the Court have any questions on that, because I --

18          THE COURT:  No, sir.

19          MR. SELINGER:  Then let me -- let me briefly touch

20   on the T-Mobile agreement.  The Magistrate Judge recommended

21   that the Court find T -- that because of the T-Mobile license,

22   MTel could not recover damages against LG.  We have exactly the

23   same agreement, exactly the same circumstances.  The Court

24   adopted that recommendation.  That is a decision.

25          And then the -- the -- if the Court has no questions

1   on that, let -- and I can talk for a long time on it, but I

2   know I shouldn't.

3        The -- the last issue is the Sprint license.  What --

4   what didn't come up in -- in the prior case was the covenant

5   not to sue.  And in the -- Section 8 of -- of the -- of

6   technically the Clearwire agreement, but it's -- it's called

7   Sprint, it -- what -- what that section said is -- is no third

8   party that is a current Defendant shall be a beneficiary of any

9   of these rights, except to the extent that such Defendant

10  receives rights under the licensed patents as an authorized

11  third party.  It doesn't say if you're currently being sued,

12  you get no rights.

13       And we -- we were selling product to T-Mobile that

14  made us an authorized third-party beneficiary.  Once that

15  happened -- and Section 6 of -- of the agreement is titled

16  Covenant Not to Sue.  And -- and so once our -- once our status

17  as an authorized third party is triggered under Paragraph 8,

18  then the covenant not to sue protects us from suit against all

19  MTel patents, except it carves out claims against us for

20  products not sold to T-Mobile.  And that makes sense because

21  we're selling to T-Mobile.  T-Mobile can -- can buy from us.

22  It's licensed to buy from us.  And that's the extent of -- of

23  the -- the agreement.

24       We're not licensed under the three -- we're -- we're

25  not involving the three patents per se because we weren't sued

```
 1   on them, but T-Mobile was.  We were authorized to -- we became
 2   an authorized third party by being able to sell those products
 3   which T-Mobile was then authorized to resell and that triggered
 4   Paragraph 6 where we have covenant not to sue rights only with
 5   respect to T-Mobile.
 6           We're -- we're not -- and -- and I -- and I heard the
 7   rumor that -- in one of the earlier cases, somebody tried to
 8   argue if you're licensed on one, you're licensed for all
 9   possible situations.  We're not trying to do that.  But I do
10   believe that we're protected under the covenant not to sue
11   provision because we are an authorized third party so that
12   T-Mobile can buy products from us which it can then use in ways
13   that MTel thought otherwise infringed the '403 and other
14   patents.
15           THE COURT:  All right.
16           MR. SELINGER:  If -- if the Court has no other
17   questions, it's late, and I'll sit down.
18           THE COURT:  Thank you, counsel.
19           Let me hear a response from Plaintiff.
20           MR. SELINGER:  I should have been saying Sprint, Your
21   Honor, at the end.
22           THE COURT:  All right.
23           MR. SELINGER:  Thank you.
24           THE COURT:  Thank you.
25           What's the Plaintiff's response, Mr. Cohen?
```

 1          MR. COHEN:  Yes, Your Honor.  Would it be all right if

 2  I used the projector, Your Honor?

 3          THE COURT:  Talking about the document camera next to

 4  you?

 5          MR. COHEN:  No.  I'm sorry --

 6          THE COURT:  Okay.

 7          MR. COHEN:  -- I was thinking it might be up now.

 8          THE COURT:  We've gotten this far all afternoon, and

 9  here's our first PowerPoint.

10          MR. COHEN:  I apologize, Your Honor.

11          THE COURT:  All right.

12          MR. COHEN:  I'll try to be brief, Your Honor.

13          Let me first emphasize, Your Honor, that we do need to

14  distinguish between control and ownership.  And that's

15  important because most -- not all of the evidence that HTCA has

16  adduced is premised on -- on an alleged ownership, 55 percent

17  ownership that HTCA contends extends from Verizon

18  Communications to Cellco Partnership.  But ownership is -- is

19  not the issue here.

