```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4   MOBILE TELECOMMUNICATIONS        )(

 5   TECHNOLOGIES, LLC                )(     CIVIL DOCKET NO.

 6                                    )(     2:13-CV-946-JRG

 7   VS.                              )(     MARSHALL, TEXAS

 8                                    )(

 9   ZTE (USA), INC.                  )(     JULY 15, 2016

10                                    )(     10:50 A.M.

11   _____

12   MOBILE TELECOMMUNICATIONS        )(

13   TECHNOLOGIES, LLC                )(     CIVIL DOCKET NO.

14                                    )(     2:13-CV-948-JRG-RSP

15   VS.                              )(     MARSHALL, TEXAS

16                                    )(

17   HTC AMERICA, INC.                )(     JULY 15, 2016

18                                    )(     10:50 A.M.
```

19                      PRE-TRIAL HEARING

20          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

21               UNITED STATES DISTRICT JUDGE

22

23   APPEARANCES:

24   FOR THE PLAINTIFF:  (See Attorney Attendance Sheet docketed in
                          minutes of this hearing.)

25

```
 1   FOR THE DEFENDANT:   (See Attorney Attendance Sheet docketed in
                           minutes of this hearing.)
 2

 3   COURT REPORTER:      Shelly Holmes, CSR-TCRR
                          Official Reporter
 4                        United States District Court
                          Eastern District of Texas
 5                        Marshall Division
                          100 E. Houston Street
 6                        Marshall, Texas  75670
                          (903) 923-7464
 7
     (Proceedings recorded by mechanical stenography, transcript
 8   produced on a CAT system.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2

3   July 15, 2016

4                                                    Page

5        Appearances                                   1

6        Hearing                                       4

7        Court Reporter's Certificate                 89

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  This is the time set for additional

 4    pre-trial matters to be taken up and considered in the case of

 5    Mobile Telecommunications Technologies versus HTC America, et

 6    al.  These are Case Nos. 2:13-CV-946 and 2:13-CV-948.

 7              Let me call for announcements on the record.

 8              What says Plaintiff, Mobile Technologies --

 9    Telecommunications Technologies?

10              MR. SCARDINO:  Good morning, Your Honor.  Daniel

11    Scardino for Plaintiff.  I'm here today with Mr. Ray Mort,

12    Dustin Taylor, Ian Cohen, and our client representative,

13    Mr. Michael Carper.

14              THE COURT:  All right.  Thank you, counsel.

15              What says the Defendant, HTC?

16              MR. GILLAM:  Good morning, Your Honor.  Gil Gillam,

17    along with Jerry Selinger, Susan Powley, Trampas Kurth, and our

18    corporate representative here today, Mr. Owais Siddiqui for HTC

19    America.  We're ready to proceed, Your Honor.

20              THE COURT:  All right.  Thank you, Mr. Gillam.

21              All right.  Counsel, before we get into the actual

22    motions that are pending, I want to cover a few housekeeping

23    matters related to pre-trial and the upcoming trial of this

24    case.

25              Much of this -- those of you who've practiced in this
```

1   Court before may already know, but out of an abundance of

2   caution, to make sure everyone knows and is on the same page,

3   I wanted to review these overall housekeeping matters with

4   you.

5         As you know, this case is scheduled for jury selection

6   on August the 15th.  The Court's going to afford each side 30

7   minutes per side for voir dire.  During that voir dire process,

8   the Court will allow each side up to three minutes at the

9   beginning of its voir dire to outline from a very high level

10   and a very non-argumentative fashion what it believes the facts

11   and major contentions in the case are.  You're not to argue

12   your case, and you're not to go over three minutes.  It's

13   simply to give the jury panel a very high level rudimentary

14   understanding of what the case is about.  You don't have to do

15   that, but if you choose to do it, you have up to three minutes

16   to pursue that at the beginning of your voir dire examination

17   of the panel.

18         The panel will see the patent video produced by the

19   Federal Judicial Center before the voir dire process starts.

20         And let me ask, counsel, are there or do you

21   anticipate there being jury questionnaires requested in this

22   case?

23         MR. SCARDINO:  We are working together on a jury

24   questionnaire to submit to the Court.  I don't know if that's

25   been done yet --

1              THE COURT:  All right.

2              MR. SCARDINO:  -- but it's in the process.

3              THE COURT:  Well, let me -- let me tell you this.

4    Those questionnaires need to be ready and delivered to the

5    clerk so that they can go out with the summons for the panel.

6    I do not have the panel come in and then pass out the

7    questionnaires and we kill an hour while each member of the

8    panel sits down and fills out the questionnaire.  They need to

9    get the questionnaire in advance.  And to avoid the cost and

10   duplication of additional deliveries, I want the questionnaire

11   delivered with the summons with the instructions that it be

12   filled out and sent back in.

13             Each side needs to coordinate with Ms. Martin, our

14   deputy in charge, as to when she anticipates doing that.  And

15   you need to have your submission to me early enough so that I

16   can review it, make any edits or changes, and you can get it

17   back and get it reproduced and delivered to her so it can go

18   out on that timeline.  Okay?

19             There are -- there are samples available, if you need

20   them, of similar type questionnaires.  Typically, the Court

21   limits them to a couple pages, and I always review them to make

22   sure there are not any inquiries on there that I think are

23   overly burdensome or overly personal.  And I usually check them

24   for what the Court views to be relevant to this case.

25             But suffice it to say, if you don't coordinate that

1  with the clerk and get them to me in time, you're going to find

2  that the time has passed and you're not going to be able to get

3  them.  So if you're concerned about that, you need to work with

4  the clerk in that regard and with the Court.

5         Each side is going to be afforded four peremptory

6  challenges.  I intend to seat eight jurors for this trial.

7  Trial will begin after jury selection.  It may be that we break

8  for lunch and then come back and start, but I intend to begin

9  the evidence -- opening statements and then the evidence the

10 same day as we select the jury.

11        Each side is going to be afforded 25 minutes for

12 opening statements, and each side's going to be afforded 30

13 minutes per side for closing statements.

14        On your closing statements, you may divide your time

15 with co-counsel, if you like.  You are not required to.  The

16 only requirement that I have is on the Plaintiff's side, if

17 you're going to split your time, you must use at least half of

18 your time in your first closing argument.  You can't get up and

19 have a one-minute first closing argument and a 29-minute final

20 closing argument.

21        Okay.  During -- during the time that we're in trial,

22 beginning with the Monday the 15th that we'll begin with jury

23 selection, the Court's going to be in chambers by 7:30 each

24 morning.  My intention during trial is to bring in the jury by

25 approximately 8:30 each morning.  That intervening hour between

1   7:30 and 8:30 is there for counsel's benefit.  If there are

2   disputes that have arisen overnight, perhaps with regard to

3   demonstratives or other matters, whatever might have come up

4   overnight, you have an hour before the jury comes into the

5   box to advise the Court that you have issues you need some

6   guidance and some rulings on from the Court, and I'll -- I'll

7   make myself available.

8           That time is there for your use.  It saves time

9   throughout the rest of the trial, and it also streamlines the

10  process, so I want you to be available -- be aware that that's

11  going to be available to you.  I hope you don't need it.  But

12  I'd rather you use it, if you need it, than not use it and that

13  need comes up later in the day and creates problems for us.

14          I'm going to afford each side up to 13 hours per side

15  to put on their case.  That does not include voir dire time,

16  that does not include opening statement time, does not include

17  closing statements, but it includes the rest of the time that

18  you use to put on your case.

19          I will advise counsel periodically throughout the

20  trial of the amounts of time they've used and the amounts of

21  time they have remaining.  Any time we take a recess and you're

22  curious and I haven't told you shortly before, you're free to

23  approach the Court's law clerks and make an inquiry, and we'll

24  keep you posted on your time used and time remaining on a

25  running basis.

1          Speaking of a running basis, it's the Court's practice

2    to take up disputes regarding designations and counter

3    designations for deposition testimony on a rolling basis.  And

4    that rolling basis is as follows:  I want to know about

5    deposition designation disputes at least one day before the day

6    that you intend to present them.  That means if on Day 2 of the

7    trial you have disputed deposition designations, I want to know

8    about them before that day.  I don't want to get here at 7:30

9    and find out you've got deposition designation disputes,

10   because those are such that once I grant some and deny others,

11   those clips have got to be reworked, and I won't -- I don't

12   want a delay created by your technical people not having time

13   to recut the videos so that they can be played without a delay

14   in the trial.

15          So if it's a deposition clip that there's a dispute

16   about on Day 2, I need to know about it on Day 1, which means

17   you all need to be discussing them in advance so that there's

18   enough time so that I can give you my rulings and the

19   adjustments, if there are any, can be made and not create a

20   delay in the trial, okay?

21          You should exchange demonstratives by 7:00 o'clock on

22   the night before you intend to use them during your direct

23   examination, and you should exchange any objections to those by

24   9:00 o'clock that evening.

25          And if there are disputes that cannot be resolved

 1   through that meet and confer process, then you need to e-mail

 2   the Court through my clerks no later than 10:00 o'clock that

 3   evening.  It's not -- it's not productive for me to walk in at

 4   7:20 in the morning and find out there were disputes that were

 5   not resolved overnight.  It helps me to know about them at

 6   10:00 o'clock the evening before so I can at least think about

 7   them when I go to bed and not be confronted with them for the

 8   first time when I walk in that morning or the next morning.

 9         My practice at the end of the trial will be to hear

10   motions under Rule 50(a) after all the evidence is in.  I don't

11   intend to hear motions from the Defendant after the Plaintiff

12   rests their case and before they put on any rebuttal case.

13   After Plaintiff has rested, Defendant has rested, Plaintiff's

14   presented their rebuttal case, if any, and rested, all the

15   evidence is in, then I will take up motions under Rule 50(a)

16   from both sides.

17         I think the rule is clear that as long as the Court

18   takes them up before the case is submitted to the jury, they're

19   timely.

20         It's also the Court's practice, after motions under

21   Rule 50(a) have been offered, heard, and ruled upon, for the

22   Court to conduct an informal charge conference.  That takes

23   place in chambers.  It includes any and everybody on each side

24   that you want to be there.  If you've got a lead lawyer that's

25   going to be arguing closing the next morning and they're not

1    going to be involved in discussions about the charge itself,

2    they don't have to be there.  But anybody that's going to

3    participate, young lawyers on the trial team that -- that you

4    want in the room, anybody's welcome during the informal charge

5    conference.

6            At that point, I'll take up your jointly submitted

7    final jury instructions and verdict form.  We'll talk about the

8    differences.  We'll talk about why each side thinks their

9    version or their proposal is correct.  I'll hear you out fully.

10   I'll take your comments and your arguments and your positions

11   into account, and then after that informal charge conference is

12   completed, I'll prepare and send out a subsequent version of

13   the final jury instructions and verdict form based on that

14   input and being what at that point the Court thinks the final

15   charge and verdict form should look like.

16           After that, you'll have an opportunity to review what

17   I've sent you, and then I'll hold a formal charge conference on

18   the record where any surviving positions that you've been

19   overruled on and you want to object to in the record, you

20   can -- both sides can make your record.

21           It's -- it's possible I could be persuaded at that

22   formal charge conference, but it really is more likely than not

23   that I will have heard all your arguments in the informal

24   charge conference.  And the biggest significance of the formal

25   charge conference is to let each side make their record as to

1   any matters that they've not prevailed on with regard to the

2   final jury instructions and the verdict form.

3           Also, counsel, I want you to know that I have -- I

4   have reserved Wednesday, August the 10th, for an additional

5   pre-trial hearing in this case.  It's my hope that we get

6   through the motions for summary judgment and the Daubert

7   motions and motions to strike today.  I would hope that we

8   could come back on the 10th and complete any surviving and

9   remaining objections as to exhibits, anything else that would

10  be left.  I hope to have the final pre-trial at that time.

11          You'll be noticed at a later date as to exactly when

12  we're going to start.  That may, in some part, depend on how

13  much we get done today.

14          Also, I think you're probably aware of this, but it's

15  the Court's practice to provide each member of the jury with a

16  notebook for their use during the trial.  I'm directing that

17  both sides collectively prepare 10 juror notebooks.  Included

18  in those three-ring binder notebooks should be one complete

19  copy of each patent-in-suit, the claim construction chart

20  showing the disputed term, and the resulting construction

21  adopted by the Court on a side-by-side listing, the witness

22  page for each witness that's going to testify with each witness

23  page containing a head and shoulder's photograph of the witness

24  at the top of the page and their name underneath.  They don't

25  need to be characterized as Plaintiff's expert regarding

1  damages or any other such characterization.  Simply put their

2  name.  If they have an earned doctorate or any other earned

3  academic designation, you can put Dr. John Smith or you can put

4  Bill Jones, M.D., or you can put whatever their earned academic

5  designation is, but other than that, just an identification by

6  name.

7       Those notebooks should also contain a blank legal pad,

8  punched with three holes and included in the notebook for note

9  taking purposes, and a pen.  Please make sure the pen doesn't

10  click or make noise of any kind.  We don't want to listen to

11  eight people clicking pens the entire week.