20          What is at issue is control, and specifically the

21  ability to direct the management and policies of a company.

22          We know that because of the definition of affiliate.

23  We know that because elsewhere in the asset purchase agreement

24  where the parties did want terminology to depend on

25  ownership -- for example, the subsidiary -- they were able to

1    define it that way.

2            Now, there has been some, we think, in HTCA's reply

3    saying that ownership is broader than control.  That's largely

4    not the case.  There are two separate terms.

5            One, I think any -- anyone that is familiar with a

6    homeowner's association is generally familiar with the

7    distinction between ownership and control.  One might own --

8    own their house, but when it comes to the exterior or the

9    gardening of the front lawn, they certainly don't control it.

10   Conversely, one can have no ownership rights whatsoever and

11   have full control.  And as the -- the asset purchase agreement

12   explains, that can be done by contract.

13           So these are two different concepts, and we can't just

14   jump from one to the other.

15           THE COURT:  I understand theoretically those can be

16   separated.  Let's talk about specifics as to what does and

17   doesn't apply here.

18           MR. COHEN:  Yes, Your Honor.

19           Now, as far as showing control, the issue is whether

20   Verizon Communications controlled Cellco Partnership, and that

21   control has to extend through each link of the chain from

22   Verizon Communications to Cellco Partnership.  And, frankly,

23   all we're left here is -- is a black box.  We don't know any of

24   the relationship between Verizon Communications and the actual

25   partners to Cellco Partnership.

1           And now, the -- the partnership agreement was

2    structured such that the -- the various partners were bucketed

3    into the two groups.  One was the Vodaphone group, and one was

4    the Bell Atlantic group.  So even within those partnership

5    groups, there are interactions between the partners.  And we

6    don't know anything about the interactions between those.  And,

7    of course, the devil is in the details.

8           The fact that there might be, quote, partnership

9    extending from Verizon Communications to Cellco Partnership

10   says nothing about the control that would extend from Verizon

11   Communications through each of these multiple partners and

12   then from each of the multiple partners to the partnership

13   groups.

14          We frankly have -- we have no evidence whatsoever.

15   Now, it's -- not only is this -- this licensing defense HTC's

16   burden at trial, but it's also their burden at summary

17   judgment.  They have adduced no evidence showing the -- that

18   any control extended from Verizon Communications to Bell

19   Atlantic to NYNEX, et cetera, or from those partners down

20   through the specific partnership groups.

21          Now, even if the Court was to look only at the

22   partnership groups to Cellco Partnership and ask whether, for

23   example, the Bell Atlantic group or the Vodafone group exerted

24   control, even there, within the Cellco Partnership agreement,

25   the answer has to be no.  As Your Honor observed Mr. Selinger,

1    there's a -- there's a laundry list of provisions over which

2    the Vodafone group held veto rights.  Those were basically

3    every significant decision, and one thing Your Honor might pick

4    up on is that --

5              THE COURT:  Give me some examples, counsel.

6              MR. COHEN:  Sure.  So, for example, the purchase of

7    the products and services as having a value of greater than $15

8    million.  Now, at first blush, that seems like a large amount.

9    In 2007, when --

10             THE COURT:  The purchase of what?

11             MR. COHEN:  Products and services.

12             THE COURT:  Okay.

13             MR. COHEN:  In 2007, when all these transactions

14   occurred, Verizon -- Cellco Partnership, rather, had a revenue

15   of over $43 billion.  $15 million was -- was a small amount.

16   Other provisions are similar.

17             Under Section 4.1(e)(3), the acquisition or

18   disposition of assets having a value in excess of $10 million.

19   Again, a small amount relative to the actual annual revenue of

20   Cellco Partnership.

21             Even more mundane issues, such as firing of Cellco's

22   CPA, or not so mundane issues relating to the preservation or

23   existence of Cellco Partnership declaring bankruptcy.  For

24   instance, Cellco Partnership had veto rights over -- over all

25   these issues.