12       Also, I want to remind you again, those of you that

13  practice in this Court know that this is a point of

14  significance for the Court, but in all trials like this, there

15  are going to be competing expert witnesses testifying.  It is

16  critical that your experts stay within the scope of their

17  expert reports.  And objections that an expert has gone beyond

18  the scope of their expert report are particularly troubling and

19  problematic for the Court.  I can't rule on those like I can a

20  simple objection that so-and-so violates rule whatever it is of

21  the Rules of Evidence.  When you object that an expert has gone

22  beyond the scope of their report, I have to send the jury out,

23  I have to get the report, I have to hear your argument, and I

24  have to decide who's right and who's not.  That takes time,

25  it's disruptive, and it's particularly troublesome to the

1   Court.  It breaks the flow of the evidence.  It reduces the

2   ability of the jury to follow and absorb the information that's

3   being given to them.  It's just not helpful.  That doesn't mean

4   you can't make that objection, if you're absolutely sure that

5   the other side has gone well beyond the scope of the expert's

6   report.

7           But I would encourage you to make sure you're right

8   before you do that, because if there are objections of that

9   nature that cause those type of disruptions that the Court

10  views as weak or unfounded or flippant, I have been known to

11  penalize a party by reducing their trial time or reducing their

12  closing argument time or doing whatever else I need to do to

13  make sure that they understand the Court doesn't want those

14  kind of disruptions and -- and wasting of time to take place.

15          I'm not telling you you can't make that objection.

16  I'm telling you be careful when you do.  And I'm also telling

17  you, make darn sure your experts stay within the scope of their

18  expert reports.  It is without doubt the duty of the experts to

19  let those reports define and confine their testimony.  And

20  that's what the Court expects of them.  And I'll expect you to

21  make sure they do what they're supposed to do.

22          Also, to the extent there may be proprietary or

23  confidential information that would arise during the trial, the

24  Court has a standing order posted on our website with regard to

25  protecting confidential information and the sealing of the

1    courtroom and the redaction of the transcript.

2         Let me summarize it for you very briefly.  If there's

3    going to be confidential information that's proprietary and

4    needs to be protected given during the trial, you need to meet

5    and confer with each other in advance about that.  You need to

6    let the Court know what you anticipate.  And when it comes to

7    that time, you should move the Court to seal the courtroom.

8         If I make the required finding that the sensitivity

9    and nature of the information is such that it exceeds the

10   public's right to be present, then I'll seal the room, and you

11   can offer that information.  By sealing the courtroom, I've

12   sealed the record, so you don't need to -- you don't need to

13   request any redactions because it won't be there.  It will be

14   sealed.

15        If you don't seal the courtroom, it's going to be in

16   the transcript.  It's also going to be in the public domain as

17   far as I'm concerned.  So don't come to me after you've let a

18   witness testify about something you then believe is sensitive,

19   confidential, and proprietary and tell me you really should

20   have sealed the courtroom but you didn't think to do it.  By

21   that point, the cat is out of the bag, as far as I'm concerned.

22   I don't fix these kind of problems typically with redactions of

23   the transcript after the trial.  Redaction is essentially

24   limited to excluding personal identifiers, like driver's

25   licenses, Social Security numbers, those kinds of things.

1   That's really the only type of post-trial redaction the Court's

2   going to be amenable to.

3         I would direct that you look at the Court's standing

4   order on proprietary information and sealing the courtroom.

5   Long story short, talk about it before each other, let me know

6   what you anticipate.  When you do seek and have a ruling from

7   the Court to seal the courtroom, try to collect your

8   confidential information so that we're not sealing and

9   unsealing and sealing and unsealing.

10        Even though the jury stays, those in the gallery have

11  to get up and leave, and the Court Security Officer has to

12  reposition himself by the doors to the courtroom to make

13  someone -- sure someone doesn't wander in unexpectedly.  So it

14  does take some time.  It does cause somewhat of a disruption.

15  And to the extent you can work together and minimize those and

16  group your proprietary information so we do it as few times is

17  as necessary, that's helpful and I would direct you to pursue

18  that kind of an approach.

19        All right.  Are there any questions about any of these

20  housekeeping matters that I've gone over with each of you?  Any

21  questions on the Plaintiff's side?

22        MR. SCARDINO:  No questions, Your Honor.

23        THE COURT:  Any questions from the Defendant's side?

24        MR. SELINGER:  Yes, Your Honor.  I have just two.  And

25  I'll preface the first one by saying I've talked both with

 1   Mr. Gillam and Mr. Dacus about it, and -- and I think we've

 2   come to a common understanding, but it's an issue that the

 3   Court has raised, so I want to make sure that the lawyers'

 4   common understanding is consistent with the Court.

 5        THE COURT:  If you don't mind, Mr. Selinger, step to

 6   the podium so that we have adequate amplification.

 7        MR. SELINGER:  Thank you, Your Honor.

 8        So a number of -- of deposition -- MTel produced a

 9   number of deposition transcripts in this case from prior

10   lawsuits that HTC America plans to rely on.  Those -- those

11   transcripts don't come with photographs obviously, and I was

12   planning on -- on doing the depositions the old-fashioned way,

13   having question read from the transcript and having somebody

14   read the response.

15        Under that circumstance, I raised with counsel whether

16   or not it made sense to have a -- a witness photograph when, in

17   fact, the -- the real witness isn't going to be there, the jury

18   won't have seen it, and I think the consensus among counsel was

19   that in those circumstances, we should not put -- put a

20   photograph in, but obviously the -- the Court has rules, so I

21   want to make sure the Court is comfortable with that.

22        THE COURT:  What I'd prefer you do is go ahead and

23   prepare a witness page and include it.  But below the witness's

24   name, just put "will appear by deposition" or something like

25   that, deposition witness, because a lot of the juries will use

1    that witness page to take notes on, and they'll have those

2    notes tied to that witness's testimony.  When you superimpose

3    the photograph at the top, 75 or 80 percent of the page is left

4    blank with lines on it and a lot of witness -- a lot of jurors

5    will take notes on those pages, in addition to notes they may

6    take on their legal pads in their notebook.

7              So even though they're not going to be here and you're

8    going to present them by deposition, I think we ought to have a

9    witness page for them.  If you want to designate below their

10   name as deposition witness, you can do that.

11             MR. SELINGER:  And I believe we -- we were all in

12   agreement about having the page.  The only -- the only issue

13   was the photograph.  And if I misspoke, I apologize.

14             THE COURT:  Well, if they're going to -- if it's going

15   to be a video deposition where the jury sees the witness, then

16   we need a picture.  If it's going to be your associate who is

17   just playing the role and as you say, doing it the

18   old-fashioned way from the witness stand, I guess we don't need

19   a picture of somebody they're never going to see.

20             MR. SELINGER:  Okay.  Thank you.

21             And then my -- my other question is -- is about

22   witnesses.  There are a number of -- there are a number of

23   witnesses that Plaintiff has designated that -- that I've also

24   designated for trial.  And -- and I've -- I've spoken with

25   Mr. Gillam, and he suggests that I ask the Court about whether

1  the Court has a rule that if Plaintiff puts a witness on, I

2  should do all of our examination while that witness is on or

3  whether we -- we should break it into cross-examination and

4  what the witness has said on direct and then recall the

5  witness.

6        THE COURT:  Well, typically what I -- what I'm

7  presented with is a complete examination of a witness.  It --

8  I'm not telling you you can't put them on and then recall them

9  later, but unless there's some compelling reason to, it's

10  usually better that we hear everything we're going to hear from

11  a witness at one time.  It keeps their testimony together

12  rather than breaking it up with intervening witnesses.

13        MR. SELINGER:  I agree.  Thank you, Your Honor.

14        THE COURT:  Okay.  Any other questions from either

15  side on these housekeeping matters?

16        All right.  All right.  Counsel, why don't we start

17  with HTC's motion to strike portions of the expert report and

18  preclude corresponding testimony of MTel's expert Paul D.

19  Prucnal, or it is -- how do we pronounce that gentleman's name?

20        MR. TAYLOR:  It's Prucnal, Your Honor.  Prucnal.

21        THE COURT:  Prucnal.

22        MR. TAYLOR:  Yes, Your Honor.

23        THE COURT:  All right.  Thank you.  That's Document

24  175.  And let me hear from HTC on this motion.  I know there

25  are -- there are multiple parts in here.  I've kind of broken

1    it down in my own notes, but rather than do it on a

2    topic-by-topic basis, let me just hear HTC's argument overall.

3             MR. SELINGER:  Good morning, Your Honor.  And may it

4    please the Court.

5             THE COURT:  Proceed, counsel.

6             MR. SELINGER:  Thank you.

7             There -- there are three general categories on

8    which HTC America has objected to move to strike aspects of

9    Dr. Prucnal's expert report and to preclude him from -- from

10   testimony.  The -- the first is -- is a group of -- of

11   paragraphs where he expressed opinions but where he had not

12   been instructed about and did not apply appropriate legal

13   standards.

14            The second was his opinion about willful and knowing

15   infringement of the '946 patent.  And the third had to do with

16   construction dicta in his report about claim construction from

17   this, and more particularly from -- from other cases.

18            In -- in our brief, we actually dealt with willful and

19   knowing infringement at the end, but it has appeared -- it

20   appears in -- in MTel's argument in -- in a somewhat different

21   way.  So let me start with willful knowing infringement.

22            THE COURT:  All right.  Let me ask you this.  Why was

23   I not presented with a motion for summary judgment of no

24   willful infringement?  Did you just elect to put all your eggs

25   in the Daubert basket in this regard, because I don't find that

 1   there's been such a companion summary judgment motion filed.

 2            MR. SELINGER:  There -- there was not, Your Honor.

 3   And I'm trying to recall the timing with -- with the Magistrate

 4   Judge's letter practice -- letter brief practice, and -- and

 5   I'm just -- I don't recall now -- about it.

 6            THE COURT:  I shouldn't take the absence of such a

 7   motion for summary judgment as an indication that you're

 8   conceding this witness should be able to testify before the

 9   jury on these matters?

10            MR. SELINGER:  That is correct, Your Honor.

11            THE COURT:  Okay.  Let me hear the substance of your

12   position.

13            MR. SELINGER:  Okay.  And Paragraph 432 states that

14   HTC America was a willful infringer beginning on January 14,

15   2011, based on a reissue application that was filed on that

16   date and was allegedly owned by HTC Corporation, not -- not the

17   party in this lawsuit but the ultimate parent.

18            And an IDS, a document listing prior art, was filed on

19   that day by the -- the patent applicant that identified about a

20   hundred new patents, none of which were the '946 patent, which

21   is in this case, but one of which was the parent patent, the

22   '403.  The -- and there's no dispute that the '946 patent is a

23   continuation-in-part.  There's no dispute that it was not

24   listed.

25            I've got three reasons why Dr. Prucnal should be

1   precluded from offering an opinion on -- on willful and knowing

2   infringement.

3            First, as -- as shown in our summary judgment record,

4   HTC Corporation did not actually own that patent when -- when

5   the IDS was filed.  It didn't own -- it didn't obtain --

6   acquire the company and didn't get rights to that patent until

7   months later.

8            Now, what Dr. Prucnal -- his paragraph is very

9   sparse.  In his deposition, he -- which -- which Your Honor has

10  said is not an opinion on which MTel can rely at trial.  But

11  Dr. Prucnal said he had a personal practice, not as a technical

12  expert, but in connection with what he did in -- with his

13  patent applications of -- of doing certain things, and based on

14  that, he thought that HTC -- the patent owner should have been

15  aware of the -- the '430 patent, and from that he generalized.

16           Now, application of his personal practice is method --

17  methodologically flawed because it is -- one, it's his personal

18  practice.  He's not an expert on -- on that, and it's not

19  reflected -- that personal practice is not reflected in

20  Paragraph 432 of his report.

21           Second, Dr. Prucnal backed away from his opinion that

22  even -- even the ultimate parent, HTC Corporation, should have

23  been aware of the '946 patent based on the identification of

24  one among 500 other United States patents and the reissue.  And

25  it's MTel Exhibit D, Prucnal Trial Transcript 61.  And

1    Dr. Prucnal said:  I don't know to what extent looking at a

2    patent would or should these attorneys doing the due diligence

3    to patents that were derived as a continuation-in-part.  He

4    just didn't know.  And he also -- he's also superimposing his

5    own personal due diligence on looking through hundreds of

6    patents that somehow have been cited.

7           And -- and then the third reason is Dr. Prucnal's

8    opinion in Paragraph 432 makes -- makes the -- the giant

9    logical leap of saying that because HTC Corporation acquired

10   this reissued patent, somehow that knowledge should be imputed

11   to HTC America, a different entity.  There's no evidence

12   supporting that.  He doesn't explain why.  As I said, he has

13   the same testimony.  MTel Exhibit D, Prucnal Transcript Page

14   61, also supports -- he doesn't know.  And there's no evidence

15   about how that kind of information -- or why that kind of

16   information ought to have been superimposed on this Defendant.

17   It's just speculation.

18          Does the Court have any questions?

19          THE COURT:  No.

20          MR. SELINGER:  Then let me turn to the next category;

21   and that's the opinions lacking legal guidance or which ignore

22   elements of -- of causes of action.  And -- and under Rule --

23   Rule 702, Personalized Media and in the Johnson case, MTel --

24   Dr. Prucnal should not be allowed to offer opinions based on

25   incomplete or non-existent or inaccurate legal instructions.

1    They're just untethered from the law and are speculation.

2          Let me start with his -- his indirect infringement

3    opinions, and those are three paragraphs, 4 -- 429, 430, and --

4    and 431.

5          Now, Dr. Prucnal's indirect infringement opinions

6    don't refer to any of the elements of contributory

7    infringement, nor is there an instruction in -- in Paragraph

8    49, which is all the legal instructions of his report, on the

9    elements of contributory infringement.

10         So there's no mention of no substantial non-infringing

11   use.  There's no mention of especially made.  There's no

12   mention of knowledge that the combination infringed, all of

13   which are elements required for contributory infringement.