1              THE COURT:  You mean Vodafone?

2              MR. COHEN:  I'm sorry, Your Honor, Vodafone, or the

3     Vodafone group rather.  And it is important to recognize that

4     we are talking about groups of partners, not -- even the Bell

5     Atlantic group, it's multiple partners, not just -- there's no

6     Bell Atlantic entity that stands alone.

7              THE COURT:  Let me ask you this.

8              MR. COHEN:  Yes, Your Honor.

9              THE COURT:  Opposing counsel talked about 55 percent

10    of the ownership being in Verizon Communications, four out of

11    seven members of the board being appointed or designated by

12    Verizon Communications as examples of control.  But yet what I

13    hear you saying is Verizon Communications is not a partner in

14    the -- in the Cellco Partnership?

15             MR. COHEN:  That's correct.  Verizon --

16             THE COURT:  How would they have such control and

17    authority indirectly, and if so, how?

18             MR. COHEN:  Well, I think that is the $64,000

19    question.  To back up one-half step, indeed, Verizon

20    Communications is not a partner, and Verizon Communications is

21    not even mentioned in the Cellco Partnership.

22             THE COURT:  But the representation was made that there

23    really are no questions of material fact.  These are

24    established facts.  And, therefore, you should simply apply

25    them to this circumstance and apply the law and give us an

1    answer on a summary judgment basis.

2              MR. COHEN:  Yes, Your Honor.  And I think the error is

3    in presuming that because -- even assuming that that 55 percent

4    ownership -- and what we'll talk about is direct ownership

5    through multiple links of the chain -- even assuming that there

6    is such -- that that does exist, and to be fair, it hasn't been

7    proven, but the issue is whether control follows that.  And it

8    doesn't -- it's not necessarily so.  As we can see from the

9    partnership -- the Cellco Partnership agreement itself, we

10   don't know --

11             THE COURT:  Control can't follow it if it doesn't

12   exist.  So I think we start with existence.  Is there 55

13   percent ownership somehow directly, indirectly, vested in

14   Verizon Communications and attributable to this Cellco

15   Partnership, or is there not, or do we not know?

16             MR. COHEN:  One, I think we don't know.  But even if

17   we were to take the fact that there is ownership extending

18   direct -- indirectly from Verizon Communications to Cellco, I

19   don't know and I don't think anyone in this room knows what

20   ownership means.

21             Are we talking about a profits interest?  Are we

22   talking about full membership interest?  Are we talking about

23   Class A stock?  Are we talking about Class B stock?  The flow

24   of control from Verizon Communications all the way down each

25   link of the chain depends very much on how we understand those

1   relationships.

2          And to use the word "ownership" colloquially says

3   nothing about the actual relationship between Verizon

4   Communications and each one of those partners, their essential

5   relationship, each one of those partners to each -- to the

6   partner groups, and then from the partnership groups, to Cellco

7   Partnership.  The devil is in the details, and we just don't

8   have any of those.

9          THE COURT:  Well, clearly, there's an argument that

10  can be made that control follows ownership or control doesn't

11  follow ownership.  But unless you can establish ownership, you

12  never get to that question.

13         And Mr. Selinger's argument seemed predicated on the

14  fact that there was really no dispute that Verizon

15  Communications owned 55 percent of the Cellco Partnership and

16  Verizon Communications had the direct right to control the

17  appointment of four out of seven members of the board of Cellco

18  Partnership, and you're telling me that's not the case.

19         MR. COHEN:  I think there -- there are two --

20         THE COURT:  Or you don't know that's the case because

21  nobody's shown it to be the case.