14         Now, in like fashion, Dr. Prucnal's report does not

15   refer to any of the elements of active inducement, and active

16   inducement, as -- as we know, requires both knowledge of the

17   patent and knowledge that the acts complained of -- that the

18   acts that the party is alleged to cause are infringing acts.

19         And the Supreme Court has recently reaffirmed that

20   in -- in Kumho.  So Dr. -- Dr. Prucnal's report doesn't have

21   instructions to guide him.  He doesn't come up with buzz words

22   that would show he somehow had knowledge of those elements.

23   And so his opinions, again, are no more than untethered

24   speculation or subjective belief.

25         Does -- and -- and to answer the question -- same

 1    question Your Honor asked me with respect to willful and

 2    knowing infringement, I did not -- we did not somehow waive or

 3    intend to allow Dr. Prucnal to testify about those elements or

 4    that -- those aspects, notwithstanding having no motion for

 5    partial summary judgment.  I'll go on.

 6            THE COURT:  Let's continue.

 7            MR. SELINGER:  Offered to sell opinions, and I -- I

 8    will just, for the record -- maybe for -- hopefully for -- for

 9    simplification, MTel only included Claims 1 and 4 of the '946

10    patents on offer for sale liability.  So if the Court grants

11    the partial summary judgment motion as to Claims 1 and 4, then

12    that ruling would moot this aspect.

13            Offer for sale opinions are in Paragraphs 245, 250,

14    258, and 372.  My objection is Dr. Prucnal does not merely

15    offer a technical opinion, but then he opined that -- that HTC

16    America infringed by offers to sell certain products.

17            The acts he described, though, do not constitute offer

18    for sale infringement.  And we -- we talk about that at the

19    opening brief at Page 5, the L&W and the Rotec cases, what is

20    required for proof of an offer to sale is -- is specific

21    details of price and product.  And at most, what he got was

22    some very vague generalized response that -- that -- that

23    should not, I submit, be allowed to -- to go to the jury.

24            The -- his opinion, again, is untethered from the law

25    because it does not have any instructions on offer for sale

1  liability.  The opinion -- the opinion doesn't reflect he had

2  an independent understanding of those elements.  And so those

3  opinions -- those -- those paragraphs and his opinion should be

4  stricken.

5          Does the Court have any questions?

6          THE COURT:  No.

7          MR. SELINGER:  Then let me go next to literal

8  infringement opinions under -- under 1 -- 112(f).

9          THE COURT:  So far, your arguments are tracking your

10  briefing pretty accurately, so...

11          MR. SELINGER:  Thank you.  And that's --

12          THE COURT:  And I've read the briefing, so that's why

13  I don't have additional questions.

14          MR. SELINGER:  Thank you, Your Honor.

15          So -- and, again, for -- for the record, the -- this

16  next complaint about Dr. Prucnal's report is moot if the Court

17  grants partial summary judgment motion on Claims 1 and 4.

18          The paragraphs that are at issue here are his

19  Paragraphs 294, 296 through 298, and 301 through 304.

20          The -- the fatal flaw in his opinions and -- and the

21  reason we move to strike is -- is that, first, Dr. Prucnal

22  received no instruction on Section 112(f), literal

23  infringement, and then second, he -- his improper redaction of

24  linked structure for the -- for the means for transmitting

25  limitation.  I don't think there is -- there's any doubt that

1    he didn't get an instruction on 112(6) -- (f).

2            MTel points to Paragraph 49.  The last bullet of

3    Paragraph 49 is about claim construction and is the only

4    mention of 112(f) at all.  Nothing about infringement.

5            Turning -- turning -- turning to his improper

6    redaction, and -- and that -- that appears in Paragraph 294

7    where the -- the last four words of -- of a corrupted message

8    or a message corrupted by errors, and it's few more than four

9    but not many, were redacted, and -- and in their place, they

10   have dot, dot, dot.  The -- if I may step away briefly, Your

11   Honor?

12           THE COURT:  You may.

13           MR. SELINGER:  Thank you.

14           This same issue comes up again, so I'll deal with it

15   now and hopefully just once.

16           So in the -- the LG case, the Court had the

17   construction -- first -- first time the Court dealt with the

18   dispute over means for transmitting only upon actuation of the

19   switch a signal to the communication network requesting

20   retransmission of said specified portion of said message.

21           And in -- in that case, the -- the Magistrate Judge

22   applied 112(f) or 112(6), and if I can -- may -- may I put a

23   few things up on --

24           THE COURT:  You may.

25           MR. SELINGER:  Thank you.

1           And the Court -- and what I've -- I've got is Page 27

2     from Document No. 94 in Case 2:13-CV-947.

3           And -- and what Magistrate Judge Payne first did is to

4     identify structures that were clearly linked or associated with

5     claimed function.  And what he identified there was a paragraph

6     at 15 -- the '946 patent, Column 15, Lines 36 through 45, where

7     he emphasized a number of -- of structures, the first of which

8     were input switches 15 and 16.

9           On Page 28, the -- the Court provided its construction

10    of the -- the means limitation, and -- and the corresponding

11    structure was input switches 1516, transmit logic 1518, and --

12    and some others.

13          In this case, Your Honor, I had a dispute about the

14    transmit logic, but MTel and the Magistrate Judge concluded

15    that the structure -- the corresponding structure should be as

16    it was in the LG case, namely input switches 1516 -- pardon me,

17    the input switches 15 and 16, transmit logic, and so on.

18          This is important -- let me try --

19          THE COURT:  This is Column 15?

20          MR. SELINGER:  It is -- it is, Your Honor.

21          THE COURT:  I've got the patent in my hands.

22          MR. SELINGER:  Okay.  And then the -- the second

23    sentence at about Line 40 is the input switches 15 also include

24    a switch that allows the user to request retransmission of a

25    message corrupted by errors.  The dispute here is -- is, I

1   think, very simple, Your Honor.  As part of the corresponding

2   structure, the Magistrate Judge --

3           THE COURT:  Let me stop you for a minute --

4           MR. SELINGER:  Yes.

5           THE COURT:  -- Mr. Selinger.  This issue is a theme

6   that seems to run throughout several of the matters that we

7   have set for argument this morning.  I don't want to preempt

8   your argument, but I want to make it clear that I don't have

9   any intention of reopening claim construction.  I don't have

10  any intention of allowing either side's experts to argue

11  anything contrary to the claim construction order entered by

12  the Court.  And to the extent we're going to replow or attempt

13  to replow some of the underlying arguments that went into and

14  were disposed of by the entry of the claim construction order,

15  that's really a waste of time this morning.

16          MR. SELINGER:  And -- and I appreciate that, Your

17  Honor.  I have -- and let me -- let me suggest while I've seen

18  the same thing, and it's mostly been pointed at me, I think --

19  I think this is a situation where MTel is doing everything it

20  can to run from the claim construction.  Let me talk -- this is

21  about input switches 1516, that's -- that's a quote.  That's --

22  that's a defined term in the specification, and -- and that's

23  why that one paragraph in the patent is so important.

24          The input switches are a specific universe of

25  switches, and that's what the -- that's what the claim

1   construction order says is -- is the corresponding structure.

2   Quote, input switches 1516.

3          Now, I saw this fight coming.  And so in -- in the

4   claim construction, I -- I asked the Magistrate Judge to

5   specifically call out that one of those switches was the --

6   the -- the switch that allows a user to request mess --

7   retransmission of messages corrupted by errors.

8          The Magistrate Judge didn't do that.  But the

9   Magistrate Judge didn't say it was wrong.  What -- what the

10  mag -- I'm looking at Page 19 of our hearing -- I'll just put

11  that up.  His question to me was:  So why do I need to call

12  that out?

13         And my only reason was because I knew this fight was

14  going to happen.  But he didn't deny -- he -- he didn't include

15  it, but he didn't say that's wrong.  And he then granted the

16  relief requested in HTC America's letter -- letter brief, which

17  was to file motion for partial summary judgment on -- on this

18  particular issue.

19         So I'm not asking the Court to change claim

20  construction.  What -- what I'm -- what -- what we have here,

21  and it is a recurring issue, is MTel's desire to exclude the

22  one of the input switches that actually provided the linkage

23  language to the -- the claim function and which we don't have.

24         So the -- and that -- what Dr. Prucnal did at his

25  Paragraph 294 was simply ignore -- it was to delete part of the

1   structure which is defined in the patent as one of input

2   switches 1516.  That is why I'm asking the Court to exclude his

3   testimony on that.

4          THE COURT:  All right.  Let's move on.

5          MR. SELINGER:  Okay.  Prosecution history estoppel

6   is -- is the next issue, and I'll be brief on this, Your Honor.

7   It's been -- the issue of prosecution history estoppel has --

8   has been briefed elsewhere.  It's -- it's a bar, I submit, to

9   MTel's reliance -- Dr. Prucnal's reliance on the Doctrine of

10  Equivalents.  In -- in a different brief, MTel doesn't try

11  to -- doesn't even respond with respect to Structure Claims 1

12  and 4.  It only responds with respect to -- to Method Claim 8.

13         The only point thing -- the only point I want to add

14  to what the Court has already seen is -- is that MTel's

15  argument response confuse -- confuses prosecution disclaimer

16  with prosecution history estoppel.  I -- I made a prosecution

17  disclaimer argument about another limitation, and that's a

18  claim construction rule that limits the meaning of a claim

19  term.

20         I didn't get that, and -- and, you know, that is what

21  it is.  But that's not prosecution history estoppel.

22  Prosecution history estoppel bars the application of -- of

23  judicial Doctrine of Equivalents.  And the Elkay case, which

24  we've cited, makes -- makes clear the distinction and to -- for

25  avoidance of confusion, I'm relying on prosecution history

1    estoppel.

2           HTC America -- let's see, so does the Court have any

3    questions on that?

4           THE COURT:  No, sir.

5           MR. SELINGER:  Then -- then the -- the next issue

6    is -- is use infringement, and that's only of Claims 326

7    through 331.  And Dr. Prucnal's opinions should be stricken for

8    two reasons.

9           First, what he relies on is testimony from -- from

10   HTCA America employee, Dr. Ying, that -- with respect to a

11   number of phone -- clearly not all of the phones, Dr. Ying

12   had -- had tested the phones -- tested phones using his

13   personal T-Mobile carrier.

14          Now, the Court has before it the partial summary

15   judgment motion with respect to HTC America as a license -- as

16   a licensee or as -- as a permitted user.  But putting that to

17   the side, the -- the T-Mobile license is clear beyond -- that

18   end users are not subject to liability.  So whatever Dr. Ying

19   did -- however the Court rules on the T-Mobile license in this

20   case, what Dr. Ying did could not have been infringement.

21          And the second ground, of course, is HTC -- as -- as I

22   said last time I was here, HTC America is entitled to partial

23   summary judgment under the T-Mobile license for the same reason

24   the Court determined in -- in the prior case.

25          Does the Court have any questions?  Then --

1          THE COURT:  Let's continue.

2          MR. SELINGER:  Okay.  The -- the last -- I believe the

3   last -- the last two issues, we have a dispute about level of

4   ordinary skill opinions.  And -- and Your Honor may have seen

5   this in other thematic issues here.

6          In this case, though, with respect to Dr. Prucnal, the

7   instruction he was given intentionally omitted the first

8   category of -- of the standard test, and that is the -- the

9   actual background of the inventors.  His instruction -- his

10  legal instruction just didn't have that.  That's Paragraph 57

11  and 60.  And -- and Dr. Prucnal admitted in his deposition that

12  he didn't know the -- the educational levels of -- of the

13  inventors.  And that's -- we cited his -- his transcript, Page

14  22.

15         The second reason why Dr. Prucnal should not be

16  allowed to -- to testify on level of ordinary skill is -- is

17  his stated belief that a person of ordinary skill in the art

18  would need to have the requisite skill to understand all of the

19  patent's subject matter, rather than the subject matter in the

20  asserted claims.  And -- and he said that at -- at Transcript

21  Page 22.

22         The problem with that, of course, is -- is that -- and

23  this arises more in connection with Dr. Kesan.  The Graham

24  invalidity analysis starts with the claims.  First, you

25  identify the level of ordinary skill -- you look at the claimed

1    invention, and you identify distinctions between the claimed

2    invention and the prior art.

3           There's -- there's a direct analogy, though.  When

4    you're doing infringement, you're do -- you're looking at the

5    claimed subject matter and applying that to the accused

6    product.

7           In this case, the claimed subject matter is a

8    smartphone.  It's not all of the other things that are

9    disclosed in the '946, most of which came from the parent

10   application, the '403.  And in that methodology, the -- you

11   have to be able to understand everything in the application, no

12   matter how unrelated to the claim renders the methodology

13   fatally flawed.

14          And then finally -- and -- is -- is the claim

15   construction dicta.  And MTel -- Dr. Prucnal continues to use

16   claim construction dicta, and what MTel says in response is,

17   well, he'll use the dicta without attribution.

18          That's not fair.  And it puts HTC America in an

19   untenable position.  We either allow Dr. Prucnal to rely on and

20   use this unattributed dicta without challenge or cross-examine

21   him and open the door to him saying, oh, well, it, you know,

22   came from prior rulings.  I mean, it -- there's -- I believe

23   the Court may have dealt with this in -- in our -- in our

24   motions in limine discussion.  There's no reason to allow

25   Dr. Prucnal, or frankly Dr. Kesan, to rely on claim

1    construction dicta or analysis.  It's about the actual claim

2    and his opinions applying that.

3            If -- if the Court has no other questions, I'll sit

4    down.