22         MR. COHEN:  I -- there are two facts built into that.

23  If I could have them --

24         THE COURT:  Please comment.

25         MR. COHEN:  As to the ownership question, we have --

1   we have no basis to -- to challenge a statement that ownership,

2   whatever that term may mean, and we don't know what it means,

3   but ownership generally may exist from Verizon Communications

4   to Cellco Partnership.  We have no idea how that ownership

5   flows or what exactly ownership means.

6           As I said, it could be a profits only interest, as

7   opposed to a full membership interest in any one or multiple

8   partners.  But the dispositive question is whether control

9   follows ownership.  And that is -- that is not necessarily the

10  case.  As we see from the Cellco Partnership agreement itself,

11  one can -- control is largely distinct from it -- for example,

12  in Section 4.1, which provides Vodafone the veto power.

13          Now, Section 4.1 is not the -- the last word when it

14  comes to the Vodafone group's ability to -- to prevent the Bell

15  Atlantic group from having its way, controlling, say, Cellco

16  Partnership.  We know that Vodafone appointed at least one,

17  quote, significant officer, in this case, the CFO.  We know

18  that Vodafone was guaranteed board representation under Section

19  3.3(a).  We know that -- and the committee required the

20  presence -- the presence of at least one Vodafone group

21  representative.  We know that will satisfy the forum

22  requirement.  Vodafone group had to have at least one

23  representative present.

24          We know that there was no right for any partner, the

25  Bell Atlantic group of partners or the Vodafone group of

1  partners, to petition the Cellco property.  We know that there

2  were limits on the business dealings that Cellco Partnership

3  had with respect to any of the other partners.  We know that

4  there were limits on capital contributions.

5       So the fact is that there are all these structural

6  provisions in the Cellco Partnership agreement that were

7  specifically intended to prevent what HTCA's alleging to

8  have -- to have happened.

9       There are at least half a dozen separate provisions

10  that provide a floor -- 20 percent floor beneath which either

11  the Bell Atlantic group or the Vodafone group could fall.  If

12  one of those partnership groups' collective interest in Cellco

13  partnership fell beneath that, then, yes, at that point, I

14  think we'd be facing a much different question as to whether

15  there was control, because at that point, these partnership

16  groups are basically riding along while the other group of

17  partners does what they want.

18       But by HTCA's own admission, the Vodafone group had

19  45 percent interest in Cellco Partnership, well above the 20

20  percent floor.

21       So the question arises why if the Bell Atlantic group

22  had control over Cellco Partnership, what purpose could any of

23  those multiple triggers have if -- if 20 percent floor means

24  nothing, then why even have it in there?  Under HTC's argument

25  those half dozen provisions would be negated because we would

```
 1   say, well, I guess Bell Atlantic -- the Bell Atlanta group
 2   really wasn't in control, and -- and all the other structural
 3   provisions in the Cellco Partnership that Vodafone -- that
 4   provided for Vodaphone's participation were not worth anything.
 5         Now, I think ultimately this all boils down to one
 6   fact.  This is HTCA's burden both at trial and especially here
 7   in the of context for motion for summary judgment.  But there
 8   are numerous questions of material fact that the jury needs to
 9   hash out.
10         As I said at the beginning, there are all the factual
11   holes relating to -- to Verizon Communications' ownership
12   from -- flowing from Verizon Communications through all the
13   different links of the chain through to Cellco Partnership.
14   And then the more pertinent question of whether control flowed
15   and how control flowed and if control flowed from each one of
16   those links from Verizon Communications through to -- to all
17   the different partners, from all the different partners to all
18   different -- the partnership groups and then from the different
19   partnership groups among the partners there and then flowing to
20   Cellco Partnership.
21         The jury would also have to understand the import of
22   all these structural restrictions in the Cellco Partnership
23   agreement, the fact that under 4.1, Vodafone had veto power
24   over every significant decision, the fact that there were all
25   these triggers with which a partnership group lost the ability
```

1    to participate in the partnership but above which they were --

2    they were right on board in the wheelhouse.