5            THE COURT:  Let me hear a responsive argument from the

6    Plaintiff.

7            MR. TAYLOR:  Good morning, Your Honor.  Thank you.

8            THE COURT:  Good morning.

9            MR. TAYLOR:  Your Honor, I would like to first address

10   the last point raised by HTC, which I do believe was handled by

11   this Court's rulings on the motions in limine at our last

12   pre-trial hearing.  I would like to simply note that the Court

13   noted that MTel's experts would be fine so long as they

14   introduced their own opinions that were consistent with this

15   Court's claim construction, and that is all that MTel intends

16   to do.

17           The statements to which HTC complains are such

18   that retran -- the limitations of retransmission, the plain and

19   ordinary meaning, and the fact that the mobile unit is not

20   limited to errors.  I believe our briefing speaks at length

21   about this, and I believe the Court has already resolved this

22   issue.

23           Without any questions from the Court, I would like to

24   turn to HTC's other points.

25           THE COURT:  All right.  Go ahead.

1           MR. TAYLOR:  Turning first to the issue of willful

2    infringement, Your Honor, I would like to first note, as Your

3    Honor raised the issue of the existence of summary judgment

4    motions, that the Federal Circuit recently lowered the standard

5    for finding willful infringement.

6           Second, I would like to note that the issue -- the

7    issues that HTC raises are properly reserved for

8    cross-examination.  All of the issues that they have

9    identified, they can question Dr. Prucnal about on the stand.

10   Dr. Prucnal testified at his deposition that his own experience

11   filing for patents, being an inventor, and his experience in

12   electrical communications and the -- the related industries

13   over the years led him to believe that when he submitted a

14   patent application, that you examine the prior art that was

15   cited on the face of the patent.

16           Whether HTC owned the patent at the time, the number

17   of references cited, along side the parent patent for the '946,

18   all of these are issues that HTC can raise on

19   cross-examination, but none go to the underlying methodology of

20   Dr. Prucnal's opinion.

21           HTC cites numerous issues wherein it alleges

22   Dr. Prucnal misapplied the law or was improperly or rather not

23   instructed on the law.  And as support, HTC cites the

24   Personalized Media case.  And I'd like to point out, Your

25   Honor, as indicated in our briefing, the Personalized Media

 1   case does not speak to instruction on the law.  It speaks to

 2   misapplication of the law, which is -- we actually cite the

 3   case in our -- in support of our brief -- MTel's brief to

 4   strike the opinions of Dr. Beckmann and Mr. Thomas.  So I -- I

 5   definitely think the case is applicable, but not in the way

 6   that HTC asserts.  It's really a misapplication of the law, and

 7   Dr. Prucnal did not misapply the law, regardless of the

 8   specific instructions that he included with the scope of his

 9   report.

10           Regarding indirect infringement, MTel will not present

11   evidence or -- or -- excuse me, will not present evidence of

12   induced infringement.  So we believe this is a moot point.  We

13   believe that in -- the latter half, and I believe it -- it's on

14   the last page of Dr. Prucnal's report where Dr. Prucnal

15   identifies the patents that belong to HTC and also identifies

16   portions of user guides that HTC authored that instruct users

17   on the operation of the accused devices, and specifically the

18   operation of the accused instrumentality.  We believe that

19   this is a correct application of evidence regarding

20   contributory infringement, and whatever issues HTC has with the

21   sufficiency of that evidence goes to the weight and not the

22   admissibility.

23           Dr. Prucnal -- regarding the offer for sale opinions,

24   Dr. Prucnal is an electrical engineer.  He's an established

25   Princeton professor, and will testify to the operation of the

1    accused devices and the application of that to the claims of

2    the '946 patent, as construed by the Court.

3         Dr. Prucnal will not testify to a legal conclusion of

4    when HTC began offering for sale or any other issue on that,

5    so we also believe that this is a moot point.  And although

6    Dr. Prucnal should obviously be restricted to the scope of his

7    report, additional striking of his report is not necessary and

8    merely serves as an effort by HTC to hamstring Dr. Prucnal's

9    infringement analysis, which is, once again, limited to the

10   operation of the devices.

11        Turning to the issue of the 112(f) opinions, HTC was

12   correct in that this issue is -- permeates throughout the

13   parties' dispute.  This is the subject of HTC's motion for

14   summary judgment, and, Your Honor, we have prepared extensively

15   on this subject on that issue.

16        THE COURT:  And we'll get to that later today.

17        MR. TAYLOR:  I would submit that it rise and falls

18   with that issue then, Your Honor.

19        Would -- would Your Honor like me to address any

20   specific statements HTC made regarding the 112(f) -- 112(f)

21   issue or reserve it for --

22        THE COURT:  Let's save it for the summary judgment

23   motion.

24        MR. TAYLOR:  Yes, Your Honor.

25        THE COURT:  What else?

1           MR.  TAYLOR:  Prosecution -- excuse me --

2           MR.  MORT:  Your Honor, I think we have a point of

3    clarification.  Regarding the indirect infringement, we're not

4    asserting contributory infringement.  We are asserting

5    inducement.  So I think there's been some confusion between the

6    two.  We are not asserting contrib, but they present a majority

7    of a product that's not a stable commerce and so forth.  We are

8    presenting evidence, and I don't think Dr. Prucnal's opinions

9    that he's presenting will change regarding the operation of a

10   device.  The question will be a side fact of whether or not

11   HTC's activities induce that infringement, and that's not for

12   Dr. Prucnal to -- to provide opinion on.

13          So he's not providing an opinion on the activity of

14   HTC.  Whether or not it constitutes the active inducement part,

15   he will provide an opinion whether or not the components of the

16   structure satisfy the claims.

17          THE COURT:  All right.

18          MR.  TAYLOR:  And for the record, Your Honor, that was

19   entirely my mistake and the by-product of too little sleep this

20   week.

21          THE COURT:  That's why we have several lawyers at each

22   table.

23          MR.  TAYLOR:  It's nice to have backup, Your Honor.

24          THE COURT:  Let's go forward.

25          MR.  TAYLOR:  Yes, Your Honor.

1          Looking at the prosecution history estoppel, I believe

2    this is also adequately addressed in HTC's motion for summary

3    judgment.  I would like to simply note, as evidenced by our

4    briefing throughout this issue, that MTel only identifies the

5    Doctrine of Equivalents as applying to the issue of whether the

6    claims are limited to messages with errors.  This is an issue

7    that's been throughout the case, throughout claim construction,

8    and MTel simply provides and Dr. Prucnal opines that even were

9    the claims limited to messages with errors, that the -- HTC's

10   devices would still infringe under the Doctrine of Equivalents.

11         We do not believe the messages are limited -- or the

12   claims are limited to messages with errors, and, therefore, we

13   also believe that this Doctrine of Equivalents is either a moot

14   point or adequately addressed, along with the motion for

15   summary judgment.

16         THE COURT:  All right.

17         MR. TAYLOR:  Turning to two last small points.  First

18   is the use infringement.  HTC asserts that Dr. Prucnal

19   improperly relies on testimony from Dr. Ying which was HTC's

20   corporate representative.  As discussed in MTel's briefing, HTC

21   designated Dr. Ying to testify on HTC's testing of the accused

22   devices.  So his knowledge was -- he was supposed to be

23   prepared for all of HTC's testing.  And in doing so, he

24   testified that there was a testing group.  He was unaware of

25   what other individuals in that group did and was only able to

1    offer his personal testimony regarding the -- his own efforts

2    within that group and which involved his personal carrier,

3    T-Mobile.

4           In testing on behalf of HTC and under the direction of

5    HTC, Dr. Ying was not acting as an end consumer, but rather as

6    an agent of HTC America.  Therefore, to whatever extent the

7    license agreements exclude end users, Dr. Ying, in testing, was

8    not acting as a user, but rather on behalf of HTC.

9           Finally, Your Honor, on the level of ordinary skill in

10   the art, Your Honor, this issue has been briefed extensively

11   throughout the numerous motions to strike.  And we -- we submit

12   that largely this is a moot point.

13          Your Honor, we -- we've recited extensive case law

14   stating that the -- no single factor is controlling.  We've

15   cited examples wherein the level -- the exact skill and

16   education level of the inventor is not determinative because

17   inventors are often seen as extraordinary and beyond the skill

18   and abilities of one skilled in the art.  Rather, the patent

19   must be looked at together.

20          Dr. Prucnal did not state that the POSITA would

21   need -- or, excuse me, that the person of ordinary skill in the

22   art would need knowledge of the entire specification.  And, in

23   fact, Your Honor, we believe this resolves the issue because

24   the only claims remaining at issue are for the mobile unit, and

25   the only inventor, even including the '428 patent, which is no

 1  longer at issue in the case, the only inventor that had a

 2  computer science degree, which is the crux of the parties'

 3  dispute, testified in his deposition that he did not contribute

 4  to the mobile unit claims.

 5          THE COURT:  All right.  What else, Mr. Taylor?

 6          MR. TAYLOR:  That is all, Your Honor, pending any

 7  questions from the Court.

 8          THE COURT:  No.  Let me just make it both -- clear to

 9  both sides, if I have questions, I'll ask them.

10          MR. TAYLOR:  Understood, Your Honor.

11          THE COURT:  You don't need to ask me at every juncture

12  do you have questions.  I'm not bashful about asking questions.

13          All right.  Mr. Selinger, would you like a brief

14  follow-up?  I'll have to keep -- I'll have to keep it very

15  brief, but I'll give you an opportunity.

16          MR. SELINGER:  Thank you, Your Honor.  I will be

17  brief.

18          With respect to willful infringement, counsel said the

19  Federal Circuit had changed the law.  And actually the Supreme

20  Court --

21          THE COURT:  I know it's the Supreme Court in the Halo.

22          MR. SELINGER:  -- in Halo, but -- but it doesn't

23  change the analysis here how -- because you still have to know

24  about the patent.  And that's what happened.  Halo -- that's --

25  that's clear under Halo, and so the -- the three -- the three

```
 1    issues -- three problems remain.
 2            Dr. Prucnal's personal experience is faulty
 3    methodology.  He -- they didn't offer any -- it's not in his
 4    expert report.  They didn't try to show that it comports with
 5    some standard --
 6            THE COURT:  I'm aware --
 7            MR. SELINGER:  -- process.
 8            THE COURT:  I'm aware of the Halo test, and I'm aware
 9    of your three points --
10            MR. SELINGER:  Thank you.
11            THE COURT:  -- you argued before.
12            MR. SELINGER:  Thank you.
13            THE COURT:  If there's something new, I'll hear it.
14            MR. SELINGER:  With respect to the -- the induced
15    infringe -- induced infringement, again, Dr. -- and I'm pleased
16    to hear contributory infringement is now gone.  There are two
17    components.  It's -- it's both knowledge of the patents and
18    knowledge that the acts infringe.  Dr. Prucnal doesn't offer an
19    opinion on either of those and shouldn't be -- shouldn't be
20    allowed to.
21            And, finally, with respect to -- to use infringement,
22    whether Dr. Ying was -- was acting in his own or -- or during
23    work, he still was using a phone on T-Mobile, his personal
24    T-Mobile account.  And so that's permitted conduct, I submit.
25            And subject to that, every -- everything else has been
```

1    briefed.  The -- the Court will be dealing with -- with it in

2    other ways, so with the Court's permission, I will sit down.

3            THE COURT:  All right.  Thank you, counsel.

4            Thank you, counsel, for your argument in regard to

5    this motion with several parts and issues in it.  As I noted,

6    I've reviewed the briefing, and I've now heard the argument.

7    Let me give you the Court's ruling.

8            With regard to Dr. Prucnal's indirect infringement

9    testimony, the Defendant's motion is overruled.

10           With regard to his testimony on the

11   means-plus-function infringement and testimony on Doctrine of

12   Equivalents infringement, Defendant's motion is overruled.

13           I'll carry the motion for summary judgment on the

14   issue we've talked about and let that dispose of that issue,

15   whether it's in the motion for summary judgment or whether it's

16   raised in this motion.

17           With regard to Dr. Prucnal's testimony on offer to

18   sale, the Defendant's motion is overruled.

19           With regard to the Defendant's motion on Dr. Prucnal's

20   opinion on use infringement, that's overruled, as is his

21   opinion on level of ordinary skill.

22           With regard to Dr. Prucnal's opinion on willful and

23   knowing infringement, the Defendant's motion is granted.  The

24   Court finds no evidence to impute HTC's knowledge to HTC

25   America, and it does not seem reliable to infer that knowledge

1   of a parent patent automatically constitutes knowledge of all

2   children patents.  Effectively, the Court's ruling in this

3   regard precludes evidence or attempts to offer evidence

4   regarding willful infringement through this witness.

5         With regard to Dr. Prucnal's opinion which relies on

6   dicta from other MTel cases, the witness is precluded from

7   referencing any case or litigation other than this case.  To

8   the extent the witness's testimony comports or overlaps with

9   analysis or conclusions that might match what was said or

10  concluded elsewhere, that is not a problem, as long as he

11  doesn't attribute it to some other ruling from some other case.

12  He's not going to bolster his testimony by saying the Court

13  agreed with me in XYZ case elsewhere.  He's not going to

14  testify contrary to any of the Court's rulings, but the only

15  thing I am precluding him from are express attempts to link

16  or bolster his testimony to rulings from other litigation.

17  That would be an unfair bolstering, and I'm going to

18  preclude that under this motion.  Otherwise, his testimony is

19  allowed.