3         The fact that Verizon Communications is not mentioned

4    once -- not once in the Cellco Partnership agreement.  The fact

5    that when SkyTel and Bell consummated this transaction in 2007

6    and the definition of affiliate was written, that -- that

7    Cellco Partnership had a revenue of $43 billion.  No small

8    amount.  It's not like the Cellco Partnership was an

9    afterthought.  And yet despite that, Cellco Partner -- Bell

10   Atlantic and Cellco -- sorry, Bell Atlantic and -- and SkyTel

11   didn't mention once Cellco Partnership in the asset purchase

12   agreement or the IP agreement.

13        The fact that Vodafone appointed Cellco's CFO.  The

14   fact that Indiana Tax Court said that Vodafone participated in

15   Cellco's operation.

16        And last thing -- I know this is the question to the

17   Court regarding motions to strike, but to the extent that any

18   experts testify, that the jury will have to weigh the

19   credibility of -- of those experts.

20        So if there's no further -- further questions on that

21   specific matter, I'll move on, Your Honor.

22        THE COURT:  Please do.

23        MR. COHEN:  Okay.  With respect to the -- to the

24   marking issue, and that -- and we're discussing this, I think,

25   assuming we even get there past all these questions of material

1  fact regarding the Cellco license, we now know we apply the

2  rule of reason approach.

3       Now, the question is whether under the rule of reason

4  to what extent can MTel or its predecessors be held responsible

5  for marking of a licensee or alleged licensee that MTel never

6  knew existed in the first place?  And how reasonable was it or

7  would it have been for MTel to police companies that it never

8  thought were a licensee to begin with?

9       THE COURT:  Let me ask you this, counsel.  If -- if

10 HTC prevails on its motion and as a result effectively the

11 Court concludes that HTC is licensed under the patents-in-suit,

12 why is it not game over?  Why do we worry about pre-suit

13 damages on a failure to mark situation if, in fact, to get to

14 the marking question, there's a prerequisite finding of

15 licensure that basically takes HTC out of the trap altogether?

16      MR. COHEN:  Yes, sir.  I don't think that we're

17 talking about whether HTC is licensed.  I think we're talking

18 about whether Cellco Partnership is licensed.

19      THE COURT:  Right.  But then you've got -- then you've

20 got the step from Cellco Partnership to HTC through the

21 importing and manufacturing and so forth and so on of the

22 phones that are at issue, right?  I mean, there's a way for HTC

23 to effectively be non-infringing if Cellco Partnership is

24 licensed.

25      MR. COHEN:  Assuming Cellco Partnership is licensed,

1    then the argument that HTC will have to prevail on is whether

2    they could capitalize on -- on part of that license.  We're not

3    talking about all the damages.  We're talking about only

4    damages from Cellco part -- regarding Cellco Partnership

5    phones.  But even then we're dealing with a question of have

6    made rights.  And there's a series of law primarily out of

7    Delaware.  I think there's also a Pennsylvania case that

8    explains that to -- to exercise have made rights for Cellco

9    Partnership -- more specifically, to exercise have made rights,

10   they actually have to have products specially made.  They can't

11   go to HTC and -- and --

12          THE COURT:  And I understand that's another argument,

13   but if the Court finds that Verizon Communications was in a

14   position of control, then there is a path for HTC to be

15   shielded from infringement altogether in this case, correct?

16          MR. COHEN:  I don't --

17          THE COURT:  Or is that not correct?

18          MR. COHEN:  With all due respect, I -- I don't believe

19   that's correct, Your Honor.

20          THE COURT:  Okay.

21          MR. COHEN:  I think that's why this is a partial

22   motion for summary judgment because it's only carving --

23   assuming that HTC can prevail on -- on all the different -- the

24   waterfall of the factual legal issues, then at the end of the

25   day, we're talking about carving out a subset of damages, not

1    that HTC altogether is -- for -- for every single phone that's

2    sold across the board.