20        All right.  We'll next take up MTel's motion to strike

21  regarding Drs. Beckmann and Thomas.  It's Document 178.  But

22  before we move to that, counsel, we're going to take a short

23  recess.  The Court stands in recess.

24        COURT SECURITY OFFICER:  All rise.

25        (Recess.)

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:  Be seated, please.

 3              All right.  We'll next take up the Beckmann and Thomas

 4   motion from the Plaintiff, MTel.  Let me hear from the

 5   Plaintiff.

 6              MR. TAYLOR:  Your Honor, may I approach?

 7              THE COURT:  You may.  Go ahead.

 8              MR. TAYLOR:  Thank you, Your Honor.

 9              MTel's motion to strike presents numerous reasons that

10   the opinions of HTC's experts must be stuck.  To respect the

11   Court's time, MTel here focuses on only the most egregious.

12              First, Dr. Beckmann's written description and

13   enablement opinions rest upon an unreliable foundation.

14              Second, Dr. Beckmann does not apply the Court's

15   construction of the term "portion" in his Section 102 and 103

16   analysis.

17              And, third, Dr. Beckmann and Mr. Thomas'

18   non-infringing alternative opinions are the product of unsound

19   methodology and the fact that they rely upon incorrect and

20   highly prejudicial assumptions.

21              Turning to the first point, which is Slide No. 3,

22   Dr. Beckmann's written description and enablement opinions must

23   be struck for two reasons.  First, Dr. Beckmann's opinion is

24   nothing more than a straw man attack.  The patentee amended

25   Claim 1 of the '946 patent during prosecution to change at
```

1   least portions to a portion of the message.

2          HTC, however, rewrites the claim construction to

3   require that the user be able to specify multiple portions that

4   are noncontiguous to one another.

5          Your Honor, with this issue and this disagreement over

6   what it means to specify a portion, the parties have an 02

7   Micro dispute that must be resolved.

8          Dr. Beckmann and HTC then assert that the '946

9   specification does not support their expanded read.  In doing

10  so, Dr. Beckmann misapplies the law.  The law of enablement

11  provides that a single enablement -- excuse me, a single

12  embodiment provides a broad enablement for other embodiments.

13  That's the application of Fisher, 427 F.2d 883.

14         Dr. Beckmann agrees that one skilled in the art could

15  practice the claim to request a portion.  During his

16  deposition, Dr. Beckmann testified that he would say it would

17  be reasonable to say that that would be within the skill level

18  of a person of ordinary skill.

19         Moreover, Your Honor, HTC did not adequately

20  disclose -- HTC did not adequately disclose its Section 112

21  invalidity position.  On the screen, Your Honor, is a lot of

22  text, but it is the entire disclosure of HTC's 112 opinions in

23  its invalidity contentions.  HTC merely recites boilerplate

24  recitations of the standards of written description and

25  enablement and do not provide any specificity as to the actual

 1    theory regarding written description and enablement they have.

 2          Second, Your Honor, Dr. Beckmann's opinion must be

 3    struck with regard to his 102 and 103 analysis because

 4    Dr. Beckmann does not apply the Court's construction of the

 5    term "portion of a displayed message."

 6          The -- Dr. Beckmann concedes that the Kane reference

 7    does not anticipate the '946 patent because it does not specify

 8    anything other than the full message.  As Your Honor knows,

 9    this Court has construed portion to mean less than the entire.

10          Dr. Beckmann testified that he, and as stated in his

11    report, that he applied his understanding of how MTel was

12    asserting the term -- how MTel understood the term "portion" to

13    mean.  Your Honor, that is not the law.  MTel does not contest

14    or in any way believe that portion is less -- is anything other

15    than less than the entire, and MTel's infringement theory

16    reflects that.

17          Dr. Beckmann, in doing so, did -- did not apply the

18    Court's construction, and his 10 -- Section 102 and 103

19    analysis is, therefore, improper and must be struck.

20          Your Honor, I have additional slides regarding the --

21    Dr. Beckmann's opinions regarding the Samsung -- the ability

22    for HTC to implement the Samsung email application as a

23    non-infringing alternative.

24          Your Honor, I believe, and MTel is under the

25    impression that your previous rulings in the prior pre-trial

1   conference resolved this issue.  If the Court believes that

2   MTel is in error in this assumption, I will happily address

3   this issue.  However, I -- without that, I would -- I would

4   like to discuss Mr. Thomas' opinion.

5          Mr. Thomas' opinion must also be struck because he

6   relies on an unreliable source.  Dr. Thomas relies on Dr. Ying,

7   which was HTCA's corporate representative regarding the source

8   code functionality.  Specifically, Dr. Thomas relies on Mr. --

9   on Dr. Ying regarding the cost and effort involved to change

10  source code in the HTC devices.

11         Dr. Ying, as HTC's corporate representative, however,

12  testified that he had no knowledge whatsoever regarding source

13  code.  When he was asked, do you have an understanding of the

14  source code that operates or runs on the HTC branded phones, he

15  simply replied:  Nope.

16         You understand that the HTC branded phones do operate

17  running source code, correct?

18         No.

19         Nevertheless, he provides the basis for Mr. Thomas'

20  opinion regarding the ability of HTC to modify this source code

21  to provide a non-infringing alternative to what -- to MTel's

22  patent.

23         Thank you, Your Honor.

24         THE COURT:  Let me ask you before you sit down,

25  Mr. Taylor, is there agreement from both sides that there is an

1   02 Micro issue now raised requiring new claim construction that

2   hasn't previously been sought or given?  I was not aware of

3   that.

4           MR. TAYLOR:  There is not an agreement.

5           THE COURT:  And I don't necessarily view what you've

6   just argued as raising an 02 Micro issue, but I want to be

7   clear on the record about where the parties stand.

8           MR. TAYLOR:  There is not an agreement.  It is MTel's

9   position that the parties are taking contrary positions

10  regarding the meaning of a claim term and that that presents an

11  02 Micro issue.

12          THE COURT:  All right.  Mr. Selinger, briefly, where

13  is HTC on this?

14          MR. SELINGER:  On the 02 Micro issue, Your Honor?

15          THE COURT:  Yes, sir.  If you'll step to the podium,

16  please.

17          MR. SELINGER:  And HTC America's view on this is -- is

18  that there is not an 02 Micro issue.  The -- the dispute is

19  about application of -- of the term -- the entire limitation of

20  the claim, including words that -- that one -- one side wants

21  to ignore to a product.  And Dr. Beckmann took the entire claim

22  term and applied it.  So that's -- that's not a -- that's not a

23  claim construction dispute in -- in HTC America's view, Your

24  Honor.

25          THE COURT:  All right.  Thank you.

1          The Court doesn't view this as an 02 Micro situation.

2    The Court's claim construction is clear.  The parties are

3    precluded directly or through their witness -- and through

4    their witnesses from attempting to contradict the claim

5    construction order, both in its analysis and in its ultimate

6    constructions.

7          The Court's satisfied this issue has been dealt with,

8    and that previous directive should resolve this issue.  I will

9    tell you that it's the Court's view that HTC is on the right

10   side of this issue, not MTel.  And I'm going to expect the

11   parties to be guided by the Court's prior order on not

12   contradicting claim construction ruling in any fashion before

13   the jury.  But needless to say, I'm not persuaded that there is

14   a new issue not already raised and disposed of that implements

15   02 Micro in this case.

16         And with that, having heard argument from the

17   Plaintiff on this motion, let me ask for responsive argument

18   from the Defendant.

19         MR. SELINGER:  Thank you, Your Honor.

20         Let -- let me -- let me start first with the -- the

21   question -- the issue of a portion.  Dr. Beckmann applied the

22   Court's claim construction correctly.  This isn't -- he didn't

23   ignore it and in his analysis did not -- the genesis of this

24   fight and the reason that Kane was applied as anticipatory is

25   because of positions that MTel took in its infringement