3            THE COURT:  And is that carve-out of damages limited

4    to pre-suit damages through the marking statute?

5            MR. COHEN:  I believe HTC is arguing on two respects.

6    One, they're -- what they're arguing as to pre-suit damages

7    under marking, but I think -- and I don't want to speak too

8    much for them, but I believe that they are also arguing that

9    post-suit damages for Cellco Partnership phones would also be

10   carved out.

11           THE COURT:  All right.  Go ahead and complete your

12   argument.

13           MR. COHEN:  Two very brief points, Your Honor, one as

14   to the T-Mobile license.  HTC's counsel said that -- that they

15   stay in the exact same position as LG.

16           Factually, I don't think that's the case.  What we

17   have here that we didn't have the in LG case is the supplier

18   agreement between HTC and what is now known as T-Mobile.  At

19   the time this supplier agreement was consummated, T-Mobile had

20   a different name.

21           Now, that agreement shows that there is no -- there's

22   no basis in that agreement by which T-Mobile could be held

23   liable for indirect infringement, and that is the key factual

24   distinction that is here that did not exist in the T-Mobile

25   case.

1          As to the Cellco Partnership -- I'm sorry, Your

2     Honor, as to the Clearwire license agreement, HTC is saying

3     that they are a third party -- that they are an authorized

4     third party.  An authorized third party, whether it's under the

5     covenant not to sue or any other provision in that document

6     turns only on -- it's limited only to the three patents that

7     were at issue in that case that HTC is not being accused of

8     infringing here.

9          Even if they were an authorized third party, that

10    wouldn't cover -- that license wouldn't extend to HTC for the

11    '946 patent, which that issued here.  But the '946 patent

12    wasn't part of that lawsuit and -- and isn't part of the

13    definition of authorized third party.

14          THE COURT:  All right.

15          MR. COHEN:  Thank you, Your Honor.

16          THE COURT:  Anything in rebuttal, Mr. Selinger?

17          MR. SELINGER:  May I proceed, Your Honor?  I promise

18    to be brief.

19          THE COURT:  Yes.

20          MR. SELINGER:  Control has got three -- three

21    alternatives, ownership, contract, or otherwise.  MTel seems to

22    focus on one.  But really I want to -- I want to focus just

23    briefly on the -- the CV-56 practice.  We set forth

24    undisputed -- proposed undisputed findings of fact.  MTel

25    didn't disagree with No. 24, 25.  And by the way, the reason

1    Verizon Communications isn't mentioned in the Cellco

2    Partnership is it wasn't created.  Undisputed Finding 24

3    says -- points out it wasn't even created then.  And so, of

4    course, you wouldn't expect it.

5            But the -- what -- what we did is offer evidence of

6    control through the undisputed facts, through -- through the

7    Federal Communications Commission's findings of fact, not

8    conclusive, but -- but they're evident.

9            And then if you look at MTel's reliance on the

10   Vodafone case, you get another footnote, Footnote 1.

11   There's -- there's yet another finding of 55 and -- and 45.  We

12   put that -- that's our evidence.  And what we hear is, oh,

13   well, there might be all of these other issues, but not

14   evidence.

15           And so I submit to the Court that in the context of --

16   of summary judgment, we have -- we have put on prima facie

17   evidence, and what MTel has offered is -- is arguments and --

18           THE COURT:  What about the specifics that MTel gave me

19   with regard to the Vodafone veto prerogatives?

20           MR. SELINGER:  They're --

21           THE COURT:  Anything over $10 million if the business

22   is doing $43 billion a year --

23           MR. SELINGER:  Well --

24           THE COURT:  -- for example?

25           MR. SELINGER:  -- it actually doesn't say that, Your

1   Honor.  And what -- what it -- those -- those -- those numbers,

2   if I'm looking at them, are -- are not business -- I'm actually

3   looking at -- at the heading under which that comes, and

4   it's -- it's Section E -- it's Exhibit O.  It's HTC.  The last

5   three digits are 013.  The sub -- the subheading is Dealing

6   With Affiliates.  And so the limitation -- and admit there's a

7   limitation, is -- is that while -- while Vodafone was -- was

8   involved, there -- there were restrictions on what I'd call

9   dealings with -- between the Cellco Partnership and -- and

10  other affiliates.  Obviously, that's to the -- to the

11  detriment.  And so they -- one of those restrictions was

12  intercompany loans.  That's where the 10 million comes from.