```
 1   contentions, and -- and Dr. Prucnal has taken with respect to a
 2   retry button.
 3           If -- if -- if Dr. Beckmann gets on the witness stand
 4   and says I've applied this claim and I find that Kane meets
 5   every limitation, they're going to cross-examine him with a lot
 6   of -- with great glee if they're not trying to apply that -- a
 7   portion the same way to us.
 8           This isn't -- this isn't an in opt.  And -- and so I
 9   don't view that as a dispute over a portion.  It's -- it's
10   simply trying to make sure that the claim construction is
11   applied the same way by both parties.  And that's -- that's --
12   that's all there -- there is on that issue.
13           THE COURT:  Well, let me just --
14           MR. SELINGER:  Yes, sir.
15           THE COURT:  -- let me just say this.  As far as the
16   Court's concerned, the claim's been construed.  It's certainly
17   possible that the experts may disagree about the -- the
18   application of the Court's construction to the accused
19   products.  That's not unexpected.  But that disagreement as to
20   application of the claim -- of the Court's construction doesn't
21   raise an 02 Micro issue, in the Court's view.
22           MR. SELINGER:  Nor -- nor in my view, Your Honor.  Nor
23   in HTC America's view.
24           THE COURT:  All right.  Let's move on to the rest of
25   the motion.
```

1          MR. SELINGER:  Okay.

2          THE COURT:  And I'll look for that cross-examination

3    with glee when we get to the trial.

4          MR. SELINGER:  The next argument -- and I was --

5    frankly, I was scrambling a little bit to stay up with -- with

6    MTel's changes, has -- has to do with the written description

7    and enablement argument.  And the dispute here is very simple.

8    MTel has a case that it cited that says under those particular

9    facts -- In re -- I forget who -- who it was, but that in that

10   technology, a single example was enabling.

11         There's no disagreement, however, that the -- the

12   claim has to be enabled to its full extent.  MTel's prior jury

13   charge in -- in cases it's recently settled reflect that.  And

14   that is -- that is the law.

15         The dispute we have, again, is the application of the

16   law to particular facts.  Dr. Beckmann said:  Okay, in response

17   to a trivial hypothetical, yes, that is enabled.  That -- that

18   by itself, one of ordinary skill in the art would understand

19   how to -- how to make and use.

20         But with respect to the full scope -- and this is

21   about how the claims morphed over time and -- and how MTel is

22   applying claims from pager technology to downloading

23   attachments when the patent -- patent doesn't talk about email

24   or attachments or anything like that.  And -- and so the -- the

25   dispute is about whether the claim, as it's being applied

1    again, is -- is fully enabled.

2           And so, yeah, Dr. -- Dr. Beckmann came up with an

3    example of something that wasn't all that difficult that he

4    didn't believe was enabled.  And so that -- that -- that is --

5    is the enablement dispute.

6           And may I have one second, Your Honor, to step away?

7           THE COURT:  You may.

8           MR. SELINGER:  Thank you.  Let me -- let me turn last

9    to -- to non-infringing alternatives very briefly.

10          Dr. -- Dr. Ying was, in fact, the corporate

11   representative of HTC America, which is after all the

12   party's -- party's name in this case.  I keep hearing HTC from

13   others.  But putting that to the side, Your Honor, with -- what

14   Dr. Ying was asked do you -- do you sometimes talk to people

15   from HTC Corporation?  If you wanted -- if you were to -- if

16   you wanted to find out some information that you didn't know,

17   what would you do?

18          And he testified about what he would do.  And -- and

19   then this -- this design-around question came up.  And so

20   Dr. Ying did exactly what he had told MTel he would do when

21   faced with a technical question to which he didn't know the

22   answer.  And -- and that's what Mr. Thomas is relying on.

23          Now, is it hearsay?  Of course.  But it's reliable

24   hearsay.  And if -- and if MTel wants to cross-examine

25   Mr. Thomas about the reliability or lack, that -- that, to me,

1    is an issue for -- for trial.

2            And with that, I -- I think I've responded to each of

3    the -- the points that MTel has raised.

4            THE COURT:  Okay.

5            MR. SELINGER:  Thank you.

6            THE COURT:  Mr. Taylor, any short rebuttal?

7            MR. TAYLOR:  Extremely short, Your Honor.

8            Your Honor, I would like to clarify what I believe to

9    be an ambiguity raised by HTC's response, and that is to the

10   term "portion."  MTel understands that the Court does not view

11   an 02 Micro dispute to this issue, and MTel abides by the

12   Court's direction.

13           The term "portion" is important in two ways.  First,

14   the term -- the term -- excuse me, the term "portion" is

15   important in two ways with regard to MTel's motion to strike.

16           First, the term "portion" is important because Dr. --

17   Dr. Beckmann misapplied this Court's construction for portion

18   of the displayed message, which the Court construed as less

19   than the entire message.

20           MTel does not nor did MTel ever contend that there was

21   an 02 Micro dispute with regard to that aspect of the Court's

22   construction.  Rather, MTel contends that Dr. Beckmann's

23   opinion is improper and must be struck because he did not apply

24   the Court's construction.  He viewed the prior art references

25   and looked at it as transmitting the entire message.

 1              This is separate and apart from the other issue, which

 2    is Dr. Beckmann's written description and enablement opinions.

 3    Here, Dr. Beckmann -- this is where MTel did contend that there

 4    was an 02 Micro issue because the party -- there was a

 5    disagreement over portions versus portion, singular.

 6              The patentee amended the claim during prosecution to

 7    change from at least portions to a portion.  This -- HTC's

 8    Dr. Beckmann nevertheless requires the claim to have -- be --

 9    be -- excuse me, the user to be able to select multiple

10    portions, plural, which is not the claim term.

11              Regarding the preferred embodiment, MTel contends

12    that -- or, excuse me, the specification does fully enable the

13    preferred embodiment, and that is all that is -- that is all

14    that is required.  If all we have to do is enable the preferred

15    embodiment and Dr. Beckmann testified that, yes, one of skill

16    in the art would be able to specify a single portion for

17    retransmission, then MTel believes summary judgment on this

18    issue is appropriate.

19              THE COURT:  All right.  Mr. Selinger?

20              MR. SELINGER:  May I respond very briefly, Your Honor?

21              THE COURT:  Very brief -- very briefly, but do so from

22    the podium, please.  And during the trial when you address the

23    Court or the jury, please do so from the podium.

24              MR. SELINGER:  I will.  Thank you.

25              That's not what Dr. Beckmann said.  His example

1   doesn't say that.  What he did was he -- he defined a portion

2   that extended over two data packets.  It was a single portion.

3          Other -- other than that, I'll thank the Court and sit

4   down.

5          THE COURT:  All right.  Well, I've heard the parties'

6   arguments and considered their briefing in this regard.  Let me

7   give you the Court's rulings.

8          With regard to MTel's portion of this motion seeking

9   to strike undisclosed combinations and strike a failure to

10  disclose written description and enablement arguments, that's

11  overruled.

12         With regard to Dr. Beckmann not being a person of

13  ordinary skill in the art, that's overruled.

14         With regard to Beckmann's alleged misstatements

15  regarding law of enablement, that's overruled.

16         With regard to Dr. Beckmann's alleged misstatements

17  after-arising technology law, that could be cured by the

18  Court's jury instructions.  That's overruled.

19         With regard to Beckmann's misstatements concerning

20  means-plus-function law, I think that can be addressed by the

21  Court's rulings on HTC's Dauberts.  But Beckmann should be

22  limited to stating that there are embodiments in the

23  specification that are limited to error correction, but the

24  claim does not claim just error correction.

25         To the extent that's teed up in a remaining motion,

1    we'll take it up then.

2           With regard to whether HTC can use Samsung's system,

3    which was found non-infringing, I'm not striking the testimony

4    of Dr. Beckmann as far as it relates to software

5    design-arounds.  I am striking testimony from Dr. Beckmann as

6    far as it discusses the verdict of the prior trial.  We're not

7    going to talk about other litigation, other cases, and other

8    trials in this lawsuit.  I've said that before, and I'm

9    reiterating it now.

10          With regard to Mr. Thomas' relying on Dr. Beckmann's

11   testimony, as far as Mr. Thomas' testimony that would recite or

12   discuss the Samsung verdict or any verdict or decision in any

13   other case other than this case, that's stricken.  But I'm not

14   striking Mr. Thomas' testimony as far as it relates to Dr. Ying

15   or the software design-around described by Dr. Beckmann.

16          I don't believe MTel has shown that it would be

17   unreasonable for him to rely on Dr. Ying.  And that's certainly

18   something that could be addressed by vigorous

19   cross-examination.

20          With regard to whether Kane does not anticipate Claim

21   1 of the '946 because Kane discloses an entire message and not

22   a portion, I'm not striking that testimony.  To me, that's a

23   fact question that he can testify to and can be addressed by

24   cross-examination.

25          With regard to Beckmann's alleged contradiction of the

1   Court's claim construction order on retransmission, I'm not

2   striking Beckmann's testimony, and the motion is overruled in

3   that regard.

4         I'll note the Court's previous orders have held that

5   retransmission does not mean a message that is transmitted once

6   and then transmitted again, but it includes a message

7   transmitted for the first time as the second leg of a message

8   relay.

9         I'm certainly not going to allow any witness to

10  testify contradictory -- in a contradictory fashion to the

11  claim construction order.  But given the briefing and the

12  argument, I don't find that on its face, Dr. Beckmann's

13  testimony in this regard does that, and so I'm denying MTel's

14  motion.

15        Notwithstanding this motion, if anybody gets up there

16  and purports to do just that and contradict or attempt to

17  contradict the claim construction order of the Court, I will

18  not permit that to happen.  And I'll grant any appropriate

19  objections if, in fact, that's what happens in real-time before

20  the jury.

21        And with regard to the issue regarding Kane does not

22  anticipate Claim 1 because Kane discloses an entire message,

23  not a portion of the message, I'm not striking Beckmann's

24  testimony, and that portion of the Plaintiff's motion is

25  overruled.

1          And I believe that covers all of this pending motion.

2          And let's next take up HTC's -- HTC America's

3    corrected motion for partial summary judgment of

4    non-infringement, Document 170.  And let me hear from HTC on

5    this.

6          MR. SELINGER:  Thank you, Your Honor.

7          The -- the motion focuses on -- on the means for

8    transmitting limitation.  And I'm not going to go back over the

9    construction of means for transmitting.

10         The fact is we -- we have an undisputed summary

11   judgment record with respect to input switches 1516.

12         MTel -- looking at Undisputed Fact 3 and MTel's

13   response, MTel conceded that its infringement contentions for

14   that limitation did not identify a switch that allows the user

15   to request retransmission of messages corrupted by errors.

16   MTel conceded that its infringement expert referred to only and

17   based his literal infringement opinion for that limitation

18   on -- on a switch that allows the user to request

19   retransmission of messages, dot, dot, dot, dot, undisclosed --

20   Undisputed Fact 4 in MTel's response.

21         And MTel conceded in that same -- in Undisputed Fact 4

22   in its response that its infringement expert did not opine in

23   his report that accused devices have a switch that allowed the

24   user to request a message -- request retransmission of messages

25   corrupted by errors.

1           This -- there's no literal infringement -- and this

2    is -- this is about the defined term "switch" -- input switches

3    1516 in the patent.  And -- and Your Honor has seen, Column 15

4    defines what are the components.  Thank you, Your Honor.

5           So with respect to Claims 1 and 4, there's no literal

6    infringement of this 112(6) claim because the structure is not

7    identical.  The -- the infringement con -- neither the

8    infringement contentions nor the expert -- MTel's expert report

9    identified an identical structure that performs that.

10           And -- and, again, these are structure claims, Your

11   Honor, not app -- not method claims.  They're not -- they're

12   not about messages.  They're about structure to do certain

13   things.

14           There is --

15           THE COURT:  Let me stop you for just a second,

16   Mr. Selinger.  Let's go off the record for just a minute.

17           (Off the record discussion.)

18           THE COURT:  Back on the record.

19           Go ahead, counsel.

20           MR. SELINGER:  Thank you, Your Honor.

21           There is -- there is -- so there's -- there's no

22   literal infringement of Claims 1 and 4 because there is no

23   identity of structure because the accused HTC-branded products

24   do not have a switch that allows the user to request

25   retransmission of messages corrupted by errors.

1          The -- the alternative for literal infringement of a

2     112(f) claim is that there is structure that must have been

3     available at the time of the issuance of the claim, structural

4     equivalent.  And that's -- that's in Al-Site, Chiuminatta,

5     Welker Bearing.  I don't -- I don't think there's much of a

6     dispute that -- that the law for statutory equivalents is that

7     the structural equivalent must have been available at the time

8     of the issuance.

9          And the -- the accused structure is -- is not just a

10    dumb touchscreen.  It's a touchscreen.  The software that

11    generates an icon showing an email attachment is available for

12    downloading, and then software implementing either the IMAP,

13    I-M-A-P, or E-A-S mail retrieval protocols.  And -- and that

14    comes from -- from Dr. Prucnal's report in Paragraphs 277

15    through 280, and Undisputed Fact 7.

16         Now, for -- we've got two different operating systems.

17    We have Android -- accused Android phones and accused Windows

18    phones.

19         For -- for Androids phones, Dr. Prucnal's opinion

20    is that the displayed icon comes from something called HTC

21    Sense in Paragraph -- that's Prucnal Paragraph 276.

22         And MTel conceded in response to Undisputed Fact 7

23    that HTC Sense was first introduced in 2009.

24         Going further, MTel's expert stated at Prucnal

25    Paragraphs 169 through -- through 174 that the IMAP mail

1    retrieval protocol on which he relied was not even published --

2    not even published until March of 2003.  Again, it's Prucnal

3    169 through -- through 74.  And what he relied on was something

4    called an RFC, which means request for comments.

5        So something -- an RFC that was published in 2003

6    doesn't mean the technology was developed in 2003, just that

7    this request was published.

8        So bottom line is the -- the combination of

9    technologies on which MTel relies for literal infringement

10   under 112(f) was not developed until well after the patent

11   issued in 2 -- in 1998.

12       MTel in its -- Dr. Prucnal didn't rely on a reply

13   brief.  There are a lot of things in his report, a reply

14   button, retry button.  Pardon me.  Doctor -- there are a lot of

15   things in his report that he mentions his background or -- or

16   side.  He mentions a retry button in Paragraph 197, but his

17   infringement analysis and opinions start many paragraphs later.

18   And, frankly, there's good reason why he -- he mentioned it and

19   moved on.

20       More importantly, that button still functions only

21   within the framework of IMAP, according to Paragraph 197, which

22   Dr. Prucnal's report indicating it was not even published until

23   2003 is -- confirms is still after developed technology.

24       Referring briefly just to Windows devices, Dr. Prucnal

25   opined that HTC devices have supported an alternative mail

retrieval protocol called EAS since 2009.  Dr. Prucnal has not

offered any opinion, and there's no documents that have been

offered to show that EAS technology was -- was available, let

alone well -- well known in the art or known in the art as an

alternative prior to the patent issuing in May of 1998.

So with that said, there -- there is no literal

infringement of either Claims 1 or Claim 4.

Mr. Taylor -- not Professor Taylor, but Mr. Taylor who

is here today, attached two exhibits to a declaration in

response.  HTC America objects to those.  They were not

produced during discovery.  They're hearsay.  They're not

referred to in -- in Dr. Prucnal's report, and in -- they are

not relevant.

So they're -- they're not a proper part -- neither is

a proper part of the summary judgment record.

Let me turn briefly to judicial doctrine of

equivalents.  That -- in that -- that would capture after

developed technology.

MTel's response brief at Pages 12 and 15 did not argue

that it is barred by prosecution history estoppel from

asserting Doctrine of Equivalents under judicial construction

for -- for Claims 1 and 4.  MTel only sought to apply Doctrine

of Equivalents to after developed technology for Claim 8.

So HTC America is entitled to partial summary judgment

of no infringement of Claims 1 and 4, either literally or under

1      the Doctrine of Equivalents.

2              Turning to Method Claim 8, MTel is barred by a

3      prosecution history estoppel from asserting Doctrine of

4      Equivalents.  MTel does not deny that there's a presumption of

5      estoppel that applies against it and that it bears the burden

6      of rebutting the application of prosecution history estoppel.

7      It relies on a very narrow exception, the -- asserting that the

8      rationale underlying the amendment bears no more than a

9      tangential relation to the equivalent in question.

10              That -- that exception is not applicable for three

11      reasons.  First, MTel's brief at Pages 13 and 14 represent that

12      Dr. Prucnal's Claim 8 Doctrine of Equivalents opinion was an

13      alternative it would use only if the Court limited Claim 8 to

14      situations involving errors.  That hasn't happened, so it

15      should moot MTel's tangential relation argument.

16              Second, the Chimie case, 40 -- we cite 402 Fd.3d at

17      1383 -- precludes MTel from arguing on the tangential

18      relationship exception because MTel made an argument as in

19      Chimie, to avoid prior art that contained the equivalent in

20      question.  In particular -- and it's an attachment to our

21      brief, prosecution history, the Bates number ending 253, MTel

22      argued that Tsurumi, a reference, T-s-u-r-u-m-i, quote, is not

23      concerned with the retransmission of messages that may -- may

24      contain errors.  Thus MTel's Tsurumi disclaimer encompasses

25      messages of the type MTel here accuses of infringement.

1    Downloading attachments which do not contain -- do not contain

2    errors.

3          Third, while -- while MTel tries to rewrite history in

4    its -- in its characterization of what was said during

5    prosecution, what it actually said is not nearly as limited as

6    what it now argues.  And, again, referring to the brief or to

7    the prosecution history, pages ending in Bates Nos. 298 and

8    300, MTel argued first Claim 1, as amended, defines a mobile

9    unit comprising a combination of elements.

10          According to amended Claim 1, the mobile unit

11   includes, among other things, a switch actuatable and then

12   tying that to Claim -- to Method Claim 8 which was pending --

13   application Claim 10.  MTel argued new Claim 10 defines a

14   method for receiving and transmitting messages comprising a

15   combination of steps.  These steps recite acts similar to the

16   recitation -- recitations of the mobile unit defined by Claim

17   1.

18          Again, that's prosecution history, Pages Bates Nos.

19   ending in 298 and 300.  As in Felix -- it's 562 F.3d at 1184,

20   it's not tangential because the argument refers not just to the

21   one limitation but to other structure of the claims.

22          With that having learned, I will sit down, Your Honor.

23          THE COURT:  All right.  Let me hear a response from

24   the Plaintiff.

25          MR. MORT:  Ray Mort, Your Honor, for MTel.

1          THE COURT:  Proceed.

2          MR. MORT:  I think the first thing maybe to do is

3    reorient us to where exactly we are in this.  The claim term

4    here at issue is a means for transmitting, not the previous

5    element which is a switch actuatable to specified portion.

6          So the specifying has already occurred in the claim in

7    the previous element.  The means for transmitting, the only

8    action the switch is doing is activating the transmission of

9    the previously selected portion.

10          So with that, the parties agreed on what the function

11   was.  The Court properly identified the corresponding structure

12   as input switches 1516, transmit logic 1518, transmitter 1520,

13   and antenna 1502, and equivalents thereof.  We don't -- we do

14   not have the burden of finding identical structure.  We get

15   112(6) equivalent structures to the extent we need them.  We

16   are not arguing Doctrine of Equivalents for a

17   means-plus-function claim.

18          And, frankly, Doctrine of Equivalents, when applied to

19   means-plus-function claim, alters the function, not the

20   structures because you already get equivalent structures.  We

21   are also not argue -- arguing Doctrine of Equivalents for Claim

22   8.

23          So one of the recurring themes, to the extent the

24   Court is not already satisfied, I just want to briefly show the

25   Court some of the stuff that was in the Court's claim

1  construction order, in that the Defendant argued with respect

2  to the means for transmitting that the corresponding structure

3  should include a switch that allows a user or the user to

4  request retransmission of a message corrupted by errors.

5       Judge Payne rejected that when he issued his claim

6  construction order and said input switches.  And he made a

7  comment that the Defendant's proposed constructions -- and this

8  was with the claim as a whole -- might be interpreted to

9  improperly limit the claims to an error.

10      While the claims may cover a circumstance in which the

11 message may be corrupted by errors, it's certainly not limited

12 to that.  And it's improper to find structure to redefine the

13 recited function, especially in light of the fact that the

14 parties agreed what the recited function was.

15      And as the Court should know, the only necessary

16 corresponding structure necessary to perform the recited

17 function needs to be done.

18      With that, Your Honor, I think the -- the record shows

19 that HTC's motion for summary judgment should be denied.

20      THE COURT:  All right.  Thank you, Mr. Mort.

21      Final word, Mr. Selinger, anything?

22      MR. SELINGER:  The -- the final word, Your Honor, is

23 the Court's construction is that corresponding structure is,

24 quote, input switches 1516, end quote.  That -- that is defined

25 in Column 15 as a series of switches, one of which is the

1    switch that allows a user to request retransmission of a

2    message corrupted by errors.  It's just part -- it's -- it's

3    part of the structure.  It's -- it doesn't -- it's not the only

4    component of the structure.  It's part of it.

5         Thank you.

6         THE COURT:  All right.  Well, it appears to the Court,

7    having considered your argument and your briefing, that the

8    Court's defined function as a means for transmitting said

9    specified portion of said message, and that those words are

10   exactly from the claim itself.  And since the correct

11   definition of the function doesn't limit the claim to messages

12   corrupted by errors, the Court should not read them into the

13   claim as a switch that allows a user to request messages

14   corrupted by errors.

15        And as Plaintiff points out, even if that limitation

16   were imposed by the Court, there could still be a showing of

17   infringement with that narrowed or limited application.

18        The Court's persuaded that the Defendant has not

19   met its burden to show there's no material question of fact as

20   to this issue, and Defendant's motion for partial summary

21   judgment of non-infringement is denied.

22        Counsel, we're going to break for lunch, and when we

23   come back, we will take up the motions regarding Professor

24   Taylor and Dr. Kesan.  I'd like to have you back about 1:15,

25   and until that time, we stand in recess.