13  But, again, it's -- it's dealing with affiliates.  It's not you

14  can't do business.  It's you -- you -- you can't deal with

15  affiliates.

16          Purchase of products or services of -- of greater

17  value than 15 million.  Exactly the same thing, Your Honor.

18  It's dealing with affiliates.  If -- if you want to -- if -- if

19  Cellco wanted to buy something from an affiliate of more than

20  15, it needed permission.  It could spend an unlimited amount

21  of money otherwise.  It didn't -- and so there -- there were

22  some minor limitations.  There's no doubt.  But those -- those

23  don't go to whether or not there -- there was control of --

24  not -- not absolute and -- because I don't believe that's the

25  standard.  If it was, we'd never have any SEC prosecutions for

 1    control issues.

 2            And with that, Your Honor, if the Court has questions,

 3    I'll answer them.  Otherwise, I'll sit down.

 4            THE COURT:  No.  Thank you for your argument.

 5            MR. SELINGER:  Thank you.

 6            THE COURT:  Both HTC's summary judgment motion on

 7    standing and this motion for summary judgment by HTC on

 8    license and marking are under submission.  I'll consider

 9    these carefully, as well as the supporting evidence, and try to

10    get you a written ruling with some guidance as soon as

11    possible.

12            We still have at least one more motion for summary

13    judgment.  We have not gotten to the Daubert motions.  The

14    disputed exhibits in this case are somewhere over the horizon,

15    so it's clear that we're going to have to have more pre-trial

16    time together, and I will work on scheduling a follow-up

17    pre-trial session so that we can take up what remains of these

18    unresolved pre-trial issues as soon as possible.

19            Are there questions for the Court from either party

20    before we recess for the day?

21            MR. DACUS:  Only one, Your Honor, and I think I

22    probably likely know the answer, but I'll ask anyway.  Is the

23    Court in the position to offer us any guidance on actual trial

24    date at this point?  I know our jury selection is on August 15.

25    Is the Court expecting that we're going to proceed in that

```
1    first week or subsequent, or is there any guidance from the
2    Court?
3              THE COURT:  I moved you back from July to August,
4    Mr. Dacus, so you and Mr. Gillam could go to Italy.  You still
5    need more information?
6              MR. DACUS:  I will admit to the Court I'm asking for
7    somewhat personal reasons.  The Court may have seen in the --
8    in our motion that I have a child going to Cornell on the 19th,
9    and I -- I need to get him there.  So I -- I won't --
10             THE COURT:  I don't know the answer.
11             MR. DACUS:  -- I won't try to hide that.
12             THE COURT:  I don't know the answer right now.
13             MR. DACUS:  Understood.
14             THE COURT:  We've got a fixed jury selection date.
15   If -- if practical and if there's not a worthy impediment,
16   it's always my preference to go directly into trial after we
17   select the jury.  I always worry about intervening problems
18   that can come up.  But I'm not prepared to tell you for sure
19   today.
20             MR. DACUS:  Understood, Your Honor.
21             Thank you.
22             THE COURT:  Any questions from Defendant before we
23   recess for the day?
24             MR. GILLAM:  No, Your Honor.
25             THE COURT:  All right.  We stand in recess, counsel.
```

1    Thank you.

2            COURT SECURITY OFFICER:  All rise.

3            (Hearing concluded.)

1                           CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9     /S/ Shelly Holmes                          7/20/16
      SHELLY HOLMES, CSR-TCRR                     Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25