```
1              COURT SECURITY OFFICER:  All rise.

2              (Recess.)

3              COURT SECURITY OFFICER:  All rise.

4              THE COURT:  Be seated, please.

5              All right.  Let's take up next -- we'll continue the

6    pre-trial hearing in the MTel versus HTC matters.  Let's take

7    up next Plaintiff's motion to strike the expert report of David

8    O. Taylor.  That's Document 172.  Let me hear from MTel on

9    this.

10             MR. COHEN:  Thank you, Your Honor.  Ian Cohen for the

11   Plaintiff.

12             Much of this is briefed.  I will be brief, Your Honor,

13   and -- and focus on the key point here.

14             Mr. Taylor's report should be stricken for two reasons

15   that are almost one and the same.  One, it's not helpful.  Two,

16   it's not proper.

17             I think all the parties at this point agree that an

18   expert opining on the meaning of a contract is not for the

19   experts, it's for the Court.

20             The problem with Mr. Taylor's report is that is in

21   large part what he does.  The operative part of Mr. Taylor's

22   report is devoted to, one, walking through the chain of title

23   documents for the patents-in-suit.  And most specifically,

24   focusing in on the asset purchase agreement between SkyTel and

25   Bell Industries and the IP agreement between SkyTel and Bell
```

 1    Industries.

 2          We don't need an expert to opine on those.  One, we'll

 3    have MTel's corporate rep.  Two, there's nothing for an expert

 4    to opine on.  The key point that is lacking in Mr. Taylor's

 5    report is an application of facts to that law, i.e., the

 6    contracts.

 7          Comparing Mr. Taylor's report to Dr. Kesan's, what

 8    Dr. Kesan does is applies the facts to the asset purchase

 9    agreement and the IP agreement and the issue of control through

10    the definition of affiliate.

11          Most particularly, Dr. Kesan, opines on the Cellco

12    Partnership agreement.  And this is Section -- Subsections A

13    and B of Section 4.1 within the Cellco Partnership agreement,

14    which shows that, one, the conduct of the business -- as a

15    factual matter, the conduct of the business can't change absent

16    such a unanimous approval.  And, two, the -- the distribution

17    of assets can't change.  The company can't be sold, et cetera,

18    except with unanimous control.

19          These are key facts, among all the other facts of the

20    Cellco Partnership agreement.  These are facts that are not

21    opined upon or even mentioned in Mr. Taylor's report.  That is

22    the -- the key flaw in the report is that it essentially starts

23    and stops with the contracts themselves.

24          THE COURT:  Let's do this, Mr. Cohen.  Let's call this

25    gentleman Professor Taylor --

```
 1              MR. COHEN:  Yes.

 2              THE COURT:  -- and that way we can distinguish him

 3    from your co-counsel in the record.

 4              MR. COHEN:  Yes, Your Honor.  I meant no disrespect to

 5    either my co-counsel or to Professor Taylor.

 6              Now, HTC says that at a minimum, Professor Taylor's

 7    report is helpful because there are, quote, a sea of documents

 8    that the jury would otherwise have to wade through or the

 9    jury -- allowing Professor Taylor to speak as to these

10    contracts would allow the jury to avoid the, quote, lawyer

11    speak in the documents.

12              I'd submit, Your Honor, that far from a sea of

13    documents, we're dealing with a very small handful, two or

14    three, including the asset purchase agreement, the IP

15    agreement, and the Cellco Partnership agreement outlining all

16    the facts that show there is no control, so far from the sea.

17              And, two, these are not -- these are some of the most

18    accessible, I think, documents that a jury could be presented

19    with.  One, we're not dealing with the entirety of the asset

20    purchase agreement or the IP agreement.  We're -- with respect

21    to HTC's assertion that there is a license directed to Cellco

22    Partnership, we're talking about just a couple small provisions

23    within the IP agreement and the asset purchase agreement

24    specifically directed to the definition and the applicability

25    of affiliate as it pertains to control.
```

1          So they're, frankly, quite accessible.  They're not

2    like the legalese by any means.  And so we simply don't need

3    Professor Taylor to opine -- to walk the jury through those

4    couple of documents and say what they mean.  We can present

5    them to the jury if -- to the extent that they would be

6    admissible.

7          THE COURT:  Well, to the extent Mr. Selinger wants to

8    accept your advice on how he should present his case, he's free

9    to do that.  But I don't think he's obligated to do that.

10          MR. COHEN:  Well, certainly, Your Honor.  And I didn't

11    mean to suggest that, Your Honor.

12          THE COURT:  No.  But you're trying to tell me I should

13    keep it out because the other side doesn't need it.  The other

14    side is the master of its own case.  And if they decide it's

15    probative and helpful, as long as it doesn't violate the rules

16    of evidence or there's not some procedural or legal basis on

17    which it should be kept out, I'm going to give both sides the

18    freedom to waste your time as freely as you want to, and the

19    jury will decide if you've done that or not.

20          MR. COHEN:  Yes, Your Honor.  Thank you.

21          And it's -- what MTel's concern here is the vehicle

22    through which those documents would be presented to the jury,

23    and specifically whether Professor Taylor is an appropriate

24    vehicle for that venture.  And it's MTel position -- it's

25    MTel's position that it is not.

```
 1              THE COURT:  All right.  What else, Mr. Cohen?
 2              MR. COHEN:  That's it, Your Honor.  Thank you.
 3              THE COURT:  Let me hear a response from the Defendant.
 4              MR. SELINGER:  Good afternoon, Your Honor.  May I
 5   proceed?
 6              THE COURT:  You may, counsel.
 7              MR. SELINGER:  What -- what I struggle with, Your
 8   Honor, was -- and I -- and I believe this -- this is amenable
 9   to summary judgment, but I was -- I was trying to guess what
10   might happen.
11              MTel argued there are all these fact issues, and so I
12   shouldn't have summary judgment.  And so what -- what Professor
13   Taylor was trying to do was identify issues that might come out
14   as disputed issues of fact where he could help a jury.  He's
15   not offering legal opinions.  That's -- that's this Court's
16   province.  But -- but -- and while I hear counsel say, oh, just
17   a couple of legal terms, you know, Your Honor, that may be the
18   case for somebody that's been to law school and been out
19   practicing for a while, but -- but I don't think a jury
20   necessarily has the same grasp for -- for legal provisions, you
21   know, in -- in a complicated document.  And so I believe
22   Professor Taylor is competent, in the event the Court
23   identifies disputed issues of fact, to help the jury on -- on
24   understanding the documents.
25              I try -- I specifically didn't want him, and he -- he
```

1   agreed.  He didn't -- he's trying not to provide legal opinions

2   which are the Court's province.

3            And then a second -- and then he also -- he also

4   tried -- walk -- walks the jury through on some marking

5   evidence and -- and exhibits, again, not -- not offering legal

6   opinions but trying to help in an area that -- that people

7   generally don't have background and comfort.

8            And with that, I will sit down, Your Honor.  Thank

9   you.

10           THE COURT:  All right.  Do you have anything else to

11   add, Mr. Cohen?

12           MR. COHEN:  Yes, very briefly, Your Honor.

13           THE COURT:  Very briefly.

14           MR. COHEN:  The couple or three points that I'll add,

15   Your Honor, is that when it comes to contracts, those are a

16   matter of law.  They are a matter for the Court, not -- not

17   something that an expert should opine on or is needed to be --

18   opine on in this case.

19           It strikes -- the fact that HTC has hired an expert

20   with a JD to opine on these -- to opine on contract matters,

21   matters of law, and to put those -- that -- Professor Taylor on

22   the stand on those issues strikes me as no more normal than it

23   would be for HTC to put one of its counsel on the stand and

24   present contracts through -- through that vehicle.

25           THE COURT:  Dr. Kesan has a -- has a juris doctorate,

1    too, does he not?

2              MR. COHEN:  He does.  And -- but the key difference

3    there is that Dr. Kesan is applying facts to the law, the

4    contracts.  He is not starting and stopping with the contracts

5    themselves.

6              Now, admittedly, Your Honor, this is all perhaps

7    somewhat aberrational to have both Professor Taylor and

8    Dr. Kesan opining on these issues.  With respect to Dr. Kesan,

9    he was offered as a rebuttal to Professor Taylor's opinions on

10   the matter.

11             THE COURT:  All right.

12             MR. COHEN:  Thank you, Your Honor.

13             THE COURT:  Thank you.

14             Is there any reason, counsel, that the Court shouldn't

15   also take up at the same time the Defendant's motion to strike

16   with regard to Dr. Kesan, since he's offered as a rebuttal

17   witness to Professor Taylor?  Seems like to me these go hand in

18   glove with each other.  Let me hear from the Defendant on their

19   position with regard to Dr. Kesan.  We'll get all this on the

20   table at one time.

21             MR. SELINGER:  So -- so the answer to Your Honor's

22   question is I think the two can be dealt with at once.

23   There -- there are minor differences.  I think -- and the minor

24   difference -- I didn't move to strike all of Dr. Kesan.  I

25   moved -- he has a lot of paragraphs where -- where he walked

 1   through documents.  And that's what Dr. Taylor was -- Professor

 2   Taylor was doing.

 3          But what I did -- what I did was try to identify

 4   paragraphs in his report where he was offering legal opinions

 5   on contracts -- 75 to 81, 83 to 84.

 6          But -- and -- and then some other legal opinions on --

 7   on different rights, have made rights, which -- which I think

 8   the Court will probably -- may instruct the jury on.  And so

 9   the con -- in concept, the two are together.  I think if -- if

10   Dr. -- if Professor Taylor offered a legal opinion, that wasn't

11   the intent, and I don't think that Dr. Kesan should be entitled

12   to.

13          Last -- last comment, and then I'll sit down, is since

14   Dr. Kesan is a rebuttal to Professor Taylor, he shouldn't be

15   offering rebuttal opinions beyond what Professor Taylor opines.

16          And with that, I'll sit down, Your Honor.

17          THE COURT:  All right.  What's Plaintiff's position on

18   Dr. Kesan and Defendant's motion?

19          MR. COHEN:  Your Honor, MTel does believe there are

20   differences between the opinions with respect to both of them.

21   We think that neither -- I mean, perhaps most appropriate,

22   for neither one to opine on these issues.  And to the extent

23   that Professor Taylor was stricken, Dr. Kesan would follow --

24   would be withdrawn, as well, I think, or perhaps also be

25   stricken.

1          THE COURT:  In other words, just like lawyers tell the

2     juries all the time, if you'll just answer this first question

3     the right way, you don't have to answer anything else, right?

4          MR. COHEN:  Something to that effect, Your Honor, yes.

5          THE COURT:  Okay.  Thank you, Mr. Cohen.

6          Well, let me say this, counsel.  With regard to both

7     Professor Taylor and Dr. Kesan, I don't expect either of them

8     to directly interpret any license or contract.  I do expect

9     both of them to address the factual underpinnings of what might

10    result in a determination of an affiliate or control.

11          I don't expect either to testify about a set of facts

12    and their opinions as to those factual issues and then say and

13    this means as a matter of law, it is this or that.  It is the

14    Court's province solely and exclusively to instruct the jury on

15    what the law is.

16          That doesn't mean these two witnesses can't opine as

17    to the disputed facts and issues of who and who is not an

18    affiliate, and what does and doesn't constitute control are

19    inherently fraught with factual issues.  And I think it's

20    appropriate for both of these witnesses to address those within

21    the scope of their report.  And because they are experts, if

22    they want to offer an ultimate conclusion at the end based on

23    all of these factual considerations, I believe X is an

24    affiliate of Y, or I believe A does exercise control over B,

25    that's not exceeding the bounds of what they should testify to

 1   in my view.

 2          If they purport to lecture the jury on what the law is

 3   or in their professional legal opinion this means the contract

 4   means this, yes, that's going across the line.  That's going

 5   too far.

 6          But this is an area that seems to me to be clearly

 7   endued with factual disputes.  These two witnesses, I'm

 8   anticipating, will address those, give their view of how these

 9   alleged facts do and don't fit together, and give their

10   ultimate opinion about what the compilation of facts, as they

11   view it, means for the issues of being an affiliate or being

12   under the control of another, and, therefore, being or not

13   being licensed.

14          And as long as both of them stay within those

15   parameters and stay within the confines of their reports,

16   they'll be fine.  To the extent they go outside of those

17   boundaries, they won't be fine.

18          For purposes of the record, however, and in light of

19   this guidance that I've just given you, I'm going to deny both

20   motions to strike.  I'm going to allow both witnesses to go

21   forward, but I want both sides to employ the guidance and the

22   specific direction that I've given you with regard to these two

23   witnesses.

24          I do not know Dr. Kesan.  I know Dr. Taylor at SMU.  I

25   would be surprised if he's going to attempt to lecture the jury

1    on what the law is from the witness stand.  Just make sure you

2    tell him -- tell both of them not to.  And if they do, I'll

3    take care of it, but I don't expect that to happen.

4          But given the factual disputes that underlie these

5    ultimate determinations of control and affiliate status, I

6    think witnesses with their type of expertise are appropriate.

7    And that's how I envision their respective testimony to be

8    given.

9          Anybody have any questions about what the Court

10   expects in regard to these two witnesses?

11         MR. COHEN:  No, Your Honor.

12         MR. SELINGER:  No, Your Honor.

13         THE COURT:  All right.  For the record, both motions

14   are denied.

15         There is apparently a third motion regarding Dr. Kesan

16   and validity.  Given what we've covered, is there a need to go

17   in that -- into that in detail, or is the guidance I've given

18   you adequate?

19         MR. SELINGER:  There's -- there's one -- there's one

20   issue, Your Honor, that we've not addressed.

21         THE COURT:  Okay.

22         MR. SELINGER:  And that is in -- in three paragraphs

23   of his rebuttal validity report, Dr. Kesan refers to the

24   testimony of a Samsung expert who was deposed in the second

25   Samsung case, and he relies on -- on snippets from it.  That --

1   the transcript was not produced to me, to HTC America -- we

2   weren't in that case -- until after we -- we filed the opening

3   motions to strike those parts of Bornstein's testimony.

4        And the -- MTel -- MTel says now that the evidence

5   Dr. Kesan cites is highly probative in its opening brief at

6   Page 1.  Dr. Bornstein wasn't ever identified by MTel as a

7   person with relevant knowledge.  It -- it just popped up.  I

8   wasn't invited to the deposition.  No one from HTC was.

9        MTel says, well, Dr. Beckmann knew about Dr. Bornstein

10  in the prior case, but Dr. Beckmann was under a protective

11  order in the prior case.  He could not and did not communicate

12  any of that kind of information to me.

13       And then MTel says, well, you -- you limited your

14  request for -- for third-party expert deposition transcripts

15  to -- to transcripts MTel -- to experts MTel planned to use in

16  this case.  Putting to one side whether having one expert rely

17  on another expert as an expert used in this case, I did

18  compromise a discovery dispute.  But in part that was -- that

19  was based on MTel's representation of -- of undue burden and

20  producing third-party expert and --

21       THE COURT:  When, if at all, did HTC request these

22  full transcripts?

23       MR. SELINGER:  Early on in this case, I sent a letter

24  asking for all expert depositions in all cases.  We -- we

25  then -- and I will concede, Judge, we -- we got into a

 1   discovery dispute.  We had a meet and confer, and MTel said

 2   it's burdensome because they talked about third-party

 3   discovery.  Dr. Bornstein and the others weren't identified

 4   as -- as a person with relevant knowledge and --

 5          THE COURT:  Let me ask it this way, counsel.  Once you

 6   saw the snippets, as you called them, from the prior deposition

 7   and you realized you didn't have the full prior depositions,

 8   did you specifically request those complete transcripts of

 9   those depositions?  And if you did and didn't get them, why was

10   there not a motion to compel filed with the Court to require

11   them to be produced, rather than come in at pre-trial and say I

12   didn't get them, and, therefore, they shouldn't be able to use

13   this?

14          MR. SELINGER:  So -- so to answer your question, the

15   expert report we're talking about is rebuttal validity report.

16   Discovery had closed.  Motion deadlines were gone.  And I saw

17   at that point that -- that there were three snippets used.  And

18   I thought my only -- my only option -- it only relies on --

19   Kesan only -- Dr. Kesan only relies in three places, three

20   paragraphs out of 200 on -- on the third-party expert.  So I

21   thought the best -- the best solution was just to object to him

22   relying on unproduced evidence.

23          THE COURT:  Well, the problem with that decision is by

24   the time it gets to me, we're on the eve of trial, whereas if

25   when you were presented with those snippets, whether you were

1    beyond the discovery deadline or not, you could have made a

2    request to the other side, and if they didn't meet that

3    request, you could have come to the Court and asked to reopen

4    and deal with the issue then.  But by allowing all the time

5    between then and now to pass, we're in a different posture

6    altogether than they would have been if this had been raised

7    earlier in the case.  And that leaves the Court with very

8    little latitude other than an all or nothing-type decision.

9          And I'm not saying you didn't consciously make that

10   choice.  I'm not at all sure that was a wise choice or an

11   appropriate choice.  I mean, if you're going to complain now

12   that all you got were three snippets and you should have seen

13   the whole depositions, you should have asked for the whole

14   depositions when you got the snippets.  And if you didn't get

15   them, you should have come to the Court if you thought they

16   were important.

17         But to not do that and then during pre-trial on the

18   eve of -- or in very close proximity going to trial to say I

19   never got them, therefore, they should be excluded from

20   testifying to this is not a successful strategy in most cases,

21   Mr. Selinger.

22         MR. SELINGER:  May -- may I respond briefly, Your

23   Honor?

24         THE COURT:  Please.  Please.

25         MR. SELINGER:  When I objected, MTel did provide me

1    with the full transcripts.  The -- the -- my problem with that

2    is we had already taken positions -- we had already made

3    strategy decisions based on opening expert reports that were

4    not easy or impossible to undue.  So it wasn't just a matter

5    of -- of saying, oh, I just need these.  It -- to me, it was

6    wait until I was locked in and then say, well, oh, we forgot

7    this very -- we forgot this -- this highly probative witness,

8    and that's just not fair.

9          THE COURT:  Well, that's -- ultimately, that's what

10   I'm trying to decide, what is and what is not fair in -- in

11   relation to what they did and what you did in response to it.

12         Let me hear -- let me hear MTel's side of this.

13         MR. TAYLOR:  Your Honor, Dr. Bornstein was an expert

14   in a prior case as an invalidity expert.  His deposition

15   occurred on March 2nd, 2016.  Dr. Kesan's validity rebuttal

16   report was on April 4th, 2016.  We turned the snippets of

17   Dr. Kesan's validity -- excuse me, Dr. Bornstein's deposition

18   transcript over roughly within a month of the time it occurred.

19         We do not believe that this was unduly prejudicial,

20   which is what HTC makes its motion to strike under, Federal

21   Rule of Evidence 403.

22         THE COURT:  Did you get a request from HTC upon

23   receipt of those snippets from Dr. Bornstein's deposition to

24   release or deliver the entire depositions?

25         MR. TAYLOR:  No, Your Honor, we did not.  And

1   furthermore, during Dr. Prucnal's deposition, opposing counsel

2   requested portions of Dr. Prucnal's prior expert reports in

3   related matters which we did produce.  So there was an open

4   line of communication wherein counsel for HTC requested

5   documents, and we produced them in response to that request.

6   We never received any request until -- actually, Your Honor, we

7   never received any request.  When we received HTC's motion to

8   strike and saw the substance thereof, we, on our own

9   initiative, produced the entire transcript.

10          THE COURT:  Anything else, Mr. Taylor?

11          MR. TAYLOR:  No, Your Honor.

12          THE COURT:  Anything further on this, Mr. Selinger?

13          MR. SELINGER:  No, Your Honor.

14          THE COURT:  Okay.  Defendant's motion to strike

15   portions of the expert report on Jay Kesan regarding validity

16   of the '946 and the '428 patent -- that's Document 174 -- is

17   denied.

18          All right.  Counsel, unless I overlooked something,

19   those are all of the pre-trial matters I have set for argument

20   this afternoon.  I'll expect to see you back here on the 10th

21   of August.

22          It's my understanding that what we have left in the

23   nature of potential disputes for pre-trial resolution are the

24   pre-admitted exhibits, which I'm going to direct that you

25   diligently meet and confer and work together toward in hopes

1   that we can minimize any ultimately surviving disputes on

2   exhibits.  But I anticipate taking that up at our next

3   pre-trial.

4        If there are going to be deposition designations

5   during the first day of trial, then I'll need to know about

6   those at the next pre-trial so that we will have plenty of time

7   to get them resolved before Day 1 of the trial.

8        Other than those two categories, is either side aware

9   of other unresolved pre-trial matters that the Court needs to

10  take up the next time we meet?  I want to make sure we don't

11  overlook anything.  Clearly that's what I have on my list.  If

12  anybody knows of something else, please let me know.

13       MR. SCARDINO:  Nothing further from the Plaintiff,

14  Your Honor.

15       MR. SELINGER:  Your Honor, I believe there -- there

16  are three things that are pending.  Two -- two of them

17  Plaintiff objected to a -- the claim construction ruling in the

18  '428 patent.  HTC America objected to one of the claim

19  construction -- Rs -- R and Rs with respect to the '946.

20       And then MTel still has pending a motion for leave to

21  amend the protective order with respect -- which I think is --

22  is directed solely at -- and issues relating to the '428

23  patent.

24       MR. TAYLOR:  That is correct.  It relates only to the

25  '428 patent.

1          THE COURT:  What's -- well, with regard to any matters

2     that are in the posture of a report and recommendation from the

3     Magistrate Judge, I'll take those up before you all return, and

4     I'll get you rulings on those.

5          With regard to any issue on the protective order, I

6     would assume that's something both sides are going to resolve

7     between them.  If it needs to be presented to me, is it

8     necessary to be presented before we meet next?

9          MR. TAYLOR:  No, Your Honor, it is not.

10          THE COURT:  All right.  Well, I'll direct both sides

11     to diligently meet and confer on that issue, and I would assume

12     reasonable minds can work through that -- that protective order

13     issue.  But if not, I'll expect to hear about it at the next

14     time we meet for pre-trial matters.

15          I am going to direct that -- let's see, I told you all

16     August the 10th, which is a Wednesday.  Not later than noon on

17     August the 8th, both sides should communicate with the Court by

18     way of my assigned law clerks and let me know if there are

19     issues on this protective order that still need to be heard by

20     the Court.  Hopefully, you will be communicating that there are

21     areas of agreement and things don't need to be taken up.  But I

22     want a status report telephonically from both sides to the

23     Court's law clerks no later than noon on Monday the 8th in

24     advance of our next pre-trial hearing on the 10th.

25          MR. TAYLOR:  Your Honor, we -- we will withdraw the

1  motion to supplement the protective order at this time.

2          THE COURT:  All right.  Well, that takes care of that.

3          MR. TAYLOR:  Yes, it does, Your Honor.

4          THE COURT:  I still want a report by Monday at noon on

5  the 8th on whatever else is out there.

6          MR. TAYLOR:  Yes, Your Honor.

7          THE COURT:  All right, counsel, those are the Court's

8  rulings.  I intend to file written orders memorializing what

9  I've given you from the bench, but quite honestly, we are one

10  month away from jury selection and trial today.  I felt you

11  were entitled to direct and prompt guidance.  Whether you like

12  it or not, I can't say, but I think you're entitled to it.

13  You're better armed going forward knowing where the Court

14  stands on these issues than waiting a week or 10 days to get a

15  written ruling.

16          That completes pre-trial argument for this afternoon,

17  counsel.  This hearing is concluded, and you are excused.

18          COURT SECURITY OFFICER:  All rise.

19          (Hearing concluded.)

20

21

22

23

24

25

1                        CERTIFICATION

2

3           I HEREBY CERTIFY that the foregoing is a true and

4   correct transcript from the stenographic notes of the

5   proceedings in the above-entitled matter to the best of my

6   ability.

7

8

9    /S/ Shelly Holmes                      7/21/16
     SHELLY HOLMES, CSR-TCRR                 Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25